UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| STEVE and ALLISON GARRY,<br><br>Plaintiffs,<br><br>vs.<br><br>HOMELAND CENTRAL INSURANCE COMPANY, formerly known as HAWKEYE SECURITY INSURANCE COMPANY,<br><br>Defendant. | CIV. 03-4019<br><br>**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF DR. MICHAEL GRAY** |

Defendant Homeland Central Insurance Company, f/k/a Hawkeye Security Insurance Company ("Hawkeye"), submits this Brief in Support of its Motion to Exclude Testimony of Dr. Michael Gray based on Federal Rules of Evidence 702 and the principles embodied in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Dr. Gray conducted clinical medical evaluations of Plaintiffs Steve and Allison Garry (the "Garrys") at his office in Benson, Arizona and reviewed some of their medical records on or about November 19, 2002, some four months *after* the Garrys abandoned the home and personal property at issue in this case. Dr. Gray's only communication with the Garrys prior to November 2002 was a ten to fifteen-minute telephone conversation in late July 2002 with Allison Garry, during which he advised the Garry family to abandon their home and the personal property in the home behind. Dr. Gray gave that advice based on Ms. Garry's assertion that mold had been detected in her home and that her family had experienced a number of medical illnesses while residing in the home. He did not review any of the Garrys' medical records or any results from any environmental or industrial hygiene tests conducted in the home before giving Ms. Garry that advice.

If allowed to testify, Dr. Gray is expected to opine that various of the Garrys' medical conditions were caused by exposure to mycotoxins produced by mold in their home. The Garrys presumably will argue that, based on Dr. Gray's opinions, they acted reasonably in abandoning their home and personal property. Dr. Gray's proposed testimony that various of the Garrys' medical conditions were caused by mycotoxin exposure in their home should be excluded under *Daubert*, because it is not based on any valid scientific methodology and, therefore, is not reliable. In any event, Dr. Gray's opinions should be excluded because they do not "fit," and are not relevant to, the insurance coverage matters at issue in this case—whether the Garrys' home and personal property was damaged by mold and whether the dominant and efficient cause of that mold was a covered event or peril under the policy (the alleged leaking toilet in the master bedroom of the Garrys' home).[1]

## I. Factual Background

The Garrys allege that a leak in the toilet of their master bedroom in 1999 caused mold to grow and be dispersed in their home. In 1999, the Garrys fixed the leaking toilet, allegedly cleaned the mold that was caused by the leaking toilet, and repaired water damage to their home. In July of 2002, the Garrys experienced a sewer backup in the basement of their home. The Garrys notified Hawkeye of a sewer backup claim shortly thereafter. Hawkeye denied coverage, because the Garrys' insurance agent, Gene Loos, failed to request that a rider or endorsement be added to the policy to provide coverage for sewer backup. In late August 2002, the Garrys orally notified Hawkeye of a mold claim that they alleged related to the toilet leak first detected in

[1] At his recent deposition Dr. Gray stated that he has not yet completed his analysis of the Garrys' medical conditions, that he is "working on finalizing a report on medical causation…in greater level of specificity than has been reflected [in the April 19, 2004 report he has rendered in this case]…", and that the additional opinions he expects to generate may relate to this case, as well as to the personal injury litigation that the Garrys are contemplating filing. Hawkeye reserves the right to object to any additional opinions or reports generated by Dr. Gray.

1999.[2] Prior to notifying Hawkeye of the mold claim, however, the Garrys abandoned their home and personal property on or about August 1, 2002, based on advice that Dr. Gray gave to Allison Garry in a ten to fifteen minute telephone conversation in late July 2002. (A. Garry Dep. (8/31/2004) at 18-22 (Docket #164, Affidavit of Cheryle Wiedmeier Gering dated October 5, 2004, Ex. B).)

Dr. Michael Gray is a medical doctor whom the Garrys retained in this case to provide opinions about their alleged illnesses and whether those illnesses were caused by exposure to mold in their home. (*See* Gray Report (Affidavit of Mitchell Peterson ("Peterson Aff.") Ex. T, submitted contemporaneously with this brief).) Dr. Gray practices medicine in Arizona. (Gray Dep. at 5 (Peterson Aff. Ex. S).) While Dr. Gray did not specifically recall when he first spoke to the Garrys concerning their home and medical conditions, he testified at his deposition that his advice to the Garrys to leave their home would have been based on what the Garrys reported orally to him, and not on any medical records or scientific reports. (*Id*. at 22-23.) Dr. Gray admits that he did not base his advice to the Garrys on medical records, scientific evidence, mold sampling, or any information other than Ms. Garry's comments in their telephonic conversation. (*Id*. at 24-25.) Indeed, the Garrys did not meet with Dr. Gray or provide him with any their medical records until November 2002, approximately four months after Dr. Gray advised them to abandon their home and personal property. (*Id*. at 16-17, 25.) Since that visit in November 2002, Dr. Gray has not clinically evaluated or met with the Garrys. (*Id*. at 29.) Although his report contains various opinions concerning the causation of the Garrys' medical conditions, Dr.

---

[2] Hawkeye filed a motion for summary judgment asserting that coverage for the mold claim is barred due to late notice. In that motion Hawkeye contends that the Garrys were aware in 1999 of the presence of water damage and mold from a leaking toilet, but failed to provide notice of any claim at that time. Hawkeye's motion is pending before the Court. The facts set forth in the first paragraph of this section of this brief are set forth in more detail in that motion.

Gray admits that he is still "working on finalizing a report on medical causation" that may relate to this case. (Gray Dep. at 106-07.)

**Summary of Dr. Gray's Credentials and Opinions**

Despite his claimed expertise with respect to mold-related health problems, Dr. Gray admits that prior to 2004 he had never authored or co-authored any peer-reviewed publication dealing with the alleged health effects from mold exposure:

> Q. So prior to 2004, is it fair to say that you have not coauthored or authored any publication, peer-reviewed publication, that relates to the methodology and analysis that you've employed in this case and other cases where mold exposures are alleged?
>
> A. I think that's correct.

(Gray Dep. at 50-51.) Dr. Gray also admits that he does not have a doctorate degree in epidemiology, is not a board-certified toxicologist, is not a medical board-certified pulmonologist or immunologist, and has not earned any advanced degrees in microbiology. (*Id.* at 52-53.) Dr. Gray does not have a doctorate degree in the field of mycology, which is the field of studying and evaluating fungal and mold-related illnesses, and he is not a certified industrial hygienist. (*Id.*) Dr. Gray is not medical board-certified in internal medicine, and failed the test the only time he took it in 1984. (*Id.* at 53-54.) Dr. Gray also has had his admitting privileges suspended or withheld at two hospitals in the 1990s. (*Id.* 54-56.) Further, Dr. Gray has been disciplined by the Arizona Medical Board. (*Id.* at 56-57.)

Dr. Gray also has been precluded from providing expert testimony in other cases involving mold or other alleged chemical exposures. (*Id.* at 35-38, 46-47.) In one of those cases, *Cronshey v. SPK LTD and Luna Corp., Inc.* (District Court, Dallas, Texas), the trial court precluded Dr. Gray from testifying about any alleged association or causal connection between mold exposures and many of the medical conditions that Dr. Gray is purporting to testify about

in this case, such as "mixed mold mycotoxicosis" and its immunologic, neurological, and pulmonary effects. (*Id.* at 37-38.)

In his report in this case, Dr. Gray diagnosed Allison Garry with "mixed mold mycotoxicosis with features of a) severe small airway obstruction, b) proinflammatory immune toxicity including evidence of 1) hyperactivation, 2) immune suppression, 3) increased levels of autoimmune activity, particularly relating to her central and peripheral nervous system, 4) interstitial cystitis, and 5) Crohn's disease, c) dermatomycosis [and] d) toxic encephalopathy with both electrophysologic and cognitive deficits." (Gray Report at 1.) Similarly, Dr. Gray has diagnosed Steven Garry as "suffering from mixed mold mycotoxicosis with features of a) immune toxicity (13/18 mold congruity factors positive) including hyperactivation, simultaneous suppression, and increased levels of autoimmunity, b) toxic encephalopathy, c) mild small airways obstruction, d) rhinosinusitis and e) situational depression casually related to his decremental health status." (*Id.*; *see also* Gray Report) Significantly, Dr. Gray admits that neither of the Garrys have any mold-related allergies. (Gray Dep. at 102-04.)

Although Dr. Gray has diagnosed the Garrys with various conditions which he asserts resulted from exposure to toxic substances, referred to as mycotoxins, from molds in their home, there is no evidence in this case that any molds in the Garrys home ever produced any mycotoxins in the air or on surfaces of their home while the Garrys resided there. Dr. Gray concedes that the testing done in the Garrys' home in late July 2002, a few days before they abandoned their home, did not report the presence of any mycotoxins. (*Id.* at 67-69.) Moreover, Dr. Gray admits that he cannot quantify the amount or dose of mycotoxins to which he believes the Garrys were exposed while residing in their home. (*Id*. at 72.) Dr. Gray also does not recall

whether Allison Garry told him when they spoke in July 2002 that testing had been done in the home to determine whether mycotoxins were present. (*Id*. at 47-48.)

According to Dr. Gray, Plaintiffs were also exposed to toxic bioaerosols, which include gray water-related gram-negative organisms, which Dr. Gray explained could have come from a sewer backup. Those bioaerosols have similar and overlapping effects as the "toxigenic mold" to which he believes the Garrys were also exposed. (*Id*. at 58-60.) Thus, it is clear from Dr. Gray's own testimony that the Garrys' alleged symptoms could be explained by their exposure to gray water-related gram-negative organisms:

> Q. For example, in your diagnosis, when you go on, next two paragraphs, you give a general diagnosis regard to Allison Garry. And I'm just going to refer to it as your diagnosis of mixed mold mycotoxicosis with features of, and you've named three or four or five different things. Are any of those conditions also affected or related to an exposure -- affected by or related to exposure to gray water-related gram-negative organisms?
>
> A. I'm just trying to see which one.
>
> Q. I'm talking about Allison Garry now.
>
> A. Yeah. There can be a triggering of a proinflammatory response from exposure to bioaerosols containing gram-negative organisms, however -- so, I mean, it can be a contributing factor to some of the proinflammatory effects.
>
> Q. With respect to Mr. Garry, would the same hold true in terms of your diagnosis of the diagnosis you gave for him and the various features of it, would those features also have some relationship to or be affected by gray-water related gram-negative organisms?
>
> A. Again, possibly.
>
> Q. And these are organisms we're talking about from several sewer backups that they refer to in their summary, correct? Right, this is where they come from?
>
> A. Yes. That is -- the material associated with the gram-negative bioaerosols in relation to gray water, again, represent a potential infectious hazard. They also represent potential inflammatory hazard.

(*Id*. at 60-61.)

Dr. Gray further discussed the significance of gray water-related gram-negative organisms as follows:

> Q. Do these conditions that are referred to in the symptom profile, do they have multiple causes?
>
> A. The general symptom audit that is reflected by his responses target symptoms that result from multiple organ system inflammation or inflammatory processes, and inflammatory processes in multiple organ systems can be triggered by a variety of different conditions.
>
> Q. Including gray-water organisms, right, among other things?
>
> A. Gray-water organism exposure will aggravate the inflammatory processes in a general sense, just as flu-like syndromes do. They reflect the immune system's response to antigenic stimuli in a general sense.

(*Id.* at 100-01.)

In addition to failing to identify any objective evidence showing mycotoxins being present in the Garrys' home when they abandoned it, Dr. Gray also noted in his report that Steven Garry had other possible sources of mold and mycotoxin exposure outside of his home:

> Q. On page three of your evaluation for Mr. Garry, could you go to that, sir, page three of that evaluation report. Under paragraph entitled workplace hygiene and habits there's a reference to testing having been done, air testing, presumably, or some kind of testing done of his workplace. Do you see that?
>
> A. Yes.
>
> Q. And it said that the testing yielded evidence of, quote, moderate levels of mold contamination in the crawl space under his office, with Stachybotrys having been found to be present. Do you see that?
>
> A. Yes.

* * *

Q. All right. Then you also say there was subsequent testing done after the remediation in his office, the spore count was still elevated with Stachybotrys. Do you see that?

A. Yes.

* * *

Q. And you state, quote: This nonetheless raises concern about the continuing contamination in Mr. Garry's workplace environment. It should be noted that although no spores were found in the interior of the building, there was concern for the possibility of mycotoxin penetration nonetheless. Do you see that?

A. Yes.

Q. Did you recommend to Mr. Garry in this meeting in November of 2002 that he should leave his office or abandon it or evacuate it?

A. Yeah, I don't remember what the nature of the conversation was with regard to his office, but -- so I just don't recall what was said.

(*Id*. at 87-89.)

In addition to Steve Garry's work environment, Dr. Gray also noted in his report that the air outside the Garrys' home was a possible source of mycotoxins because of agricultural activities in the general area of the subdivision, as opposed to any water intrusions in the home:

Q. Those agricultural activities, or his exposure to those, would have been another source of his potential mold exposure, correct?

A. Again, there isn't a lot of detail there, and so I can't really draw much in the way of conclusions, except to say that soil that is disturbed by either agricultural activities or wind are a contributing factor to the ambient air conditions which we talk about when we talk about ambient mold exposure.

Q. And those ambient mold exposures can get in the home when the windows are opened of the home, correct?

A. Correct.

(*Id*. at 95-96.)

**Dr. Gray's Methodology Is Subject to Substantial Criticism As Unreliable.**

Along with this Brief in support of Hawkeye's motion to exclude Dr. Gray's testimony, Hawkeye submits the Affidavit of Andrew Saxon, M.D. (Saxon Aff. (Peterson Aff. Ex. U).) Dr. Saxon's Affidavit chronicles his expertise in the field of mold-related illnesses and immunology. Dr. Saxon's experience in this field is vast and includes the following highlights: (1) Dr. Saxon is the Chief of the Division of Clinical Immunology and Allergy at UCLA School of Medicine and Director of UCLA's Asthma, Allergy, and Immunologic Disease Center; (2) Dr. Saxon is board-certified by the American Board of Allergy and Immunology, the Board of Clinical and Diagnostic Immunology, and the American Board of Internal Medicine; (3) Dr. Saxon has published in excess of 150 peer-reviewed scientific papers in the field of immunology; (4) Dr. Saxon is editor-in-chief of Clinical Immunology, the official journal of the Clinical Immunology Society; (5) Dr. Saxon either currently serves or has served on the editorial boards for Journal of Clinical Immunology, Clinical Research, Journal of Allergy & Clinical Immunology, and Disease Markers; and (6) Dr. Saxon has distinguished himself in his professional career as he was involved in the first reporting of the disease now known as AIDS in the New England Journal of Medicine. (Saxon Aff. ¶¶ 1-8.)

Moreover, Dr. Saxon is one of the three authors of the officially adopted Evidence Based Statement - Position Paper concerning human health effects associated with mold exposure issued by the American College of Occupational and Environmental Medicine, the largest such organization in the United States. (Saxon Aff. Ex. 3 (referenced as *Hardin, BD, Kelman, BJ, Saxon, A. Adverse human health effects associated with molds in the indoor environment. J Occup Environ Med 2003 May;45(5):470-8*).) That position paper discusses how molds and other fungi may adversely affect human health through three processes: 1) immune reactions to

molds best exemplified by allergic reactions to molds, 2) infection with molds, and 3) direct toxic effects of mold metabolites on the host.

In his affidavit, Dr. Saxon exposes the critical shortcomings of the methodology and principles upon which Dr. Gray's opinions are based and he explains how Dr. Gray's opinions are not based on valid scientific knowledge. Dr. Saxon is familiar with Dr. Gray's clinical findings based on the examination of the Garrys in November 2002 and he has reviewed the Garrys' medical records that have been produced in this case to Hawkeye. (Saxon Aff. ¶ 11.) Based on that review and analysis, Dr. Saxon has concluded the following:

> Dr. Gray clearly fails to follow generally accepted methods and to use the overall scientific method and his opinions cannot be relied upon….As discussed in detail below, Dr. Gray's methodology and approach to mold-related illness is far outside the bounds of the accepted medical and scientific practice.

(*Id.* ¶ 13.)

Following his general observation that Dr. Gray's opinion is unreliable, Dr. Saxon discussed in detail the flaws of Dr. Gray's opinions in this case. Specifically, Dr. Gray has not considered the possibility of allergic antibodies from other environmental allergens in his evaluation of the Garrys and in his conclusion that the Garrys' medical symptoms were caused by mold exposure in their home. (*Id.* ¶ 16.) He also noted that the Garrys have medical conditions predating any alleged mold exposure in their home and were found not to be allergic to the molds at issue in this case. (*Id.* ¶¶ 16, 17.)

Dr. Gray's erroneously assumes that all toxigenic molds capable of producing mycotoxins in the Garrys' home actually produced mycotoxins.

> Some species of fungi, including some molds, are known to be capable of producing secondary metabolites referred to as mycotoxins, some of which find valuable clinical use in medical practice. While some molds can produce mycotoxins, the amount (if any) and type of mycotoxin

> produced is dependent on a complex and poorly understood interaction of factors that probably include nutrition, growth substrate, moisture, temperature, maturity of the fungal colony, and competition from other microorganisms. Thus, it does not follow, as Dr. Gray argues, that the mere presence of a species of molds capable of making mycotoxins means that mycotoxins are actually present in the air of a building.

(*Id.* ¶ 20.) Dr. Saxon further found that:

> Dr. Gray simply assumes that if any mold capable of making a toxin, "toxigenic mold" as he refers to it, was present in the Garrys' home, then such mold produced or generated mycotoxins in sufficient amounts cause all of the symptoms reported by the Garrys. Dr. Gray's approach in assuming exposure to sufficient quantities of mycotoxins is not generally accepted, as evaluating dose is absolutely critical in assessing the exposure. As a medical shortcut, Dr. Gray unacceptably uses the symptoms reported by plaintiffs/patients, in tandem with surrogate markers of exposure that he divines from blood tests, to render his opinion that the mold exposure was sufficient to cause toxicity. Using symptoms to define dose is "backward toxicology" and is contrary to the basic tenets of toxicology and thus not generally accepted methodology. <u>It is my opinion that current medical and scientific evidence does not support the proposition that Garrys' health has been adversely affected by mycotoxins. Indeed, the current scientific evidence makes it extremely unlikely that the Garry's would have been exposed to a dose of mycotoxins that was sufficient to cause any of the medical conditions of which they complain</u>.

(*Id.* ¶ 24.)

Most importantly, Dr. Gray's methodology is flawed, because he relies on the so-called "Gray's panel" of serology tests, which he uses to attempt to prove that the Garrys were exposed to a level of mycotoxins which he believes caused their medical conditions. The first flaw of Dr. Gray's opinion is the use of a Hypersensitivity Pneumonitis ("HP") test or panel. An HP panel is used only to confirm a diagnosis of HP, even according to the laboratory who performed the testing for Dr. Gray. (Saxon Aff. ¶ 26.) However, Dr. Gray did not use HP testing to confirm a diagnosis of HP in either of the Garrys and Dr. Gray admits that he did not diagnosis the Garrys with HP. (Gray Dep. at 103-04.) Dr. Saxon explained:

> Dr. Gray relies on the HP Panel or equivalent tests, which measure antibody levels to molds, mold toxins or other materials, to conclude that there has been an unhealthy level of exposure to the bacteria or molds identified in the HP Panel or equivalent tests. <u>This is an improper use of such testing and such use is not generally accepted.</u> Critically, determination of the presence of antibodies to molds or alleged mold toxins cannot be used to determine the timing or extent or level of an alleged exposure. Indeed, a series of recent studies have confirmed that measurement of antibody levels to molds cannot be used as an indicator of "exposure."

(Saxon Aff. ¶ 26.) Dr. Saxon concluded that, "[i]n my opinion, Dr. Gray's use of the HP panel for any reason other than to confirm a diagnosis of HP is improper. Dr. Gray's use of the HP panel is not a 'generally accepted use' within the scientific community." (*Id.*)

Gray's panel also relies on Stachybotrys antibody testing to establish toxic exposure to mold, which is also unreliable. The Stachybotrys antibody testing used by Dr. Gray is subject to cross-reactivity, meaning that toxic exposure is not the only cause for a positive result on the test. (*Id.* ¶ 28.) In order to obtain results of such testing from IBT Laboratories, the recipient must sign a form acknowledging that the tests are new and have no established clinical utility. (*Id.*) In fact, the California Department of Health Services has issued a bulletin stating, "*this [Stachybotrys antibody] test cannot be used* to definitively determine whether someone has been exposed to Stachybotrys mold or its toxins." (*Id.* ¶ 29.) Apparently, the basis for using Stachybotrys antibody testing to determine exposure to mold and its toxins was one study in which less than 10% of the people actually exposed to Stachybotrys had elevated levels of antibodies. (*Id.*) Additionally, Dr. Gray's use of testing for autoantibodies is similarly considered unreliable in the medical field. (*Id.* ¶¶ 35-36.)

Dr. Gray did not actually perform any differential diagnosis or employ the scientific method in reaching his opinions concerning medical causation for the Garrys. (*Id.* ¶¶ 38-48.) Proper differential diagnosis is conducted as follows:

> Differential diagnosis is the medical parallel of the scientific method in which one makes a hypothesis, tests that hypothesis experimentally and then either rejects or accepts the hypothesis. The "differential diagnosis" is the list of likely disorders; given the evidence in hand with the working diagnosis (hypothesis as to what is wrong with the patient) being the most likely choice with the data in hand. The physician then gathers valid scientific data (physical findings or laboratory tests) to confirm or exclude that diagnosis. Dr. Gray does not follow this accepted procedure. While he claims to exclude other possible causes before reaching his conclusion that the Garrys are suffering from a host of medical problems from mycotoxicosis, in fact he does not do so.

(*Id*. ¶ 39.) After examining Dr. Gray's work, Dr. Saxon determined that "Dr. Gray is not performing differential diagnosis as it is generally accepted in medicine. Therefore, he comes to conclusions that cannot be relied upon." (*Id*. ¶ 40.)

Dr. Gray made several diagnoses that are simply inaccurate. First, Dr. Gray diagnosed Allison Garry with a severe small airway obstruction despite normal test results. (*Id*. ¶ 41.) Dr. Gray also diagnosed both of the Garrys with "mixed mold mycotoxicosis" or "proinflammatory immune toxicity including evidence of hyperactivation, immune suppression and increased levels of autoimmune activity," when in fact no such diagnosis exists in the medical community. (*Id*. ¶¶ 42, 44.) Furthermore, Dr. Gray attributed Allison Garry's immune alterations to toxic mold exposure when in fact she takes Azathioprine, an immunosuppressive drug that can result in such alterations. (*Id*. ¶ 43.)

Dr. Gray also failed to use appropriate test controls in the research he has conducted and upon which he bases his opinion that the Garrys' health has been adversely affected by exposure to mycotoxins in their home. In this regard, Dr. Saxon states as follows:

> Dr. Gray claims to have test results from 200 plus subjects … Dr. Gray has made a fatal error in failing to provide and test specific matched controls. Having such controls is critical both for biologic reasons (age, sex, genetic background, smoking and co-morbid diseases) as well as for technical reasons (flow cytometry is well known to be sensitive to shipping conditions/timing). Without such controls, his results cannot be

> accepted as valid. A simple example of how this problem invalidates Dr. Gray's immunophenotyping, even if AAL testing could be relied upon, is that people who are depressed, have insomnia, or who smoke, have changes in immunophenotyping. Without such matched controls for his "mold exposed" subjects, Dr. Gray's immunophenotyping research is not scientifically valid but will reflect differences between the selected population he saw and the normals that were used to make up the reference range. Thus, he has not followed generally accepted methodology in doing this testing and his data from those tests is not reliable. This is a common methodological error among unskilled investigators.

(*Id.* ¶ 45.)

Finally, additional criticisms of Dr. Gray are best summarized in Dr. Saxon's Affidavit:

> Additional critical deficiencies in Dr. Gray's methodology are a) his failure to determine that the "exposed" are in fact exposed, b) his failure to determine to what degree subjects are exposed so as to determine if there is a dose response relationship and c) his failure to have a matched known unexposed population for comparison. Similarly, he has no idea as to the nature of the "normal" population to which he is comparing his "exposed group". Thus, Dr. Gray's alleged exposed population contains unexposed subjects while the normals contain exposed subjects. These circumstances totally invalidate his alleged research as it fails to follow the accepted methodology for clinical research. Finally, a characterization of the level of the alleged exposure is necessary to determine if a dose response exists for the alleged exposure. The failure to recognize and demonstrate a dose response relationship further undermines his conclusions.
>
> The scientific method needs to be applied in all research, be it basic laboratory research, animal research or human research. This involves the generation of a hypothesis, the testing of that hypothesis by obtaining either experimental or observational data and then either rejecting or accepting the hypothesis. This is not what Dr. Gray has done. Rather, Dr. Gray's has sent dozens of highly nonspecific immune based tests on the Garrys and other selected subjects, compared these results to inappropriate controls and decided he sees differences. The scientific method is not a "fishing expedition" in which one measures large numbers of tests and then does post hoc analysis to draw conclusions. However, that is exactly what Dr. Gray has done. In scientific circles, what Dr. Gray has done is termed "data dredging", not hypothesis testing, and it is one of the pitfalls I educate trainees to avoid. Consequently, even if all of the testing has been done by a highly reliable laboratory which has great expertise in non-standard immune based testing, e.g. the UCLA Jonsson Cancer Center

> Core Immune Laboratory, this same flaw would invalidate Dr. Gray's "research".

(*Id.* ¶¶ 46-47.)

In short, the review by Dr. Saxon, one of the leading experts in the field of mold-related health effects, clearly shows that Dr. Gray's opinions lack sufficient facts or data to be reliable and are based on unreliable principles and methods.

**ARGUMENT**

**A. Standard for Admissibility of Expert Opinion Testimony**

Federal Rules of Evidence 702 provides the standard governing admissibility of expert testimony. Rule 702 states, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

"In deciding whether expert evidence should be admitted, a district court must determine whether the expert's methodology is reliable and can be reasonably applied to the facts of the case." *Eckelkamp v. Beste*, 315 F.3d 863, 868 (8th Cir. 2002) (citing *Glastetter v. Novartis Pharm., Corp.*, 252 F.3d 986, 988 (8th Cir. 2001) (affirming exclusion of testimony by medical expert); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95 (1993)). In making a determination of whether Rule 702 is satisfied, this Court must determine whether the proponent of the testimony establishes by a preponderance of the evidence that the testimony is reliable. *Daubert*, 509 U.S. at 592-93. A reviewing court examines whether the trial court abused its discretion in excluding testimony. *Eckelkamp*, 315 F.3d at 868 (citing *General Elec. Co. v.*

*Joiner,* 522 U.S. 136, 141 (1997); *United States v. Dico, Inc.,* 266 F.3d 864, 869 (8th Cir. 2001)). This Court should not examine whether a jury would find the challenged testimony reliable or persuasive, but rather this Court must determine on its own whether Plaintiff proves by a preponderance of the evidence that the offered testimony is reliable. *Id.*; *Daubert*, 509 U.S. at 592-93.

## B. Dr. Gray's Opinion Is Not Admissible Under Federal Rules of Evidence 702

### *1. Dr. Gray Is Not Qualified to Render the Opinions Being Proffered.*

Dr. Gray is not qualified to render the opinions being proferred because he does not have sufficient expertise in the scientific and medical fields of epidemiology, toxicology, microbiology, pulmonology, immunology, internal medicine, or mycology (the study of molds), all of which fields are implicated in his opinions. Dr. Gray's own testimony, as well the testimony by affidavit of Dr. Saxon, clearly demonstrate that Dr. Gray does not have sufficient expertise to render his opinions in this case. Fed. R. Evid. 702 (expert "witness [must be] qualified as an expert by knowledge, skill, experience, training, or education" in order to render expert opinion testimony). Dr. Gray does not have a doctorate degree in epidemiology, is not a board-certified toxicologist, is not a medical board-certified pulmonologist, immunologist, or medical internist, and has not earned any advanced degrees in microbiology. (Gray Dep. at 52-53.) Notably, he does not have a doctorate degree in the field of mycology, which is the field of studying and evaluating fungal and mold-related illnesses, and he is not a certified industrial hygienist. (*Id.*) Dr. Gray's testimony, therefore, is not admissible, as he is not sufficiently qualified under Rule 702.

### 2. *Dr. Gray's Opinion That the Garrys Have Various Medical Conditions Related to Mold Exposure in Their Home Is Not Based Upon Sufficient Facts or Data.*

Dr. Gray's opinion that mycotoxins in the Garrys' home caused various of their medical conditions as he has diagnosed them, and thus were justified in abandoning their home and personal property, is not admissible because his "testimony is [not] based upon sufficient facts or data[.]" Fed. R. Evid. 702(1). Dr. Gray could not identify any evidence that established that mycotoxins were present in any amount in the Garrys' home in July or August of 2002 when the Garrys abandoned their home. Even if such mycotoxins were present, there is no evidence there were enough mycotoxins capable of causing the Garrys' alleged health problems.

Rather than trying to quantify the amount of mycotoxins present in the Garrys' home, Dr. Gray simply assumed that there was a sufficient amount of mycotoxins to cause their medical conditions. Essentially, the only proof of the quantity of mycotoxins present is the *ipse dixit* of Dr. Gray. However, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 990 (8th Cir. 2001) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Although Dr. Gray acknowledged the importance of establishing the dose of mycotoxins to which the Garrys were exposed, he concedes he is unable to quantify the presence of mycotoxins with any degree of certainty, let alone a reasonable degree of medical certainty. At its base, Dr. Gray's opinion that there was sufficient mycotoxins to cause health problems is made up out of thin air. Since his opinion is not based on any objectively verifiable evidence of dose of exposure, it is based solely on Dr. Gray's *ipse dixit* and, therefore, it is not admissible. *Glastetter*, 252 F.3d at 990.

Dr. Gray's opinion is circular, result-driven, and based solely on the sequence of events, or *post hoc ergo propter hoc* reasoning. That sort of reasoning is invalid, because it lacks

"sufficient facts and data" of exposure to support the conclusions drawn. Fed. R. Evid. 702. As held by the Eighth Circuit on many prior occasions, opinions that are based on *post hoc ergo propter hoc* reasoning are inherently flawed and inadmissible. *Dodge Motor Trucks, Inc. v. First Nat. Bank of Omaha*, 519 F.2d 578, 584 (8th Cir. 1975) ("merely because the letter preceded the injury and the injury followed hard on the heels of the letter does not establish the relation of cause and effect. *Post hoc ergo propter hoc* must be weighed carefully, for it may be fallacious reasoning."); *Schempp v. Reniker*, 809 F.2d 541, 542 (8th Cir. 1987) ("*post hoc ergo propter hoc* is never a conclusively cogent argument"); *Black v. Food Lion, Inc.*, 171 F.3d 308, 313-14 (5th Cir. 1999) ("the fallacy of *post-hoc propter-hoc* reasoning … is as unacceptable in science as in law").

In toxic exposure cases, the courts have ruled inadmissible expert opinions where the expert cannot establish the dosage to which the plaintiffs were subjected. *Roche v. Lincoln Property Co.*, 278 F. Supp. 2d 744, 752 (E.D. Va. 2003) (mold case); *Flores v. Allstate Texas Lloyd's Co.*, 229 F. Supp. 2d 697, 703 (S.D. Tex. 2002) (mold case involving insurance coverage); *Curtis v. M&S Petroleum. Inc.*, 174 F.3d 661,671 (5th Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994) (PCB litigation)); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 198-99 (5th Cir. 1996) (affirming judgment as a matter of law where plaintiff failed to show that expert relied upon data to establish level of exposure to toxic chemical at workplace sufficient to cause brain cancer); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114-1115 (5th Cir.1991) (en banc), cert. denied, 503 U.S. 912 (1992) (holding that the district court did not abuse its discretion in excluding an expert's opinion that was based on insufficient data regarding the dosage of a harmful substance and the duration of exposure to that substance); *Viterbo v. Dow Chemical Co*., 826 F.2d 420, 423 (5th Cir. 1987)

(concluding that evidence from animal studies is insufficient based in part on the lack of evidence that the plaintiff was exposed to comparable amounts); *Castellow v. Chevron USA*, 97 F. Supp.2d 780, 796-97 (S.D. Tex. 2000) (there is no reliable basis for a causation opinion without adequate data upon which an expert can assess the extent of exposure).

As fully explained in Dr. Saxon's affidavit, mold in buildings, by itself, is harmless if the building occupants, like the Garrys here, are not allergic to the mold types present. In those circumstances, molds are harmful only if they produce elevated levels of mycotoxins and such mycotoxins are inhaled by building occupants. One of the most critical flaws in Dr. Gray's methodology is his erroneous assumption that all molds in the Garrys' home that were capable of producing mycotoxins, in fact, produced mycotoxins at levels injurious to human health. Not all molds capable of producing mycotoxins actually produce mycotoxins, and there is simply no reason to assume that mycotoxins were present in the Garrys' home at levels that can cause adverse health effects.

In *Roche v. Lincoln Property Co.*, 278 F. Supp.2d 744 (E.D. Va. 2003), the Court held that proffered expert testimony was not admissible under Rule 702 where it was based on an assumption that mold necessarily creates mycotoxins. *Roche* involved personal injury claims brought against the owner of an apartment building by two apartment residents who alleged that various health problems related to mold exposure in the building. In *Roche* the court held that the plaintiffs' expert, Dr. Bernstein, could not establish the quantity of mycotoxins that were present in the plaintiffs' apartment. Specifically, the court explained that even though some bulk samples of mold taken from the apartment were shown in laboratory tests to contain some mycotoxins, those test results did not mean that any mold was actually producing mycotoxins while plaintiffs lived in the apartment. The Court ruled the expert's opinion to be inadmissible,

in part, due to the failure to establish whether mycotoxins were present in the plaintiffs' apartment and the quantity of mycotoxins present. Dr. Gray's testimony shares the same fatal flaw as the testimony of the expert in *Roche*.

Dr. Gray cannot establish that mycotoxin exposure preceded the Garrys' alleged adverse medical conditions, let alone that mycotoxin exposure caused those conditions. Ultimately, Rule 702 is not met because Dr. Gray's opinion is not based on sufficient facts and data, specifically, proof of the presence of mycotoxins in a quantity that is capable of causing the medical conditions that Dr. Gray has diagnosed for the Garrys.

Most importantly, in July 2002, Dr. Gray saw fit to conclude that the Garrys' health was adversely affected by exposure to mycotoxins in their home, and to advise them to abandon their home and personal property, without ever reviewing their medical records or any environmental testing results and without conducting any clinical examination. The fact that the Garrys waited some four months, until November 2002, to be clinically evaluated by Dr. Gray belies the Garrys' contention that they were exposed to, and injured by, mycotoxins from mold in their home.

**3. *Dr. Gray's Opinion Is Not Reliable, And Should Not Be Admitted, Because It is Not Based on Scientific Knowledge, Principles or Methods.***

Failure to Perform Valid Differential Diagnosis

Dr. Gray's opinions should not be admitted because they are based on a flawed and invalid differential diagnosis. In short, differential diagnosis is the process of eliminating possible causes of adverse health effects to arrive at a conclusion that the only remaining possible cause, in fact, caused those effects. In this case, Dr. Gray failed to rule out many possible causes of the Garrys' medical conditions that are clearly unrelated to mold exposure in their home.

In *Glastetter v. Novartis Pharmaceutical Corp.*, the Eighth Circuit affirmed the district court's decision to exclude expert testimony based on a flawed differential diagnosis. 252 F.3d 986, 989 (8th Cir. 2001).

> Each of Glastetter's experts conducted a "differential diagnosis," which concluded that Parlodel caused her ICH. In performing a differential diagnosis, a physician begins by "ruling in" all scientifically plausible causes of the plaintiff's injury. The physician then "rules out" the least plausible causes of injury until the most likely cause remains. The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury. *See generally Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262-66 (4th Cir. 1999).
>
> In *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202 at 1208, we held that "a medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*." 229 F.3d 1202, 1208 (8th Cir. 2000). Because a differential diagnosis is presumptively admissible, *see id*., a district court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid. In the present case, the district court excluded the differential diagnoses performed by Glastetter's expert physicians because they lacked a proper basis for "ruling in" Parlodel as a potential cause of ICH in the first place. *Glastetter*, 107 F. Supp. 2d at 1045 & nn. 28-29 ("The data and methods of plaintiffs' experts are not scientifically valid bases for the conclusion that Parlodel can cause an ICH in a human."). We agree with the district court's conclusion.

252 F.3d at 989.

Dr. Gray, in his expert report in this case claims to have performed an appropriate "differential diagnosis." Dr. Gray's deposition testimony and the Garrys' medical records reveal, however, that he did no such thing. (*See also* Saxon Aff. ¶¶ 46-47.) For example, Allison Garry suffered from interstitial cystitis years before any alleged exposure to mycotoxins in the home, yet Dr. Gray failed to rule out preexisting, alternate causes for her interstitial cystitis. Similarly, Steve Garry experienced respiratory-related health problems for years prior to

his alleged mycotoxin exposure in the home at issue in this case, yet Dr. Gray failed to rule out preexisting, alternative causes for his respiratory problems.

Dr. Gray also failed to rule out other causes of the Garrys' medical conditions that are unrelated to mold exposure in the home. For example, Dr. Gray believes that gray water-related gram-negative organisms were present in the Garrys' home when they abandoned the home. This type of bioaerosol exposure is capable of causing some of the same health effects as mycotoxins, according to Dr. Gray. (Gray Dep. at 59-61.) Also, such exposure can be caused by the sewer backups. (*Id*. at 59.) Dr. Gray made no effort to rule out the gray water-related gram-negative organisms as the cause of the Garrys' health problems. The agricultural environment in which Plaintiffs lived is also a possible source of mycotoxins and a possible cause of the Garrys' health problems, yet Dr. Gray did not do anything scientifically (such as hypothesis testing under the scientific method) to rule out such agricultural exposures as a cause of the Garrys' medical conditions. Indeed, outdoor testing near the Garrys' home revealed levels of certain mold types (Aspergillus and Penicillium) in excess of those found inside the home. What is more, as he notes in his report, Dr. Gray was aware that high levels of mycotoxins were reportedly present at Mr. Garry's workplace, yet Dr. Gray has done nothing by way of the scientific method to rule out work-related mycotoxin exposure as the cause of any of the medical conditions of Mr. Garry. In short, Dr. Gray did not perform a valid or appropriate differential diagnosis in reaching his opinions in this case. (*See* Saxon Aff. ¶¶ 46-47.)

In *Flores v. Allstate Texas Lloyd's Co.*, the court held that an opinion based on flawed differential diagnosis related to toxic mold exposure was not admissible under Rule 702. 229 F. Supp. 2d 697 (S.D. Tex. 2002). In *Flores*, plaintiff homeowners purchased an insurance policy from Allstate. *Id*. at 699. Plaintiffs' home sustained water damage, mold began to grow, and

the homeowners abandoned their home based on the recommendation of Dr. Gutierrez. *Id*. The issue before the court was whether Dr. Gutierrez's opinion regarding the causes of plaintiffs' health problems and the need to abandon the home was admissible. *Id*. In forming his opinion that mold in plaintiffs' home caused their health problems, he failed to rule out, through differential diagnosis, other possible causes. *Id*. at 702. The court held that "[a]n expert's failure to consider, or control for, other explanatory variables is fatal to the reliability of his testimony." *Id*. at 703 (citing *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000)). The court also noted that despite Dr. Gutierrez's professional and clinical experience with patients, his failure to form a hypothesis and test that hypothesis according to the scientific method was fatal to the plaintiffs' case. *Id*. The court finally noted that its decision to exclude Dr. Gutierrez's testimony was supported by the fact that his methodology and principles were not generally accepted in the scientific community. *Id*. at 703-04.

Like Dr. Gutierrez, Dr. Gray failed to employ a differential diagnosis by ruling out possible causes of the Garrys' health problems by using the scientific method. Despite Dr. Gray's purported experience with patients who have allegedly been exposed to mycotoxins, Dr. Gray's opinion is not based on the scientific method of testing a hypothesis, controlling for variables, and analyzing the results of the testing to reject or accept the hypothesis. Dr. Gray's testimony, therefore, is inadmissible under Rule 702.

Dr. Gray's General Methods and Techniques for Showing Mycotoxin Exposure and Health Effects In the Garrys Is Not Reliable and Not Generally Accepted in the Scientific Community

Additionally, as explained thoroughly by Dr. Saxon in his affidavit, Dr. Gray's methods and techniques for assessing mycotoxin exposure and health effects in the Garrys based on blood (serology) tests are not valid, not generally accepted in the scientific community, and, therefore,

not reliable. In particular, Dr. Gray's use of a set of personally designed surrogate markers consisting of 70 serology tests (the so called "Gray's panel") to demonstrate evidence or markers of mold exposure is not a generally accepted scientific or medical methodology. (Saxon Aff. ¶ 25.)

For example, one of his tests, focusing on IgG antibodies to molds, is used by physicians to support a diagnosis of Hypersensitivity Pneumonitis, a form of inflammation of the lungs. IgG antibodies in general are protective antibodies but can be injurious under unusual circumstances. Such IgG mold antibody testing is only appropriately used where there already is the clinical picture of an immune response in the lungs; a process called "Hypersensitivity Pneumonitis" ("HP"). (Saxon Aff. ¶ 26.) If there is an appropriate clinical picture for HP, then the HP panel of tests is appropriately used in conjunction with other objective tests, including, but not limited to, chest x-rays, chest CT scans, pulmonary function testing, blood gas testing, and tests of white blood cell numbers and types. (*Id.*) A diagnosis of HP should only be made in the setting of a consistent clinical history; objective physical findings obtained from a complete physical examination, and appropriate laboratory testing. (*Id.*) Absent symptoms or physical findings suggestive of lung inflammation and the additional laboratory test results supportive of a diagnosis of HP, the HP panel results are not clinically useful. (*Id.*)

Dr. Gray's Stachybotrys antibody testing represents a particularly inappropriate use of such testing. Dr. Gray relies on separate solid phase immunoassay testing allegedly to confirm exposure to the mold Stachybotrys. The testing for Stachybotrys antibodies suffers from grave shortcomings, according to Dr. Saxon. As set forth in the fine print in the test results from IBT Laboratories which analyzed blood samples from the Garrys, the test for the Stachybotrys antibody is subject to cross-reactivity. It is not relied on by medical practitioners for any reason

in the diagnosis and management of patients. (Saxon Aff. ¶ 28.) Indeed, IBT requires physicians ordering this Stachybotrys to sign a special form acknowledging the limitations of such testing. This IBT form also states that the tests included in the Stachybotrys serology panel offered by IBT are new and the clinical utility of these tests has not been established in any published prospective clinical study. Furthermore, the State of California has issued bulletins specifically criticizing the use of the Stachybotrys testing. (*Id.* ¶ 29.) In short, the State of California's highest health authority has specifically found that the basis for Dr. Gray's opinions in this case regarding serologic testing as a measure of "exposure" have no clinical application at this time. (*Id.* ¶ 31.)

Dr. Saxon also explains in his affidavit that "the appropriate laboratory tests for evaluation of potentially clinically relevant immune deficiency include, in addition to the routine blood tests noted above, quantitative immunoglobulins (IgG, IgM, IgA) levels, white blood cell count with differential, sedimentation rate, basic lymphocyte enumeration of B cells and CD4 and CD8 cells, T cells delayed hypersensitivity skin testing, blood complement level, Chest X-ray, and HIV antibody testing. In contrast to the above-mentioned tests performed under specific circumstances, it is not generally accepted to use broad panels of research immunophenotyping reagents to purport to show clinically relevant changes in human subjects. Indeed, such testing has been clearly critiqued by a number of authorities." (Saxon Aff. ¶ 34.)

As part of his "panel of tests," Dr. Gray also ordered testing of the Garrys related to detecting the presence of autoantibodies**.** Autoantibodies occur as part of autoimmune disease. Dr. Saxon has explained, "the value of autoantibody testing is to aid in making a clinical diagnosis of an autoimmune illness in the appropriate clinical setting. This is similar to the use of the HP panel – the value of the test is when applied to include or exclude a specific diagnosis

that is based on a clinical picture." (Saxon Aff. ¶ 35.) Autoantibody tests are not used as screening tests in the population, and to use them in such a fashion as Dr. Gray has done with the Garrys is inappropriate. (*Id.*)

## CONCLUSION

For the foregoing reasons, the Court should grant Hawkeye's Motion to Exclude Testimony of Dr. Michael Gray.

Dated at Sioux Falls, South Dakota, this 15th day of November, 2004.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

/s/ Mitchell Peterson
Cheryle Wiedmeier Gering
Mitchell Peterson
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone: (605) 336-2880
Facsimile: (605) 335-3639
*Attorneys for Defendants Homeland Central Insurance Company, formerly known as Hawkeye Security Insurance Company*

**CERTIFICATE OF SERVICE**

The undersigned, one of the attorneys for Defendant Homeland Central Insurance Company formerly known as Hawkeye Security Insurance Company, hereby certifies that a true and correct copy of the foregoing "Brief in Support of Defendant's Motion to Exclude Testimony of Dr. Michael Gray" was served by electronic filing upon:

Steven M. Johnson
Ronald A. Parsons
Johnson, Heidepriem, Miner,
Marlow & Janklow, L.L.P.
P. O. Box 1107
Sioux Falls, SD 57101-1107

Richard Langerman
3216 N. 3rd St., #200
Phoenix, AZ 85012

*Attorneys for Plaintiffs*

on this 15th day of November, 2004.

/s/ Mitchell Peterson______________________