UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| STEVE and ALLISON GARRY,<br><br>Plaintiffs,<br><br>vs.<br><br>HOMELAND CENTRAL INSURANCE COMPANY, formerly known as HAWKEYE SECURITY INSURANCE COMPANY,<br><br>Defendant. | CIV. 03-4019<br><br>**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS RELATED TO MOTION FOR SUMMARY JUDGMENT ON ISSUES OF CAUSATION OF PROPERTY DAMAGE, ABANDONMENT, AND BAD FAITH** |

Defendant Homeland Central Insurance Company, f/k/a Hawkeye Security Insurance Company ("Hawkeye") submits this statement of undisputed material facts in support of its motion for summary judgment regarding causation of property damage, abandonment, and bad faith.

1. The Garrys moved into the home at 27207 Fountain Circle in Harrisburg, South Dakota in December, 1994 (hereinafter "the Garry home"). (S. Garry Dep. (6/23/2003) (Affidavit of Mitchell Peterson ("Peterson Aff.") Ex. M, submitted contemporaneously with this brief) at 12, 17.)

2. In 1999, more than two years before Hawkeye was notified of the mold claim at issue here, the Garrys discovered that the master bathroom toilet in the Garry home leaked. (S. Garry Dep. (6/23/2003) at 39, 49.)

3. The Garrys do not know how long the toilet may have been leaking. (S. Garry Dep. (6/23/2003) at 106-07.)

4. The leak had allegedly caused water to seep out, resulting in the saturation and collapse of a small area of the ceiling material in the southwest bedroom in the basement of the Garry home, immediately below the toilet. (S. Garry Dep. (6/23/2003) at 39.)

5. The master bathroom toilet of the Garry home was repaired in October 1999 by Frisbee Plumbing. (T. Hines Dep. (Peterson Aff. Ex. N) at 10-12 and Ex. 32.)

6. That toilet did not leak again. (A. Garry Dep. (8/31/2004) (Docket # 164 (Affidavit of Cheryle Wiedmeier Gering) Ex. B) at 15; S. Garry Dep. (8/31/2004) (Docket #164 (Affidavit of Cheryle Wiedmeier Gering) Ex. A) at 91.)

7. Allison Garry saw some mold on the ceiling of the basement southwest bedroom at about the time when the master bathroom toilet was repaired and "the ceiling got removed." (A. Garry Dep. (8/31/2004) at 14-15.)

8. The mold covered an area Mrs. Garry estimated at "maybe three to four feet in diameter approximately." (A. Garry Dep. (8/31/2004) at 15.)

9. All of the visible mold was removed when the ceiling of the southwest bedroom was repaired in 1999 by Wirth Painting. (A. Garry Dep. (8/31/2004) at 15; S. Garry Dep. (6/23/2003) at 50.)

10. The removed ceiling material was discarded. (S. Garry Dep. (6/23/2003) at 48.)

11. After 1999, Allison Garry never saw any visible mold on the ceiling or walls of the southwest basement bedroom or in any other area of the home. (A. Garry Dep. (8/31/2004) at 15.)

12. Prior to the discovery of mold in the ceiling of the home by Allison Garry in 1999, a number of other water intrusion events had occurred in the home. (S. Garry Dep. (8/31/04) Ex. 15 (Garry Residence Historical Summary).)

13. In August of 2000, the Garrys requested an environmental consulting firm, Geotek, to inspect their home for the presence of mold. (A. Garry Dep. (8/31/2004) at 7, 9; S. Garry Dep. (8/31/2004) at 146-48.)

14. On August 18, 2000, Geotek personnel inspected the Garrys' home and did not find any visible mold in the home and did not detect any mold smells. (A. Garry Dep. (8/31/2004) at 8; *see also* S. Garry Dep. (8/31/04) Ex. 19.)

15. However, Geotek suggested to the Garrys that air testing be undertaken to further investigate for mold, but no testing was done at that time. (A. Garry Dep. (8/31/2004) at 8, 12-13; S. Garry Dep. (8/31/2004) at 148 and Ex. 19.)

16. In October and November of 2000, Geotek tested for and found mold present in the office building where Steve Garry maintained a business. (Wilkinson Dep. (Docket #166 (Affidavit of Cheryle Wiedmeier Gering) Ex. A) at 20-23 and Ex. 1; S. Garry Dep. (8/31/2004) at 144-45.)

17. On July 10, 2002, a sewer backup occurred in several areas of the basement of the Garry home. (Loos Dep. (Peterson Aff. Ex. O) at 25.)

18. Within hours after the sewer backup, Intek was on scene and spent several days cleaning up the Garry home. (Berg Dep. (Peterson Aff. Ex. P) at 19, 21, 23.)

19. "Immediately upon [Intek's] entering the house[,]" Steve Garry expressed concerns about mold to Intek personnel. (Berg Dep. at 20.)

20. The day after the sewer backup occurred, in the course of removing some carpet from the southwest bedroom (that carpet was to be used to replace carpet in another room that had been impacted by the sewer backup), Jerry Berg of Intek took the baseboard off from one of

the walls in the southwest bedroom and noticed "black spots" on the baseboard. (S. Garry Dep. (8/31/2004) at 56-58.; Berg Dep. at 24, 26-31; Wilkinson Dep. Ex. 11 (pp. 4 and 9).)

21. Berg immediately telephoned Steve Garry "to say there were black spots against [the baseboard], and did [Mr. Garry] know anything about it." (S. Garry Dep. (8/31/2004) at 56-58.)

22. There is no evidence showing that any mold was present in the Garrys' home, either dead or growing, before the July 2002 sewer backup. (Carlson Dep. (Peterson Aff. Ex. Q) at 71.)

23. There is no "baseline" reflecting the amount of spores of any mold type that were present in the Garrys' home prior to the July 2002 sewer backup. (Carlson Dep. at 47.)

24. Carlson acknowledges there were multiple sources of water intrusion that can give rise to the mold types that the Garrys assert were detected in their home as of July 29, 2002 (Stachybotrys, Chaetomium, Aspergillus and Penicillium). (Carlson Dep. at 51-52, 62-63, 84-85.)

25. On or about August 1, 2002, the Garrys abandoned the Garry home and most of the personal property therein. (S. Garry Dep. (8/31/04) at 117-19; A. Garry Dep. (8/31/04) at 20-22.)

26. The Garrys did so at the suggestion of Dr. Michael Gray with whom Allison Garry had spoken by telephone for ten to fifteen minutes about the alleged mold in the home and the Garrys' various reported medical conditions. (S. Garry Dep. (8/31/04) at 117-19; A. Garry Dep. (8/31/04) at 20-22.)

27. Dr. Gray had not reviewed any of the Garrys' medical records or any results from any environmental or industrial hygiene tests conducted in the home before suggesting that the Garrys abandon their home. (Gray Dep. (Peterson Aff. Ex. S) at 22-25.)

28. There is no evidence that the Garrys gave Hawkeye any prior notice of their intention to abandon their home and personal property. (*See* S. Garry Dep. (8/31/04); S. Garry Dep. (6/23/03); A. Garry Dep. (8/31/04).)

29. After the Garrys abandoned their home and personal property, there were several other water intrusions in the home that resulted in mold, including a leak from a refrigerator ice maker and water seepage through the concrete foundation in the basement of the home as a result of rainstorms. (Carlson Report (Peterson Aff. Ex. R); Carlson Dep. at 141-46.)

30. Mr. Carlson's opinion that the leaking toilet was the "primary" source of the Stachybotrys and Chaetomium mold types found in the Garrys' home is based on two grounds: (1) his observations of water stains under the carpet on the floor along some of the walls of the southwest and northwest bedrooms which he believes reflects extensive water intrusion from the leaking toilet in both of those locations where mold spores were detected, and (2) his assessment, as explained for the first time at his deposition on October 22, 2004, that 90% of the Stachybotrys and Chaetomium mold spores found in air samples taken in the southwest and northwest bedrooms resulted from the disturbance of Stachybotrys and Chaetomium mold found in the southwest bedroom, rather than from the Stachybotrys and Chaetomium mold found in other areas of the basement that resulted from sewer backups in July 2002 and earlier. (Carlson Report.)

31. Mr. Carlson is not an expert in interpreting water stain lines and cannot opine, based on the stains, he observed how long the carpet in those southwest and northwest bedrooms had been saturated or how long those areas had been wet. (Carlson Dep. at 68, 71.)

32. The water stains he observed when he inspected the home in June 2003, almost a year after the Garrys left the home, may have been due to windows in the southwest and northwest bedrooms having leaked during a rainstorm earlier that month, rather than from long-term leaks in the master bedroom toilet. (Carlson Dep. at 141-44.)

33. Moreover, the water intrusion from a crack in the foundation of the west wall in the northwest bedroom of the home was also a possible source of the water stains. (Carlson Dep. at 145-46.)

34. With respect to the second purported ground for his opinions, Mr. Carlson testified at his deposition that he derived his estimate from comparing the "volume" or amount of visible Stachybotrys and Chaetomium found on the sheetrock and baseboard in the southwest bedroom to the smaller amounts of those same mold types that he asserts were found on other areas of the basement that were affected by the sewer backup. (Carlson Dep. at 41-42, 52, 85-86.)

35. There is no photographic or videographic evidence showing what volume or amount of suspected Stachybotrys or Chaetomium mold was present and removed from the sheetrock and from the baseboards of the walls of the southwest bedroom. (*See* Carlson Dep.)

36. The July 2002 sewer backup in the basement may have caused a mold problem in several areas of Plaintiffs' basement at some point. (Carlson Dep. at 114-15.)

37. In particular, Stachybotrys mold growth found in the laundry room in the basement resulted from the July 2002 sewer backup, and some of the Stachybotrys mold spores

found in air samples taken in the northwest bedroom, may have come from the laundry room and not from the leaking toilet. (Carlson Dep. 158-59.)

38. Mr. Carlson also admitted that he did not know if the Stachybotrys growth found in the laundry room was disturbed at some point and dispersed mold spores throughout the Garrys' home. (Carlson Dep. at 166.)

39. For these reasons, Mr. Carlson cannot testify whether Stachybotrys mold spores found in air samples taken from the basement bathroom in the Garrys' home were from the leaking toilet or from the July 2002 sewer backup. (Carlson Dep. at 152, 159.)

40. Intek, the company hired in July 2002 by the Garrys to abate and remove the suspected mold growth from the sheetrock in the southwest bedroom, failed to use proper containment procedures during the abatement, and such an uncontrolled abatement contributed to the elevated mold levels that were detected in the Garrys' home. (Carlson Dep. at 118-20, 130-33, 135-36.)

41. Indeed, "[u]ncontrolled abatement results in significant levels of spore dispersal." (Carlson Dep. at 161.)

42. Mr. Carlson cannot testify that, in the absence of the uncontrolled abatement by Intek in July 2002, the leaking toilet would have resulted in elevated levels of Stachybotrys or Chaetomium spores in the Garrys' home. (Carlson Dep. at 151-52.)

43. Stachybotrys and Chaetomium mold spores probably were also released during an uncontrolled abatement or remediation of mold that resulted from a refrigerator leak in the home in September 2002, an event unrelated to the toilet leak claim and not at issue in this case. (Carlson Dep. at 143-44.)

44. Furthermore, Stachybotrys mold spores could have been dispersed throughout the home when the ceiling material containing mold in the southwest bedroom was removed and remediated in 1999 without proper engineering controls. (Carlson Dep. at 137-38.)

45. Although Dr. Gray, the Garrys' proffered expert on medical issues, has diagnosed the Garrys with various conditions which he asserts resulted from exposure to toxic substances, (mycotoxins) from molds in their home, there is no evidence that any molds in the Garrys' home ever produced any mycotoxins in the air or on surfaces of their home while the Garrys resided there. (*See* Gray Dep.; Carlson Dep.)

46. The testing done in the Garrys' home in late July 2002, a few days before they abandoned their home, did not report the presence of any mycotoxins. (Gray Dep. at 67-69.)

47. Moreover, Dr. Gray admits that he cannot quantify the amount or dose of mycotoxins to which he believes the Garrys were exposed while residing in their home. (Gray Dep. at 72.)

48. According to Dr. Gray, the Garrys were also exposed in their home to toxic bioaerosols, which includes gray-water related gram-negative organisms that Dr. Gray explained could have come from a sewer backup. (Gray Dep. at 58-60.)

49. Those bioaerosols have similar and overlapping effects as the "toxigenic mold" to which he believes the Garrys were also exposed. (Gray Dep. at 58-60.)

50. Steven Garry also had other possible sources of mold and mycotoxin exposure outside of his home. (Gray Dep. 87-89.)

51. In addition to Steve Garry's work environment, the air outside the Garrys' home was a possible source of mycotoxins because of agricultural activities in the general area of the subdivision, as opposed to any water intrusions in the home. (Gray Dep. 95-96.)

52. In its written response to the Garrys' mold claim, dated September 18, 2002, Hawkeye expressly reserved its right to deny coverage based on several provisions, conditions and exclusions in the policy at issue here. (See HCIC 20477-20483 (Peterson Aff. Ex. V).)

53. Among other things, Hawkeye specifically referred to the provision of Section 1, paragraph 1.b.4 (c) which states that there is no coverage for loss of dwelling or personal property caused by mold. (HCIC 20477-20478.)

54. Hawkeye further stated that the cause of any mold damage to the Garrys' property had to be determined before a final coverage decision could be made. In particular, Hawkeye informed the Garrys that "questions exist regarding, among other things, the cause and date of the loss…" (HCIC 20481.)

55. Furthermore, Hawkeye noted that "[a]s the cause of the mold and the date of any damage resulting from it is uncertain, it is currently impossible to determine if the loss occurred during the policy period." (HCIC 20481.)

56. In addition to the possible application of the mold exclusion, Hawkeye also expressly informed the Garrys of the condition in the policy that does not permit the policyholder to abandon the property for which coverage is sought. (HCIC 20481.)

57. The cited condition provides that Hawkeye "need not accept any property abandoned by an 'insured'." (HCIC 20481.)

Dated at Sioux Falls, South Dakota, this 15th day of November, 2004.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

____/s/ Mitchell Peterson____________
Electronically Filed

Cheryle Wiedmeier Gering

Mitchell Peterson
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone: (605) 336-2880
Facsimile: (605) 335-3639

and

John Stadler
Nixon Peabody, LLP
101 Federal Street
Boston, MA 02110-1832
Admitted Pro Hac Vice

*Attorneys for Defendants Homeland Central Insurance Company, formerly known as Hawkeye Security Insurance Company*

**CERTIFICATE OF SERVICE**

The undersigned, one of the attorneys for Defendant Homeland Central Insurance Company formerly known as Hawkeye Security Insurance Company, hereby certifies that a true and correct copy of the foregoing "Defendant's Statement of Undisputed Material Facts Related to Motion for Summary Judgment on Issues of Causation of Property Damage, Abandonment, and Bad Faith" was served by electronic filing upon:

Steven M. Johnson
Ronald A. Parsons
Johnson, Heidepriem, Miner,
Marlow & Janklow, L.L.P.
P. O. Box 1107
Sioux Falls, SD 57101-1107

and by mail upon:

Richard Langerman
3216 N. 3rd St., #200
Phoenix, AZ 85012

*Attorneys for Plaintiffs*

on this 15th day of November, 2004.

____/s/ Mitchell Peterson___________
Electronically Filed