UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| STEVE and ALLISON GARRY,<br><br>Plaintiffs,<br><br>vs.<br><br>HOMELAND CENTRAL INSURANCE COMPANY, formerly known as HAWKEYE SECURITY INSURANCE COMPANY,<br><br>Defendant. | CIV. 03-4019<br><br>**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ISSUES OF CAUSATION OF PROPERTY DAMAGE, ABANDONMENT, AND BAD FAITH** |

Defendant Homeland Central Insurance Company, f/k/a Hawkeye Security Insurance Company ("Hawkeye") submits this brief in support of its motion for summary judgment on three grounds that have been the focus of the just concluded discovery in this case—causation of property damage, abandonment, and bad faith.

## INTRODUCTORY STATEMENT

There is no coverage for the alleged mold contamination of the home and personal property of Plaintiffs Steve and Allison Garry ("the Garrys") under the "ensuing loss" exception to the mold exclusion in the Hawkeye homeowners' policy at issue.

The Garrys cannot prove, based on the undisputed facts, that a leaking toilet in their master bedroom was the "dominant and efficient cause" of the mold. In particular, the Garrys cannot present any disputed material facts on the issue of causation, because the expert testimony they proffer does not satisfy the reliability standards established in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc,* 509 U.S. 579 (1993).[1] Accordingly, the Garrys cannot prove that the leaking toilet was the "dominant and efficient cause" of any mold contamination in their home.

Indeed, MacGregor Pearce, Mr. Carlson's colleague at the University of Minnesota and the person with whom Mr. Carlson developed a remediation plan for the Garrys' home, represents in his report (a report that Mr. Carlson cites as a basis for his own opinions), that "the past history of reported moisture problems makes it difficult to sort out just what caused what" in the home. Moreover, with respect to several of the mold types that Mr. Carlson alleges contaminate the Garrys' home and personal property, Mr. Pearce opines the difficulty "in coming to reasonable conclusions" about the source of that mold: "Where did the mold spores found on the living room shelf or the upholstered furniture come from? No one can say." Because Mr. Carlson's testimony on causation is not admissible under *Daubert*, as a matter of law the Garrys cannot present a case that the mold was an ensuing loss from a leaking toilet.

Moreover, there is no coverage under the Hawkeye policy because the Garrys failed to comply with an express condition for coverage under the policy when they abandoned their home and personal property on or about August 1, 2002. Additionally, the testimony of Dr. Michael Gray should be excluded, because it also does not satisfy *Daubert*.[2] In particular, as set forth in the affidavit of Dr. Andrew Saxon that Hawkeye submits to support its *Daubert* motion to exclude Dr. Gray as a witness, Dr. Gray's proposed testimony is not based on any scientific knowledge or any valid scientific or medical methodology or technique.

Third, summary judgment should be entered in Hawkeye's favor on the Garrys' bad faith claim because the Garrys cannot meet their burden of proving coverage under the Hawkeye

---

[1] In conjunction with this motion for summary judgment, Hawkeye has filed a motion to preclude Mr. Carlson's testimony on *Daubert* grounds.

policy. In any event, summary judgment is appropriate because the question of coverage, and specifically the source or cause of the alleged mold contamination in their home, is fairly debatable in view of the many water intrusion events that occurred for years before as well as after the Garrys abandoned their home and personal property.

## STATEMENT OF UNDISPUTED FACTS

There is no genuine dispute about any of the following material facts that support Hawkeye's motion for summary judgment on the grounds described above.

The Garrys moved into the home at 27207 Fountain Circle in Harrisburg, South Dakota in December, 1994 (hereinafter "the Garry home"). (S. Garry Dep. (6/23/2003) (Affidavit of Mitchell Peterson ("Peterson Aff.") Ex. M, submitted contemporaneously with this brief) at 12, 17.)

In 1999, more than two years before Hawkeye was notified of the mold claim at issue here, the Garrys discovered that the master bathroom toilet in the Garry home leaked. (S. Garry Dep. (6/23/2003) at 39, 49.) The Garrys do not know how long the toilet may have been leaking. (S. Garry Dep. (6/23/2003) at 106-07.) The leak had allegedly caused water to seep out, resulting in the saturation and collapse of a small area of the ceiling material in the southwest bedroom in the basement of the Garry home, immediately below the toilet. (S. Garry Dep. (6/23/2003) at 39.)

The master bathroom toilet of the Garry home was repaired in October 1999 by Frisbee Plumbing. (T. Hines Dep. (Peterson Aff. Ex. N) at 10-12 and Ex. 32.) That toilet did not leak

---

*(Footnote continued from previous page)*
[2] In conjunction with this motion for summary judgment, Hawkeye has filed a motion to preclude Dr. Gray's testimony on *Daubert* grounds

again. (A. Garry Dep. (8/31/2004) (Docket # 164 (Affidavit of Cheryle Wiedmeier Gering) Ex. B) at 15; S. Garry Dep. (8/31/2004) (Docket #164 (Affidavit of Cheryle Wiedmeier Gering) Ex. A) at 91.)

Allison Garry saw some mold on the ceiling of the basement southwest bedroom at about the time when the master bathroom toilet was repaired and "the ceiling got removed." (A. Garry Dep. (8/31/2004) at 14-15.) The mold covered an area Mrs. Garry estimated at "maybe three to four feet in diameter approximately." (A. Garry Dep. (8/31/2004) at 15.) All of the visible mold was removed when the ceiling of the southwest bedroom was repaired in 1999 by Wirth Painting. (A. Garry Dep. (8/31/2004) at 15; S. Garry Dep. (6/23/2003) at 50.) The removed ceiling material was discarded. (S. Garry Dep. (6/23/2003) at 48.) After 1999, Allison Garry never saw any visible mold on the ceiling or walls of the southwest basement bedroom or in any other area of the home. (A. Garry Dep. (8/31/2004) at 15.)

Prior to the discovery of mold in the ceiling of the home by Allison Garry in 1999, a number of other water intrusion events had occurred in the home. (S. Garry Dep. (8/31/04) Ex. 15 (Garry Residence Historical Summary).)

In August of 2000, the Garrys requested an environmental consulting firm, Geotek, to inspect their home for the presence of mold. (A. Garry Dep. (8/31/2004) at 7, 9; S. Garry Dep. (8/31/2004) at 146-48.) On August 18, 2000, Geotek personnel inspected the Garrys' home and did not find any visible mold in the home and did not detect any mold smells. (A. Garry Dep. (8/31/2004) at 8; *see also* S. Garry Dep. (8/31/04) Ex. 19.) However, Geotek suggested to the Garrys that air testing be undertaken to further investigate for mold, but no testing was done at that time. (A. Garry Dep. (8/31/2004) at 8, 12-13; S. Garry Dep. (8/31/2004) at 148 and Ex. 19.) In October and November of 2000, Geotek tested for and found mold present in the office

building where Steve Garry maintained a business. (Wilkinson Dep. (Docket #166 (Affidavit of Cheryle Wiedmeier Gering) Ex. A) at 20-23 and Ex. 1; S. Garry Dep. (8/31/2004) at 144-45.)

On July 10, 2002, a sewer backup occurred in several areas of the basement of the Garry home. (Loos Dep. (Peterson Aff. Ex. O) at 25.) Within hours after the sewer backup, Intek was on scene and spent several days cleaning up the Garry home. (Berg Dep. (Peterson Aff. Ex. P) at 19, 21, 23.) "Immediately upon [Intek's] entering the house[,]" Steve Garry expressed concerns about mold to Intek personnel. (Berg Dep. at 20.) The day after the sewer backup occurred, in the course of removing some carpet from the southwest bedroom (that carpet was to be used to replace carpet in another room that had been impacted by the sewer backup), Jerry Berg of Intek took the baseboard off from one of the walls in the southwest bedroom and noticed "black spots" on the baseboard. (S. Garry Dep. (8/31/2004) at 56-58.; Berg Dep. at 24, 26-31; Wilkinson Dep. Ex. 11 (pp. 4 and 9).) Berg immediately telephoned Steve Garry "to say there were black spots against [the baseboard], and did [Mr. Garry] know anything about it." (S. Garry Dep. (8/31/2004) at 56-58.)

There is no evidence showing that any mold was present in the Garrys' home, either dead or growing, before the July 2002 sewer backup. (Carlson Dep. (Peterson Aff. Ex. Q) at 71.) There is no "baseline" reflecting the amount of spores of any mold type that were present in the Garrys' home prior to the July 2002 sewer backup. (Carlson Dep. at 47.) Carlson acknowledges there were multiple sources of water intrusion that can give rise to the mold types that the Garrys assert were detected in their home as of July 29, 2002 (Stachybotrys, Chaetomium, Aspergillus and Penicillium). (Carlson Dep. at 51-52, 62-63, 84-85.)

On or about August 1, 2002, the Garrys abandoned the Garry home and most of the personal property therein. (S. Garry Dep. (8/31/04) at 117-19; A. Garry Dep. (8/31/04) at 20-

22.) The Garrys did so at the suggestion of Dr. Michael Gray with whom Allison Garry had spoken by telephone for ten to fifteen minutes about the alleged mold in the home and the Garrys' various reported medical conditions. (S. Garry Dep. (8/31/04) at 117-19; A. Garry Dep. (8/31/04) at 20-22.) Dr. Gray had not reviewed any of the Garrys' medical records or any results from any environmental or industrial hygiene tests conducted in the home before suggesting that the Garrys abandon their home. (Gray Dep. (Peterson Aff. Ex. S) at 22-25.) There is no evidence that the Garrys gave Hawkeye any prior notice of their intention to abandon their home and personal property. (*See* S. Garry Dep. (8/31/04); S. Garry Dep. (6/23/03); A. Garry Dep. (8/31/04).)

After the Garrys abandoned their home and personal property, there were several other water intrusions in the home that resulted in mold, including a leak from a refrigerator ice maker and water seepage through the concrete foundation in the basement of the home as a result of rainstorms. (Carlson Report (Peterson Aff. Ex. R); Carlson Dep. at 141-46.)

Mr. Carlson's opinion that the leaking toilet was the "primary" source of the Stachybotrys and Chaetomium mold types found in the Garrys' home is based on two grounds: (1) his observations of water stains under the carpet on the floor along some of the walls of the southwest and northwest bedrooms which he believes reflects extensive water intrusion from the leaking toilet in both of those locations where mold spores were detected, and (2) his assessment, as explained for the first time at his deposition on October 22, 2004, that 90% of the Stachybotrys and Chaetomium mold spores found in air samples taken in the southwest and northwest bedrooms resulted from the disturbance of Stachybotrys and Chaetomium mold found in the southwest bedroom, rather than from the Stachybotrys and Chaetomium mold found in

other areas of the basement that resulted from sewer backups in July 2002 and earlier. (Carlson Report.)

Mr. Carlson is not an expert in interpreting water stain lines and cannot opine, based on the stains, he observed how long the carpet in those southwest and northwest bedrooms had been saturated or how long those areas had been wet. (Carlson Dep. at 68, 71.) The water stains he observed when he inspected the home in June 2003, almost a year after the Garrys left the home, may have been due to windows in the southwest and northwest bedrooms having leaked during a rainstorm earlier that month, rather than from long-term leaks in the master bedroom toilet. (Carlson Dep. at 141-44.) Moreover, the water intrusion from a crack in the foundation of the west wall in the northwest bedroom of the home was also a possible source of the water stains. (Carlson Dep. at 145-46.)

With respect to the second purported ground for his opinions, Mr. Carlson testified at his deposition that he derived his estimate from comparing the “volume” or amount of visible Stachybotrys and Chaetomium found on the sheetrock and baseboard in the southwest bedroom to the smaller amounts of those same mold types that he asserts were found on other areas of the basement that were affected by the sewer backup. (Carlson Dep. at 41-42, 52, 85-86.) There is no photographic or videographic evidence showing what volume or amount of suspected Stachybotrys or Chaetomium mold was present and removed from the sheetrock and from the baseboards of the walls of the southwest bedroom. (*See* Carlson Dep.)

The July 2002 sewer backup in the basement may have caused a mold problem in several areas of Plaintiffs’ basement at some point. (Carlson Dep. at 114-15.) In particular, Stachybotrys mold growth found in the laundry room in the basement resulted from the July 2002 sewer backup, and some of the Stachybotrys mold spores found in air samples taken in the northwest

bedroom, may have come from the laundry room and not from the leaking toilet. (Carlson Dep. 158-59.) Mr. Carlson also admitted that he did not know if the Stachybotrys growth found in the laundry room was disturbed at some point and dispersed mold spores throughout the Garrys' home. (Carlson Dep. at 166.) For these reasons, Mr. Carlson cannot testify whether Stachybotrys mold spores found in air samples taken from the basement bathroom in the Garrys' home were from the leaking toilet or from the July 2002 sewer backup. (Carlson Dep. at 152, 159.)

Intek, the company hired in July 2002 by the Garrys to abate and remove the suspected mold growth from the sheetrock in the southwest bedroom, failed to use proper containment procedures during the abatement,[3] and such an uncontrolled abatement contributed to the elevated mold levels that were detected in the Garrys' home. (Carlson Dep. at 118-20, 130-33, 135-36.) Indeed, "[u]ncontrolled abatement results in significant levels of spore dispersal." (Carlson Dep. at 161.) Mr. Carlson cannot testify that, in the absence of the uncontrolled abatement by Intek in July 2002, the leaking toilet would have resulted in elevated levels of Stachybotrys or Chaetomium spores in the Garrys' home. (Carlson Dep. at 151-52.)

Stachybotrys and Chaetomium mold spores probably were also released during an uncontrolled abatement or remediation of mold that resulted from a refrigerator leak in the home in September 2002, an event unrelated to the toilet leak claim and not at issue in this case. (Carlson Dep. at 143-44.) Furthermore, Stachybotrys mold spores could have been dispersed throughout the home when the ceiling material containing mold in the southwest bedroom was removed and remediated in 1999 without proper engineering controls. (Carlson Dep. at 137-38.)

---

[3] As noted in Hawkeye's pending motion for summary judgment on Intek removed the suspected mold material before Hawkeye received notice of the leaking toilet claim.

Although Dr. Gray, the Garrys' proffered expert on medical issues, has diagnosed the Garrys with various conditions which he asserts resulted from exposure to toxic substances, (mycotoxins) from molds in their home, there is no evidence that any molds in the Garrys' home ever produced any mycotoxins in the air or on surfaces of their home while the Garrys resided there. (*See* Gray Dep.; Carlson Dep.) The testing done in the Garrys' home in late July 2002, a few days before they abandoned their home, did not report the presence of any mycotoxins. (Gray Dep. at 67-69.) Moreover, Dr. Gray admits that he cannot quantify the amount or dose of mycotoxins to which he believes the Garrys were exposed while residing in their home. (Gray Dep. at 72.)

According to Dr. Gray, the Garrys were also exposed in their home to toxic bioaerosols, which includes gray-water related gram-negative organisms that Dr. Gray explained could have come from a sewer backup. (Gray Dep. at 58-60.) Those bioaerosols have similar and overlapping effects as the "toxigenic mold" to which he believes the Garrys were also exposed. (Gray Dep. at 58-60.)

Steven Garry also had other possible sources of mold and mycotoxin exposure outside of his home. (Gray Dep. 87-89.) In addition to Steve Garry's work environment, the air outside the Garrys' home was a possible source of mycotoxins because of agricultural activities in the general area of the subdivision, as opposed to any water intrusions in the home. (Gray Dep. 95-96.)

In its written response to the Garrys' mold claim, dated September 18, 2002, Hawkeye expressly reserved its right to deny coverage based on several provisions, conditions and exclusions in the policy at issue here. (See HCIC 20477-20483 (Peterson Aff. Ex. V).) Among other things, Hawkeye specifically referred to the provision of Section 1, paragraph 1.b.4 (c)

which states that there is no coverage for loss of dwelling or personal property caused by mold. (HCIC 20477-20478.) Hawkeye further stated that the cause of any mold damage to the Garrys' property had to be determined before a final coverage decision could be made. In particular, Hawkeye informed the Garrys that "questions exist regarding, among other things, the cause and date of the loss…" (HCIC 20481.) Furthermore, Hawkeye noted that "[a]s the cause of the mold and the date of any damage resulting from it is uncertain, it is currently impossible to determine if the loss occurred during the policy period." (HCIC 20481.)

In addition to the possible application of the mold exclusion, Hawkeye also expressly informed the Garrys of the condition in the policy that does not permit the policyholder to abandon the property for which coverage is sought. (HCIC 20481.) The cited condition provides that Hawkeye "need not accept any property abandoned by an 'insured'." (HCIC 20481.)

## ARGUMENT

## I. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), "summary judgment shall be awarded to a party if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Dodson v. J.C. Penny Co., Inc.*, 309 F.3d 476, 478 (8th Cir. 2002) (citing Fed. R. Civ. Pro. 56(c)). The standard to be applied is well known to the Court:

> Under Rule 56(c) the Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." *Clark v. Kellogg Co.*, 205 F3d 1079, 1082 (8th Cir. 2000). Once the moving party has meet its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed.R.Cir.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505,

> 2514, 91 L.Ed.2d 202 (1986); *City of Mt. Pleasant v. Associated Elect. Coop. Inc.*, 838 F.2d 268, 273-73 (8th Cir. 1988).

*Ihnen v. United States*, 86 A.F.T.R.2d 2000-7097, *2 (D.S.D. 2000).

## II. HAWKEYE IS ENTITLED TO SUMMARY JUDGMENT ON THE COVERAGE CLAIM, BECAUSE THE GARRYS HAVE NOT MET THEIR BURDEN OF SHOWING THAT ANY MOLD DAMAGE TO THEIR HOME AND PERSONAL PROPERTY IS AN "ENSUING LOSS' FROM A COVERED PERIL.

This Court has previously ruled, by decision and order dated March 5, 2004, that, to obtain coverage under the "ensuing loss" exception to the mold exclusion in the Hawkeye policy, a leaking toilet in the master bedroom of the Garrys' home must be the "dominant and efficient cause" of the mold damage to their home and personal property. (Docket 77 (Order Denying Summary Judgment to Plaintiffs and Defendant Homeland and Granting Summary Judgment to Defendant Metropolitan).)

The Garrys have the burden of proving that any mold contamination of their home and personal property ensued from the leaking toilet that was repaired in 1999, because coverage would be triggered by the "ensuing loss" exception to the mold exclusion. *See Insurance Co. of N. Amer. V. Schultz*, 441 N.W.2d 686, 689 (S.D. 1989) (insured bears burden of establishing coverage under an insurance policy); *Triple U Enters., Inc. v. New Hampshire Insu. Co.*, 766 F.2d 1278, 1282 (8th Cir. 1985) (applying South Dakota law) (burden of proving coverage rests with insured); *see also Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998) ("[o]nce the insurer has proven that an exclusion applies, the burden then shifts back to the insured to show that the claim falls within an exception to the exclusion"); *Fischer & Porter Co. v. Liberty Mut. Ins. Co.*, 656 F. Supp. 132, 140 (E.D. Pa. 1986) (insured bears burden of proving exception to coverage exclusion); *Rodriguez v. Safeco Ins. Co. of Amer.*, 821 P.2d 849, 853 (Colo. Ct. App. 1991) ("court also correctly concluded that the plaintiffs had the burden of

proving Safeco's ultimate liability and, in particular, the applicability of the exception to the exclusion"); *Amos v. Campbell*, 593 N.W.2d 263, 266 (Minn. Ct. App. 1999) ("[i]f the insurer demonstrates the applicability of an exclusion, then the insured bears the burden of proving an exception to the exclusion").

As this Court also noted in its prior decision, and as the Garrys and their proffered experts admit, many water intrusion events have occurred in the Garry home over the years, both before and after the July 2002 sewer backup. These water intrusions have resulted in mold being detected at various times in several areas of the home, both in bulk and in samples of air taken in the home. This mold has been of many types, including four types—Stachybotrys, Chaetomium, Aspergillus and Penicillium—which may generate some amount of toxic substances (mycotoxins) under certain conditions and which the Garrys claim have caused various of their medical symptoms. Because of the many sources or causes of moisture problems in the Garrys' home, the Garrys retained Neil Carlson, an industrial hygienist, to try to sort out "what caused what" in the home. Based on Mr. Carlson's opinions, the Garrys contend that the leaking toilet in the master bedroom is the dominant and efficient cause of the mold that allegedly contaminated and damaged their home and personal property during the Hawkeye policy period.

In his expert report, Mr. Carlson purports to be able to differentiate among what he refers to as "primary" and "secondary" sources of various types of mold (Stachybotrys, Chaetomium, Aspergillus and Penicillium) allegedly detected in the the Garry's home. He opines that a leaking toilet in the Garrys' master bedroom above the southwest bedroom in the basement (apparently first discovered by the Garrys in 1999) is the "primary source" of Stachybotrys and Chaetomium mold allegedly found in the home in July 2002. Mr. Carlson further opines that several sewer backups and other water intrusions (leaking windows and leaking refrigerator ice

maker) that occurred in various areas of the home in July 2002 and in prior years (for which Plaintiffs concedes are not covered under the Hawkeye policy) were the "secondary sources" of those two mold types. He also opines that those other water intrusions were sources of the Aspergillus and Penicillium mold types that the Garrys also allege contaminated their home when they abandoned it on or about August 1, 2002. Significantly, Mr. Carlson concedes that Aspergillus and Penicillium spores were "spread throughout the house more than Stachybotrys ssp. and Chaetomium ssp." and he does not offer any opinion that the leaking toilet in the master bedroom was a "primary" source of the Aspergillus and Penicillium mold types in comparison to the other water intrusions.

Mr. Carlson asserts that he bases his opinions on his review of data from sampling done for the presence of mold in the air and on surfaces of materials in the Garrys' home and personal property. He also asserts that his opinions are based on observations of water staining on walls and floors in the home that he made for the first time more than eight months after the Garrys abandoned their home.

However, as discussed more fully in the *Daubert* brief that Hawkeye has filed to exclude Mr. Carlson's proposed testimony, the methodology that Mr. Carlson used is not scientifically reliable or valid. In particular, neither Mr. Carlson nor anyone else has ever used this methodology in any other matter, this methodology has not been the subject of any peer reviewed scientific publication, the potential error rate of such methodology is unknown, and there is no proof that this methodology is based on any scientific knowledge or is generally accepted by the scientific community. Mr. Carlson's technique or method is being used solely for litigation purposes in this case. Mr. Carlson's opinions are *ipse dixit*, because he does not describe any methodology by which other scientists and persons with expertise in the industrial

hygiene field can attempt to replicate his analysis and conclusions. *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 990 (8th Cir. 2001) ("[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert") (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The very exhibits that Mr. Carlson relies upon and attaches to his report demonstrate the unreliability of the methodology upon which he bases his opinions. Specifically, McGregor Pearce, Mr. Carlson's colleague at the University of Minnesota and the person with whom Mr. Carlson developed a remediation plan for the Garrys' home, investigated the reported mold problem in the home in December 2002, several months before Mr. Carlson visited the home. Mr. Pearce also participated in mold testing in the Garrys' home in May 2003. In his report to the Garrys' prior counsel, dated June 20, 2003, which report Mr. Carlson attaches as Exhibit 6 to his report, Mr. Pearce states that

> "[w]hile sample results suggest elevated mold levels indoors, they also suggest high levels outdoors. Except for the leaking windows, there do not appear to be any active moisture problems in this property. **The past history of reported moisture problems makes it difficult to sort out just what caused what**. It is my opinion, based on the information at hand, that with a thorough cleaning this house should be fit to occupy." (Carlson Report Ex. 6 at 6 (emphasis supplied).)

Mr. Pearce also admits the problem "in coming to reasonable conclusions" about the mold detected in sampling of the home:

> **"Where did the mold spores found on the living room shelf or the upholstered furniture come from? No one can say**. They may have come from water damage in this home, but the area surrounding this home is agricultural land. When soil is disturbed during plowing or cultivation, high levels of Aspergillus and Penicillium species (normally associated with indoor mold problems) can be relased into the air…" (Carlson Report Ex. 6 at 4-5.)

Most importantly, in his recent deposition in this case, Mr. Carlson admitted that it is difficult to "sort out what caused what" with respect to each of the four mold types allegedly present in Plaintiffs' home and on their personal property. (Carlson Dep. at 181-82.) He further conceded that, in view of the many water intrusions in the home, "to some degree there is always a level of uncertainty" in trying to determine what caused those mold types to be present in the Garrys' home. (*Id*. at 176-77.)

Even if Mr. Carlson is competent to give expert testimony in the field of industrial hygiene, his opinions regarding the sources and causes of the mold in the Garrys' home are inadmissible under FRE Rule 702 and the *Daubert* principles. Specifically, Mr. Carlson lacks the requisite expertise and qualifications to render the proffered opinions as he admittedly is not an expert in construction or renovation of homes or in interpreting water stains on flooring. (Carlson Dep. 68, 71, 93-94.) In any event, his opinions are not based on any scientifically accepted and reliable methodology, and they do not "fit" the coverage issue to be determined in this case. As his report and deposition testimony demonstrate, he cannot testify to a reasonable degree of scientific certainty that the leaking toilet in the master bedroom of Garrys' home was the "primary source," let alone the "dominant and efficient cause," of the mold allegedly contaminating their home and personal property.

Because Mr. Carlson's testimony on the issue of causation is inadmissible, the Garrys cannot establish the essential element that the leaking toilet in their master bedroom was the "dominant and efficient cause" of the alleged mold damage at issue here. Accordingly, the Court should grant summary judgment in favor of Hawkeye on the Garrys' claim for coverage.

## III. HAWKEYE IS ALSO ENTITLED TO SUMMARY JUDGMENT ON THE GARRYS' COVERAGE CLAIM BECAUSE IT IS NOT REQUIRED TO ACCEPT ANY PROPERTY ABANDONED BY THE GARRYS.

The Garrys seek coverage from Hawkeye for the loss of their home and personal property that they allege has been contaminated by mold. The Garrys specifically demand that Hawkeye accept the property and pay them its value under the Hawkeye policy. However, the Hawkeye policy expressly provides that Hawkeye "need not accept any property abandoned by an 'insured'." Moreover, the Garrys have admitted that they abandoned the property on or about August 1, 2002, and have not returned since that date. Under the plain terms of the insurance polic, Hawkeye is not obligated to provide coverage for the Garrys' home and personal property that they abandoned or left behind in the home.

The Garrys have tried to justify abandonment of their home and personal property by arguing that the mold detected in the home had caused and/or was causing them adverse health effects. To support this assertion, the Garrys have proffered the testimony of Dr. Michael Gray. If allowed to testify, Dr. Gray is expected to opine that various of the Garrys' medical conditions were caused by exposure to mycotoxins produced by mold in their home. On or about November 19, 2002, some four months *after* the Garrys abandoned the home and personal property at issue in this case, Dr. Gray met them for the first time and clinically evaluated them. At that time he reviewed some of their medical records. Dr. Gray's only communication with the Garrys prior to November 2002 was a ten to fifteen minute telephone conversation in late July 2002 with Allison Garry, during which he advised the Garrys to abandon their home and personal property. Dr. Gray gave that advice based on Ms. Garry's assertion that mold had been detected in her home and that her family had experienced a number of medical illnesses while residing in the home. He did not review any of the Garrys' medical records or any results from

any environmental or industrial hygiene tests conducted in the home before giving Ms. Garry that advice.

As set forth in Hawkeye's *Daubert* motion, Dr. Gray's opinion that the Garrys' medical conditions were caused by mycotoxin exposure in their home should be excluded, because it is not based on any valid scientific methodology and, therefore, is not reliable. In any event, Dr. Gray's testimony should be excluded because it does not "fit," and is not relevant to, the insurance coverage matters at issue in this case—whether the Garrys' home and personal property was damaged by mold and whether the dominant and efficient cause of that mold was a covered event or peril under the policy.

In particular, despite his claimed expertise with respect to mold-related health problems, Dr. Gray admits that, prior to 2004, he had never authored or co-authored any peer-reviewed publication dealing with the alleged health effects from mold exposure. (Gray Dep. 50-51.) Dr. Gray also admits that he does not have a doctorate degree in epidemiology, is not a board-certified toxicologist, is not a medical board-certified pulmonologist or immunologist, and has not earned any advanced degrees in microbiology. (*Id*. 52-53.) Dr. Gray does not have a doctorate degree in the field of mycology, which is the field of studying and evaluating fungal and mold-related illnesses, and he is not a certified industrial hygienist. (*Id*.) He is not medical board-certified in internal medicine and failed the test the only time he took it in 1984. (*Id*. 53-54.) Dr. Gray also has had his admitting privileges suspended or withheld at two hospitals in the 1990s, and he has has been disciplined by the Arizona Medical Board. (*Id*. 54-57.)

Dr. Gray also been precluded from providing expert testimony in other cases involving mold or other alleged chemical exposures. (*Id*. 35-38, 46-47.) In one of those cases, Cronshey v. SPK LTD and Luna Corp., Inc. (District Court, Dallas, Texas), the trial court precluded Dr.

Gray from testifying about any alleged association or causal connection between mold exposures and many of the medical conditions that Dr. Gray is purporting to testify about in this case, such as "mixed mold mycotoxicosis" and its immunologic, neurologic and pulmonary effects. (*Id*. 37-38.)

In his report, Dr. Gray has diagnosed both Steven and Allison Garry with "mixed mold mycotoxicosis" with various features. Significantly, Dr. Gray admits that neither of the Garrys have any mold-related allergies. (*Id*. 102-04.) Although Dr. Gray has diagnosed the Garrys with various conditions which he asserts resulted from exposure to toxic substances, referred to as mycotoxins, from molds in their home, there is no evidence that any molds in the Garrys home ever produced any mycotoxins in the air or on surfaces of their home while the Garrys resided there. Dr. Gray concedes that the testing done in the Garrys' home in late July 2002, a few days before they abandoned their home, did not report the presence of any mycotoxins. (Gray Dep. 67-69.) Moreover, Dr. Gray admits that he cannot quantify the amount or dose of mycotoxins to which he believes the Garrys were exposed while residing in their home. (*Id*. at 72.)

In addition to failing to identify any objective evidence showing mycotoxins being present in the Garrys' home when they abandoned it, Dr. Gray also noted in his report that Steven Garry had other possible sources of mold and mycotoxin exposure outside of his home, both from his office environment and from agricultural activities in the general area of the subdivision where the home was located. (Gray Dep. 87-89, 95-96.)

In support of Hawkeye's motion to exclude Dr. Gray's testimony, Hawkeye has submitted the affidavit of Andrew Saxon, M.D. (Saxon Aff. (Peterson Aff. Ex. U).) Dr. Saxon's Affidavit chronicles his vast expertise in the field of mold-related illnesses and immunology. Dr. Saxon's experience includes the following highlights: (1) the Chief of the Division of Clinical

Immunology and Allergy at UCLA School of Medicine and Director of UCLA's Asthma, Allergy, and Immunologic Disease Center; (2) board-certified by the American Board of Allergy and Immunology, the Board of Clinical and Diagnostic Immunology, and the American Board of Internal Medicine; (3) published in excess of 150 peer-reviewed scientific papers in the field of immunology; (4) editor-in-chief of Clinical Immunology, the official journal of the Clinical Immunology Society; and (5) currently serves or has served on the editorial boards for Journal of Clinical Immunology, Clinical Research, Journal of Allergy & Clinical Immunology, and Disease Markers. (Saxon Aff. ¶¶ 1-8.) Moreover, Dr. Saxon is one of the three authors of the officially adopted Evidence Based Statement - Position Paper concerning human health effects associated with mold exposure issued by the American College of Occupational and Environmental Medicine, the largest such organization in the United States. (*Id*. Ex. 3 (referenced as *Hardin, BD, Kelman, BJ, Saxon, A. Adverse human health effects associated with molds in the indoor environment. J Occup Environ Med 2003 May;45(5):470-8*). That position paper discusses how molds and other fungi may adversely affect human health through three processes: 1) immune reactions to molds best exemplified by allergic reactions to molds, 2) infection with molds, and 3) direct toxic effects of mold metabolites on the host.

Dr. Gray's opinions are not based on valid scientific knowledge. Dr. Saxon is familiar with Dr. Gray's clinical findings based on the examination of the Garrys in November 2002 and he has reviewed the Garrys' medical records that have been produced in this case to Hawkeye. (*Id*. ¶ 11.) Based on that review and analysis, Dr. Saxon has concluded the following:

> Dr. Gray clearly fails to follow generally accepted methods and to use the overall scientific method and his opinions cannot be relied upon….As discussed in detail below, Dr. Gray's methodology and approach to mold-related illness is far outside the bounds of the accepted medical and scientific practice.

(*Id.* ¶ 13.)

Following his general observation that Dr. Gray's opinion is unreliable, Dr. Saxon discussed in detail the flaws of Dr. Gray's opinions in this case. Dr. Gray did not consider the possibility of allergic antibodies from other environmental allergens in his evaluation of the Garrys and in his conclusion that the Garrys' medical symptoms were caused by mold exposure in their home." (Saxon Aff. ¶ 16.)

Dr. Gray relies on the erroneous assumption that all toxigenic molds capable of producing mycotoxins in the Garrys' home actually produced mycotoxins.

> Some species of fungi, including some molds, are known to be capable of producing secondary metabolites referred to as mycotoxins, some of which find valuable clinical use in medical practice. While some molds can produce mycotoxins, the amount (if any) and type of mycotoxin produced is dependent on a complex and poorly understood interaction of factors that probably include nutrition, growth substrate, moisture, temperature, maturity of the fungal colony, and competition from other microorganisms. Thus, it does not follow, as Dr. Gray argues, that the mere presence of a species of molds capable of making mycotoxins means that mycotoxins are actually present in the air of a building.

(*Id.* ¶ 20.) Dr. Saxon further found that:

> Dr. Gray simply assumes that if any mold capable of making a toxin, "toxigenic mold" as he refers to it, was present in the Garrys' home, then such mold produced or generated mycotoxins in sufficient amounts cause all of the symptoms reported by the Garrys. Dr. Gray's approach in assuming exposure to sufficient quantities of mycotoxins is not generally accepted, as evaluating dose is absolutely critical in assessing the exposure. As a medical shortcut, Dr. Gray unacceptably uses the symptoms reported by plaintiffs/patients, in tandem with surrogate markers of exposure that he divines from blood tests, to render his opinion that the mold exposure was sufficient to cause toxicity. Using symptoms to define dose is "backward toxicology" and is contrary to the basic tenets of toxicology and thus not generally accepted methodology. <u>It is my opinion that current medical and scientific evidence does not support the proposition that Garrys' health has been adversely affected by mycotoxins. Indeed, the current scientific evidence makes it extremely unlikely that the Garry's would have been exposed to a dose of mycotoxins that was sufficient to cause any of the medical conditions of which they complain</u>.

(*Id.* ¶ 24.)

Most importantly, Dr. Gray's methodology is flawed due to his reliance on the so-called "Gray's panel" of serology tests that he uses in attempting to prove that the Garrys were exposed to a level of mycotoxins which he believes caused their medical conditions. The first flaw of Dr. Gray's opinion is the use of a Hypersensitivity Pneumonitis ("HP") test or panel. An HP panel is used only to confirm a diagnosis of HP, even according to the laboratory who performed the testing for Dr. Gray. (Saxon Aff. ¶ 26.) However, Dr. Gray did not use HP testing to confirm a diagnosis of HP in either of the Garrys (indeed, Dr. Gray admits that he did not diagnosis the Garrys with HP). (Gray Dep. at 103-104). As Dr. Saxon explains,

> Dr. Gray relies on the HP Panel or equivalent tests, which measure antibody levels to molds, mold toxins or other materials, to conclude that there has been an unhealthy level of exposure to the bacteria or molds identified in the HP Panel or equivalent tests. <u>This is an improper use of such testing and such use is not generally accepted.</u> Critically, determination of the presence of antibodies to molds or alleged mold toxins cannot be used to determine the timing or extent or level of an alleged exposure. Indeed, a series of recent studies have confirmed that measurement of antibody levels to molds cannot be used as an indicator of "exposure."

(Saxon Aff. ¶ 26.) Dr. Saxon concluded that, "[i]n my opinion, Dr. Gray's use of the HP panel for any reason other than to confirm a diagnosis of HP is improper. Dr. Gray's use of the HP panel is not a 'generally accepted use' within the scientific community." (*Id.*)

Gray's panel also relies on Stachybotrys antibody testing to establish toxic exposure to mold, which Dr. Saxon states is also unreliable. The Stachybotrys antibody testing used by Dr. Gray is subject to cross-reactivity, meaning that toxic exposure is not the only cause for a positive result on the test. (*Id.* ¶ 28.) In fact, in order to obtain results of such testing from IBT Laboratories, the recipient must sign a form acknowledging that the tests are new and have no

established clinical utility. (*Id.*) In fact, the California Department of Health Services has issued a bulletin stating, "*this [Stachybotrys antibody] test cannot be used* to definitively determine whether someone has been exposed to Stachybotrys mold or its toxins." (*Id.* ¶ 29.) Apparently, the basis for using Stachybotrys antibody testing to determine exposure to mold and its toxins was one study in which less than 10% of the people actually exposed to Stachybotrys had elevated levels of antibodies. (*Id.*) Additionally, Dr. Gray's use of testing for autoantibodies is similarly considered unreliable in the medical field. (*Id.* ¶¶ 35-36.)

Dr. Gray did not actually perform any differential diagnosis or employ the scientific method in reaching his opinions concerning medical causation for the Garrys. (*Id.* ¶¶ 38-48.) Proper differential diagnosis is conducted as follows:

> Differential diagnosis is the medical parallel of the scientific method in which one makes a hypothesis, tests that hypothesis experimentally and then either rejects or accepts the hypothesis. The "differential diagnosis" is the list of likely disorders; given the evidence in hand with the working diagnosis (hypothesis as to what is wrong with the patient) being the most likely choice with the data in hand. The physician then gathers valid scientific data (physical findings or laboratory tests) to confirm or exclude that diagnosis. Dr. Gray does not follow this accepted procedure. While he claims to exclude other possible causes before reaching his conclusion that the Garrys are suffering from a host of medical problems from mycotoxicosis, in fact he does not do so.

(*Id.* ¶ 39.) After examining Dr. Gray's work, Dr. Saxon determined that "Dr. Gray is not performing differential diagnosis as it is generally accepted in medicine. Therefore, he comes to conclusions that cannot be relied upon." (*Id.* ¶ 40.)

Dr. Gray made several diagnoses that are simply inaccurate. First, Dr. Gray diagnosed Allison Garry with a severe small airway obstruction despite normal test results. (*Id.* ¶ 41.) Dr. Gray also diagnosed both of the Garrys with "mixed mold mycotoxicosis" or "proinflammatory immune toxicity including evidence of hyperactivation, immune suppression and increased

levels of autoimmune activity," when in fact no such diagnosis exists in the medical community (*Id.* ¶ 42, 44.) Furthermore, Dr. Gray attributed Allison Garry's immune alterations to toxic mold exposure when in fact she takes Azathioprine, an immunosuppressive drug can result in such alterations. (*Id.* ¶ 43.)

Dr. Gray's failed to use appropriate test controls in the research he has conducted and upon which he bases his opinion that the Garrys' health has been adversely affected by exposure to mycotoxins in their home.

> Dr. Gray claims to have test results from 200 plus subjects … Dr. Gray has made a fatal error in failing to provide and test specific matched controls. Having such controls is critical both for biologic reasons (age, sex, genetic background, smoking and co-morbid diseases) as well as for technical reasons (flow cytometry is well known to be sensitive to shipping conditions/timing). Without such controls, his results cannot be accepted as valid. A simple example of how this problem invalidates Dr. Gray's immunophenotyping, even if AAL testing could be relied upon, is that people who are depressed, have insomnia, or who smoke, have changes in immunophenotyping. Without such matched controls for his "mold exposed" subjects, Dr. Gray's immunophenotyping research is not scientifically valid but will reflect differences between the selected population he saw and the normals that were used to make up the reference range. Thus, he has not followed generally accepted methodology in doing this testing and his data from those tests is not reliable. This is a common methodological error among unskilled investigators.

(Saxon Aff. ¶ 45.)

In short, according to Dr. Saxon, one of the leading experts in the field of mold-related health effects, Dr. Gray's opinions lack sufficient facts or data to be reliable and are based on unreliable principles and methods. Dr. Gray should be precluded from testifying, because his proffered testimony does not meet the *Daubert* criteria.

In the absence of any reliable testimony to show that the Garrys' medical conditions as of August 1, 2002 were related to any mold exposure in their home, there is no basis for the Garrys'

assertion that they acted reasonably or justifiably in abandoning their home and personal property. The Court should, accordingly, enter summary judgment in favor of Hawkeye on the grounds that Hawkeye has no coverage obligation for property abandoned by the Garrys.

## IV. BECAUSE NO COVERAGE EXISTS UNDER THE HAWKEYE POLICY FOR THE MOLD CLAIM, HAWKEYE IS ENTITLED TO SUMMARY JUDGMENT ON THE GARRYS' BAD FAITH CLAIM.

Hawkeye is also entitled to summary judgment on the Garrys' bad faith claim, because there is no coverage under the Hawkeye homeowner policy for the Garrys' mold property damage claim. "'For proof of bad faith, there must be an absence of a reasonable basis for denial of policy benefits…and the knowledge or reckless disregard [of the lack] of a reasonable basis for denial.'" *Stene v. State Farm Mut. Auto Ins. Co.*, 1998 SD 95, ¶ 19, 583 N.W.2d 399, 403 (quoting *Walz v. Fireman's Fund Ins. Co.,* 1996 SD 135, ¶ 7, 556 N.W.2d 68, 70). As the South Dakota Supreme Court went on to state, "[a]n insurance company may…challenge claims which are fairly debatable and will be found liable [for bad faith] only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." *Id*. If there is no coverage for the Garrys' mold property damage claim, there is a reasonable basis to deny policy benefits. There can also be no showing of knowledge or the reckless disregard of the lack of a reasonable basis for denial. There is, therefore, no bad faith as a matter of law. *Id.*; *see also Simkins v. Great West Casualty Co.*, 831 F.2d 792, 793 (8th Cir. 1987); *Jordan v. Union Ins. Co.,* 771 F.Supp. 1031, 1032 (D.S.D. 1991).

In this case, the question of coverage, which turns specifically on what was the source or cause of the alleged mold contamination in their home, is fairly debatable in view of the many water intrusion events that occurred for years before, as well as after, the Garrys abandoned their

home and personal property. Consequently, summary judgment in favor of Hawkeye is also appropriate as to the bad faith claim against it.

**CONCLUSION**

For the foregoing reasons, this Court should grant Hawkeye's motion for summary judgment with respect to all claims asserted against it in this action.

Dated at Sioux Falls, South Dakota, this 15th day of November, 2004.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

____/s/ Mitchell Peterson___________
Electronically Filed

Cheryle Wiedmeier Gering
Mitchell Peterson
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone: (605) 336-2880
Facsimile: (605) 335-3639

and

John Stadler
Nixon Peabody, LLP
101 Federal Street
Boston, MA 02110-1832
Admitted Pro Hac Vice

*Attorneys for Defendants Homeland Central Insurance Company, formerly known as Hawkeye Security Insurance Company*

**CERTIFICATE OF SERVICE**

The undersigned, one of the attorneys for Defendant Homeland Central Insurance Company formerly known as Hawkeye Security Insurance Company, hereby certifies that a true and correct copy of the foregoing "Defendant's Brief in Support of Motion for Summary Judgment on Issues of Causation of Property Damage, Abandonment, and Bad Faith" was served by electronic filing upon:

Steven M. Johnson
Ronald A. Parsons
Johnson, Heidepriem, Miner,
Marlow & Janklow, L.L.P.
P. O. Box 1107
Sioux Falls, SD 57101-1107

and by mail upon:

Richard Langerman
3216 N. 3rd St., #200
Phoenix, AZ 85012

*Attorneys for Plaintiffs*

on this 15th day of November, 2004.

____/s/ Mitchell Peterson___________
Electronically Filed