Page 1

1        NEIL G. CARLSON, MS, CIH

2       IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF SOUTH DAKOTA

4

5    -----------------------------------------------------

                                    SOUTHERN DIVISION

6    STEVE AND ALLISON GARRY,

7            Plaintiffs,

8       vs.                          CIV. 03-4019

9    HOMELAND CENTRAL INSURANCE

     COMPANY formerly known as HAWKEYE

10   SECURITY INSURANCE COMPANY,

11           Defendant.

12   -----------------------------------------------------

13                    DEPOSITION

14       The following is the deposition of

15   NEIL G. CARLSON, MS, CIH, taken before Patricia K.

16   Carl, RPR, Notary Public, pursuant to Notice of Taking

17   Deposition, at the offices of Robins, Kaplan, Miller &

18   Ciresi, LLP, 2800 LaSalle Plaza, 800 LaSalle Avenue,

19   Minneapolis, Minnesota, commencing at approximately

20   1:10 p.m., October 22, 2004.

21                     COPY

22

23                 *  *  *  *  *

24

25

EXHIBIT
Q

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 2

NEIL G. CARLSON, MS, CIH

1
2
3 APPEARANCES:
4
5 On Behalf of the Plaintiffs:
   Ronald A. Parsons, Jr., Esquire
   JOHNSON, HEIDEPRIEM, MINER,
6     MARLOW & JANKLOW, L.L.P.
   P.O. Box 1107
7  431 North Phillips Avenue
   Suite 400
8  Sioux Falls, South Dakota  57101-1107
   (605) 338-4304
9  ron@jhmmj.com
10
11 On Behalf of the Defendant:
12   John S. Stadler, Esquire
   NIXON PEABODY LLP
13   100 Summer Street
   Boston, Massachusetts  02110-2131
14   (617) 947-1735
   jstadler@nixonpeabody.com
15
16
   On Behalf of the deponent:
17
   Thomas J. Conlin, Esquire
18   ROBINS, KAPLAN, MILLER & CIRESI
   2800 LaSalle Plaza
19   800 LaSalle Avenue
   Minneapolis, Minnesota  55402-2015
20   (612) 349-8500
   tjconlin@rkmc.com
21
22
23        * * * * *
24
25

Page 3

NEIL G. CARLSON, MS, CIH

1
2
   DEPOSITION REFERENCE INDEX
3
4
   EXAMINATION
5  By Mr. Stadler: 4
6
7  OBJECTIONS
8  By Mr. Conlin:  16, 25, 26, 34, 35, 43, 67, 70, 88,
      103, 119, 143, 157, 162, 177, 178, 179, 180, 182
9
   By Mr. Parsons: 50
10
   By Mr. Stadler: 69
11
12
        EXHIBIT INDEX
13
14 EXHIBIT NO. 1 MARKED, Notice of Taking Deposition....5
   EXHIBIT NO. 2 MARKED, Report.........................5
15 EXHIBIT NO. 3 MARKED, Multi-page document/
      Toxicity screening results...................5
16 EXHIBIT NO. 4 MARKED, Articles......................11
   EXHIBIT NO. 5 MARKED, Articles......................13
17 EXHIBIT NO. 6 MARKED, Article.......................13
   EXHIBIT NO. 7 MARKED, GeoTek report.................34
18 EXHIBIT NO. 8 MARKED, 9/2/02 Microbial Assessment
      For Fountain Drive, Sioux Falls, SD.........127
19
20
21
22
23
24
25

Page 4

NEIL G. CARLSON, MS, CIH

1
2        P R O C E E D I N G S
3  .  Whereupon, the deposition of NEIL G. CARLSON,
4  MS, CIH, was commenced at 1:10 p.m. as follows:
5
6        NEIL G. CARLSON, MS, CIH,
7      after having been first duly sworn,
8     deposes and says under oath as follows:
9             ***
10            EXAMINATION
11
12 BY MR. STADLER:
13    Q.    Good morning, sir.  We are taking the
14 deposition of Mr. Neil Carlson today in conjunction
15 with a case entitled Steve and Allison Garry versus
16 Hawkeye Security Insurance Company that is pending in
17 the United States District Court for the District of
18 South Dakota, Southern Division.
19        Will you please state your full name.
20    A.    **Neil Geoffrey Carlson.**
21    Q.    Where do you reside?
22    A.    **I reside at 216 16th Avenue South, New**
23 **Brighton, Minnesota, 55112.**
24    Q.    Are you currently employed?
25    A.    **Yes.  I am employed at the University**

Page 5

NEIL G. CARLSON, MS, CIH

1
2 **of Minnesota and I also am president of N.G. Carlson**
3 **Analytical.**
4    Q.    For what period of time have you been
5 an employee of the University of Minnesota?
6    A.    **I have been an employee of the**
7 **University of Minnesota since -- started July, 1988.**
8        **(Whereupon, Carlson Deposition**
9        **Exhibit Nos. 1-3 were marked for**
10       **identification.)**
11 BY MR. STADLER:
12    Q.    I have marked as Exhibit 2 a document
13 that is entitled Plaintiffs' Rule 26(a) Disclosure of
14 Neil Carlson, and it consists of a number of things,
15 one of which is a CV of Mr. Carlson.  I'm going to
16 show him Exhibit 2 and ask you, sir, if the CV,
17 curriculum vitae in Exhibit 2, accurately reflects
18 your employment history?
19    A.    **I would say probably '88 instead of**
20 **'89.**
21    Q.    When you are referring to '88, what are
22 you talking about?
23    A.    **No.  Correct.  It is '88.  '89 is when**
24 **I became a public health specialist.  '88 is when I**
25 **was a safety technician, so that is correct.  The**

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 6

NEIL G. CARLSON, MS, CIH

1   employment history is correct.
2   Q.   You are referring to the first page of
3   your curriculum vitae or your resume, so to speak?
4   A.   That is correct, yes.
5   Q.   So your full employment history is set
6   forth in these first two pages here, you began in
7   1984, at least the first job I see listed here is a
8   natural science judge at county fairs. Do you see
9   that?
10   A.   Yeah. I did some odd jobs before then.
11   That is where I started out the resume. The odd jobs
12   would have been painting, et cetera.
13   Q.   Okay. What did you do prior to today
14   to prepare for this deposition?
15   A.   I reviewed my report on the information
16   that we had, and then I reviewed some journal articles
17   with respect to some information that was germane to
18   the case. And then what else did I do?
19   Q.   When you say the report, you are
20   referring to Exhibit 2 that I marked here?
21   A.   Yes. I reviewed my report, and then I
22   looked at this document. What exhibit is that
23   entitled?
24   Q.   Are you referring to Exhibit 3?

Page 7

NEIL G. CARLSON, MS, CIH

1
2   A.   Yeah, I looked at Exhibit 3.
3   Q.   Exhibit 3 is a multi-page document I
4   received today it appears for the first time from
5   Garrys' attorney just a few minutes before the
6   deposition. The first page of it is on the apparent
7   letterhead of Eckardt Johanning, J-O-H-A-N-N-I-N-G,
8   MD, and it's entitled Toxicity Screening Results. Is
9   that the document that you referred to?
10   A.   That is exactly the document I referred
11   to. And then we had some questions about the report
12   so I called Dr. Johanning, or Tom Conlin called Dr.
13   Johanning to clarify what item number 4 space board
14   meant. And that item space board means they took a
15   sample from the actual filter, and then I had a
16   question about how long that filter had been in the
17   house, so Tom Conlin contacted the Garrys and asked
18   them about what the filter change schedule was for the
19   house and then when was the last time that that filter
20   had been changed, and he indicated that the last time
21   he knew about when the filter had been changed, it
22   hadn't been changed since they had left the house. So
23   that was informative to me.
24   Q.   So those are the three items that you
25   reviewed prior to coming here today to give testimony

Page 8

NEIL G. CARLSON, MS, CIH

1   in this case, is that correct? Let me just --
2   A.   If you mean immediately, I reviewed all
3   of these documents as well, or were you talking about
4   just today?
5   Q.   Let me back up a second. It would be
6   very helpful for the court reporter if you allow me to
7   finish my question before you answer. I will try not
8   to interrupt you and you try not to interrupt me. It
9   makes it a lot easier.
10          Before coming here today to prepare for
11   your testimony today, did you review what has been
12   marked as Exhibit 2 which includes items with eight
13   tabs?
14   A.   I didn't look today at the all of the
15   reports in the item eight tabs. I looked at my
16   summary report.
17   Q.   Exhibit 2?
18   A.   Exhibit 2, yes.
19   Q.   Did you also review Exhibit 3?
20   A.   Yes, I did.
21   Q.   Other than Exhibit 2, the main body of
22   your report, and Exhibit 3, what else, and these
23   journal articles, what else before today did you
24   review to prepare for this testimony?

Page 9

NEIL G. CARLSON, MS, CIH

1
2   A.   I also reviewed briefly your
3   consultant's report. I have to find that one. I
4   cursory reviewed the URS report, June 11, 2004.
5   Q.   Anything else did you review prior to
6   coming here today to testify?
7   A.   I am trying to recall if there is
8   anything else. Not at this time. If I recall it
9   later on, I will appraise you of that.
10   Q.   What journal articles did you refer to
11   when you said you reviewed some journal articles prior
12   to coming here to testify?
13   A.   The journal article that I referred to,
14   and I think I have it here, these three, a
15   cursory review is -- the other one is an article from
16   I believe it's ACOEM. It's the American Academy of
17   Occupational and Environmental Medicine.
18   Q.   Is that an article that was co-
19   authored by Dr. Andrew Jackson, do you recall?
20   A.   I do not recall if it was or not. I
21   hope I have it along. I may have reviewed it at my
22   desk.
23   Q.   That is a possibility?
24   A.   Yes. Here it is. Actually I have it.
25   That one, American College of Occupational and

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 10

NEIL G. CARLSON, MS, CIH

1  **Environmental Medicine.**
2  Q.    For the record, let me just identify,
3  it appears the four journal articles that Mr. Carlson
4  just pulled from his file which he says he reviewed in
5  part?
6  **A.    Yes, correct.**
7  Q.    Prior to coming here today to give his
8  testimony in this case.  The first is entitled, it's
9  an article from the American College of Occupational
10  and Environmental Medicine, an entity that published
11  this article.  The article is entitled, "Adverse Human
12  Health Effects Associated With Molds in the Indoor
13  Environment," dated October 27, 2002.
14  The second article is entitled,
15  "Understanding the Current Interest in Mold Litigation
16  From an Industrial Hygienist's Perspective," and it
17  appears to have been published as part of the ABA
18  section of litigation annual conference May 5 through
19  8, 2004.
20  The third appears to have been printed
21  out from the internet perhaps.  It's entitled, "An
22  Overview of the Health Effects Due to Mold Exposure. "
23  **A.    I have to double-check.**
24  Q.    Presented at the Indoor Air 2002 ninth

Page 11

1  NEIL G. CARLSON, MS, CIH
2  international conference on indoor air quality and
3  climate.
4  And then the fourth article is
5  entitled, "Mold - It's Not New - It Only Seems That
6  Way," by Mona Shum and Rod Bronstein.  There is no
7  date apparent on the document.
8  MR. STADLER:  I wanted to just mark
9  these collectively as Exhibit 4.
10
11  (Whereupon, Carlson Deposition
12  Exhibit No. 4 was marked for
13  identification.)
14  (Discussion had off the record.)
15  MR. STADLER:  Back on the record.
16  BY MR. STADLER:
17  Q.    Have you been retained by any party in
18  this case to testify?
19  **A.    Sir, may I enter that I recall as per**
20  **our discussion two other documents that I did review,**
21  **so I apologize for not being forthcoming.  These are**
22  **two documents that I reviewed with respect to the**
23  **case.**
24  Q.    You are handing me a one-page document
25  which is dated by fax apparently 7/19/2002?

Page 12

1  NEIL G. CARLSON, MS, CIH
2  **A.    That is correct, sir.**
3  Q.    And it is referencing a report by
4  Environmental Microbiology Laboratory, Inc.?
5  **A.    That is correct.**
6  Q.    It refers to sampling done on July 18,
7  2002?
8  **A.    That is correct, sir, yes.**
9  Q.    You reviewed that.  Let's keep that
10  aside for a moment.
11  The other document is a multi-page
12  document, the first page of which is dated July 18th,
13  2003, from a John Neville, PhD, at PK - Jarvis
14  Microbiological to Neil Carlson, is that correct?
15  **A.    That is correct, yes.**
16  Q.    Do you know whether the first one-page
17  document you have referenced from Environmental
18  Microbiology Labs is already in your report?
19  **A.    I do not know, but I recall looking**
20  **specifically at the page and I did not know if it was**
21  **in the report, so I wanted to make sure I was**
22  **thorough.**
23  Q.    As to this second document, the July
24  18, 2003 document from PK Jarvis, is that in your
25  report?

Page 13

1  NEIL G. CARLSON, MS, CIH
2  **A.    I do not know if that one is.**
3  MR. STADLER:  Let's mark these both
4  collectively.  Strike that.  Let's mark first the
5  one-page document, we are up to Exhibit 5 I believe,
6  let's mark that as Exhibit 5, and the second document
7  as Exhibit 6.
8  (Whereupon, Carlson Deposition
9  Exhibit Nos. 5 and 6 were marked
10  for identification.)
11  BY MR. STADLER:
12  Q.    Have you been retained by Steve and
13  Allison Garry for purposes of testifying in this case?
14  **A.    Yes, I have, sir.**
15  Q.    When were you retained?
16  **A.    I do not recall that.  I do not recall**
17  **when I was retained.**
18  Q.    Do you recall whether you were retained
19  in 2003 as opposed to 2002?
20  **A.    I do not recall if it was 2002 or 2003.**
21  **It would be in one of the reports as far as what time**
22  **I was retained.**
23  Q.    When you say one of the reports, are
24  you talking about the report that you issued in this
25  case?

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 14

NEIL G. CARLSON, MS, CIH

1
2   **A.    No.  It would be in one of the earlier**
3   **reports where I mentioned us going to investigate the**
4   **Garry residence, and we had some prior discussions to**
5   **going to that residence, and I recall them being in**
6   **the wintertime, and I don't recall whether those**
7   **occurred in January or December.  So it would be**
8   **either 2002 or 2003.**
9       Q.    For example, in Exhibit 2, your report
10  at tab 5 there is this GeoTek report referring to a
11  test on March 11th and May 7th, 2003.  Do you see
12  that?
13      **A.    Yes, and I was part of that.**
14      Q.    Do you recall having been involved
15  prior to March, 2003?
16      **A.    Yes.  There was discussions about**
17  **whether we should go travel to the residence, and we**
18  **discussed sampling strategy and things prior to that.**
19      Q.    But is it your memory that you were not
20  retained before January 1, 2003?
21          MR. CONLIN:  He just answered the
22  question for you.  He said it's either 2002 or 2003.
23  Now what are you asking him to do?
24          MR. STADLER:  For purposes of the
25  record would you identify yourself, sir?

Page 15

NEIL G. CARLSON, MS, CIH

1
2           MR. CONLIN:  Sure.  I am Tom Conlin and
3   I am representing the deponent.
4           MR. STADLER:  Are you representing the
5   Garrys?
6           MR. CONLIN:  I represent the Garrys,
7   but not in this case.
8           MR. STADLER:  In what other case do you
9   represent the Garrys?
10          MR. CONLIN:  It's not any of your
11  business.  I represent the Garrys.
12          MR. STADLER:  Is Mr. Carlson being
13  offered here for purposes only of the case involving
14  Steven and Allison Garry versus Hawkeye Security
15  Insurance Company for which this witness was noticed
16  today?
17          MR. CONLIN:  That is correct.
18          MR. PARSONS:  Yes, that is why we
19  brought him today.  And I, Ron Parsons, represent the
20  Garrys in this case.
21          MR. STADLER:  Mr. Conlin, you represent
22  him in his personal capacity?
23          MR. CONLIN:  I am his lawyer for his
24  deposition today.
25          MR. STADLER:  So you represent him in

Page 16

NEIL G. CARLSON, MS, CIH

1           his personal capacity?
2   his personal capacity?
3           MR. CONLIN:  I represent him for his
4   deposition today.
5           MR. STADLER:  Are you representing as
6   well Mr. Carlson's company that he referred to earlier
7   in his deposition?
8           MR. CONLIN:  Which company?
9           THE WITNESS:  N.G. Carlson Analytical,
10  Inc.
11          MR. CONLIN:  To the extent he is here
12  as a representative of that company today, yes, I am
13  representing him in that capacity as well.
14  BY MR. STADLER:
15      Q.    Sir, do you recall whether you were
16  retained by the Garrys to testify in this case prior
17  to January 1, 2003?
18          MR. CONLIN:  Objection.  Asked and
19  answered.  You can try to answer again if you want to.
20          THE WITNESS:  I frankly don't know.
21  BY MR. STADLER:
22      Q.    You brought a set of documents here as
23  a part of your file on this case?
24      **A.    Yes.**
25      Q.    Again, you are going to have to let me

Page 17

NEIL G. CARLSON, MS, CIH

1
2   finish the question before you answer.
3           Do you have a copy of the retention
4   agreement in that file before this case, a written
5   agreement with the Garrys or your counsel for
6   representing the Garrys in this case?
7           MR. CONLIN:  The case for which the
8   deposition has been noticed?
9           MR. STADLER:  The only case I am aware
10  of that exists between the Garrys and Hawkeye Security
11  Insurance Company is the one we have noticed the
12  deposition for.
13          MR. CONLIN:  That is the case being
14  discussed, Neil.
15          THE WITNESS:  I don't know if there was
16  a written agreement specifically between myself and
17  the Garrys.
18  BY MR. STADLER:
19      Q.    My question was with counsel.  Have you
20  been retained by any counsel?
21      **A.    Yes, I have.**
22      Q.    Who is that?
23      **A.    That is the Johnson -- I'm not sure of**
24  **the name of it.**
25          MR. CONLIN:  Johnson Heidepriem.

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 18

NEIL G. CARLSON, MS, CIH

1        NEIL G. CARLSON, MS, CIH
2        THE WITNESS: Johnson Heidepriem.
3  BY MR. STADLER:
4        Q.    They retained you for purposes of your
5  testimony in this case?
6        A.    Yes.
7        Q.    You don't know whether you have a
8  written agreement with the Johnson firm for giving
9  testimony in this case, is that correct?
10       A.    I don't recall if we ever had a written
11 agreement on that, sir.
12       Q.    What is your understanding as to what
13 the Garrys are claiming against Hawkeye Security in
14 this case?
15       A.    My basic understanding is that they are
16 claiming water damage and that subsequent mold growth
17 from the water damage caused a problem with their
18 house that based on medical opinion made it not
19 habitable for them.
20       Q.    What do you understand they are
21 claiming as to what the source of the water damage
22 was, as to their claim against Hawkeye?
23       A.    The central claim, as I understand it,
24 is a problem associated with a toilet leak that led to
25 fungal growth in the house.

Page 19

1        NEIL G. CARLSON, MS, CIH
2        Q.    Where was the toilet that you are
3  referring to?
4        A.    The toilet leak was in the master
5  bedroom directly above the southwest bedroom.
6        Q.    Is it your understanding that the
7  Garrys are seeking to recover for property damage
8  caused by that leaking toilet against their insurance
9  carrier, Hawkeye?
10       A.    I believe so, yes.
11       Q.    Do you know whether the Garrys are
12 seeking to recover against Hawkeye any damages for any
13 personal injuries in this case?
14       A.    This case, I don't believe they are
15 attempting personal injury.
16       Q.    Do you know of any other case where
17 they are doing that?
18       A.    Yes, I do.
19       Q.    What case is that?
20       A.    I don't know the title of the case, but
21 there is a personal injury case, yes, sir.
22       Q.    When was that filed?
23       A.    I do not know.
24       Q.    Are you going to testify with respect
25 to that case?

Page 20

1        NEIL G. CARLSON, MS, CIH
2        A.    I do not know.
3        Q.    Do you know against whom that case was
4  brought?
5        A.    I do not know.
6        Q.    How do you know there is a personal
7  injury case pending?
8        A.    I have been appraised of that by Mr.
9  Conlin.
10       MR. CONLIN: Mr. Stadler, he is wrong
11 about that. The case has not been filed yet.
12       THE WITNESS: Okay. Then I did not
13 know whether it was filed or not.
14 BY MR. STADLER:
15       Q.    What do you know about when this water
16 damage from a leaking toilet occurred, what do you
17 know about the facts of that situation?
18       A.    I understand the facts from reports
19 written, summary reports from GeoTek Engineering, and
20 that sometime, and my recollection is 1999, but that
21 date could be inaccurate, but sometime during that
22 portion there was a water leak and the ceiling
23 collapsed, and there was fungal growth identified on
24 the sheetrock, and that is the extent of it.
25       Q.    Fungal growth identified in 1999?

Page 21

1        NEIL G. CARLSON, MS, CIH
2        A.    Fungal growth identified, I believe it
3  would be referenced to this particular document.
4        Q.    You are referring to July of 2002, July
5  18th?
6        A.    That is correct.
7        Q.    In fact, in your report which has been
8  marked as Exhibit 2, there are several GeoTek reports
9  referring to an event where the Garrys detected what
10 was suspected to be mold in the southwest bedroom of
11 the basement of their home, is that correct?
12       A.    That is correct.
13       Q.    In July of 2002, correct?
14       A.    Yeah.
15       Q.    But you mention 1999. What do you
16 understand about what happened in 1999?
17       A.    I understand not from my personal
18 understanding, but from discussions about it, that
19 there was a slow leak with the toilet, but I did not
20 personally witness it. It is just my understanding
21 there was a slow leak with the toilet.
22       Q.    Were you told also that slow leak was
23 repaired in 1999?
24       A.    I was not told anything about that.
25       Q.    Were you told at any time that mold had

Page 22

NEIL G. CARLSON, MS, CIH

1 been detected by the Garrys in 1999 under that toilet
2 and that the mold had been removed at that time?
3 MR. CONLIN: Which mold, Counsel, if
4 you could clarify.
5 BY MR. STADLER:
6 Q. Were you told at any time by anyone
7 that mold was detected underneath the toilet in the
8 master bedroom and in the ceiling of the southwest
9 bedroom in the Garry home in 1999?
10 A. I don't recall when, and I am going to
11 ask for a clarification. Are we talking about when
12 the material was removed from the ceiling?
13 Q. I am talking about, sir, if you bear
14 with me, you made reference to mold found apparently
15 in July of 2002 in the ceiling of the southwest
16 basement, correct, or in the sheetrock of the
17 southwest basement, correct?
18 A. That is when the analysis was
19 conducted.
20 Q. Right. I am talking about prior to
21 that. Prior to that in 1999 were you told, did you
22 become aware prior to that in 1999 that the Garrys had
23 detected mold in the ceiling of the southwest basement
24 right below the master bedroom toilet?

Page 23

NEIL G. CARLSON, MS, CIH

1 MR. CONLIN: I object to the form of
2 the question as to the word detected. I don't know
3 what you mean by it.
4 BY MR. STADLER:
5 Q. If you understand what I mean by the
6 word detected, you can answer that question, sir.
7 A. I don't know specific dates with
8 respect to detected. I understand that at sometime
9 prior to this sample, that --
10 Q. And you are referring to the July, 2002
11 sampling, correct?
12 A. Yeah, that sometime prior to that
13 sample they had -- the ceiling collapsed and they saw
14 visible mold growth on the sheetrock. At whatever
15 event that particular time happened there was notice
16 of visible mold growth at that time.
17 Q. You are referring to the fact that in
18 July of 2002, before the sampling that was done that
19 was referenced in Exhibit 5, the Garrys and/or a
20 consultant detected what they thought was mold in the
21 sheetrock of the southwest bedroom, correct?
22 A. Yeah, sometime to prior to that they
23 saw some sheetrock that had fungal growth on it.
24 Q. Are you also aware though that three

Page 24

NEIL G. CARLSON, MS, CIH

1 and a half years before or two and a half years before
2 in 1999 Mrs. Garry also noticed what was suspected to
3 be mold in the ceiling below the master bedroom
4 toilet? Are you aware of that? That is all I am
5 asking you, sir.
6 MR. CONLIN: It assumes facts not in
7 evidence.
8 MR. STADLER: I am asking if he is
9 aware of the fact, not whether he is assuming.
10 MR. CONLIN: Your question contains a
11 premise that isn't established.
12 BY MR. STADLER:
13 Q. Let me back up. Have you reviewed
14 prior to today any testimony given by Mrs. Garry in
15 this case?
16 A. No, I have not.
17 Q. Have you reviewed any testimony given
18 by Mr. Steven Garry in this case?
19 A. No, I have not, sir.
20 Q. Would your opinion or opinions, plural,
21 as they appear in Exhibit 2 be changed in any way if
22 you knew that in 1999 Mrs. Garry had observed what was
23 thought to be mold in the ceiling of the southwest
24 bedroom under the toilet, and that that mold was

Page 25

NEIL G. CARLSON, MS, CIH

1 removed at that time?
2 MR. CONLIN: I object to the form of
3 the question. It assumes facts not in evidence. And,
4 Neil, I'm going to let you answer the question, but
5 you should read your report in full before you answer
6 that question, because it's only fair if he is asking
7 you whether any opinion in your report is going to
8 change if you assume what he said is true. Why don't
9 you get your report and read it.
10 MR. STADLER: It's my deposition, Mr.
11 Conlin. I will do as I see fit.
12 BY MR. STADLER:
13 Q. Sir, you have given a report in this
14 case, correct?
15 MR. CONLIN: You know what, John, you
16 don't need to be rude.
17 MR. STADLER: No one is rude. No one
18 has been rude at all today. You are interrupting me
19 during the middle of my questioning. If you let me go
20 forward with my questioning, you can give the witness
21 your instructions. We are speaking as professionals.
22 No one is rude.
23 MR. CONLIN: You are speaking with a
24 tone that is disrespectful of this witness.

Page 26

```
1         NEIL G. CARLSON, MS, CIH
2         MR. STADLER: I respectfully disagree.
3  I am not going to spend three hours in that capacity.
4         MR. CONLIN: I have a question to you.
5  Are you withdrawing your former question, are you
6  changing it, are you withdrawing your former question?
7         MR. STADLER: I will withdraw my
8  question and I will proceed.
9  BY MR. STADLER:
10    Q.    Sir, you have given opinions in this
11 case?
12    A.    That is correct, sir.
13    Q.    Those opinions appear in your report as
14 marked as Exhibit 2, correct?
15    A.    That is correct, sir.
16    Q.    You have a memory here today separate,
17 apart of reading this report of what your opinions
18 are, correct?
19         MR. CONLIN: You mean in their
20 totality?
21         MR. STADLER: Yes.
22         THE WITNESS: No, I would not recall my
23 memory as being that good. I would need to refer to a
24 document if you are asking some specific questions,
25 sir.
```

Page 27

```
1         NEIL G. CARLSON, MS, CIH
2  BY MR. STADLER:
3    Q.    We'll do that later this afternoon,
4  sir. What I am asking you first though is without
5  looking at the report, what opinion or opinions are
6  you giving in this case?
7         MR. CONLIN: That is not a fair
8  question. You can refer to your report if you want
9  to, Neil. I don't know -- what's the purpose for the
10 question, Counsel?
11         MR. STADLER: The purpose is to try to
12 expedite the deposition, and assuming he gives me an
13 answer that I agree with, I won't have to ask him in
14 depth about his report. If he says, "I cannot do
15 that, sir," it's a simple response and I will move on.
16         MR. CONLIN: It's not a fair question
17 to ask him what his opinions are when they are written
18 right in front of you. It's not a memory test,
19 Counsel.
20         MR. STADLER: It is. To some extent it
21 is and that is why we have depositions. He is trying
22 to remember what happened over the time he has looked
23 at this instance and these circumstances. I'm asking
24 him of his memory of things. If he is going to tell
25 me he doesn't recall, he would like to look at his
```

Page 28

```
1         NEIL G. CARLSON, MS, CIH
2  report, that is fine, he can look at his report. You
3  know that is the procedure. I am not trying to do
4  anything different than the normal procedure.
5         MR. CONLIN: It's never been my
6  experience for any good lawyer to ask a witness, "Tell
7  me what your opinions are," when they are written
8  right in front in the report. It's simply an effort
9  to trick him.
10 BY MR. STADLER:
11    Q.    Let me ask you to take a look at your
12 report and tell me what your opinion or opinions are
13 in this case.
14    A.    Thank you very much, sir.
15         MR. CONLIN: To expedite matters, you
16 can simply refer him to the pages of the report where
17 your opinions are found.
18         THE WITNESS: Okay. Thank you, sir.
19 Let's go to my report, summarizes locations where
20 various organisms were found within the house, and I
21 list the location where Chaetomium was primarily found
22 and where Stachybotrys was primarily found and where
23 Aspergillus versicolor and Penicillium was primarily
24 found, and summarize that. With respect to indoor
25 fungal growth, I summarized the contribution of the
```

Page 29

```
1         NEIL G. CARLSON, MS, CIH
2  master bedroom toilet leak, indicating that it
3  contributed to the growth of Stachybotrys, Chaetomium,
4  Aspergillus versicolor and Penicillium, and that based
5  on this, you can look at the indoor fungal
6  contribution in the master bedroom toilet leak if you
7  would like to have a full piece, but that is the
8  essence of the summary of the report.
9  BY MR. STADLER:
10    Q.    So the essence of your testimony that
11 you propose to give in this case as you are giving
12 today is that you believe that the toilet leak in the
13 master bedroom above the southwest bedroom contributed
14 to the presence of mold in the Garry home, is that
15 correct?
16    A.    That would be an accurate summary.
17    Q.    Good. What else contributed to the
18 growth of mold in the Garry home as far as you are
19 aware of as of August 1st, 2002, when the Garrys left
20 their home?
21    A.    As of 2002?
22    Q.    August 1st. And you are aware they did
23 leave their home in or about that time, correct?
24    A.    Yeah, around that time. I will need to
25 refer to specific -- there is a specific summary in
```

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 30

NEIL G. CARLSON, MS, CIH

1  one of the GeoTek reports that laid out the specific
2  moisture incidents that occurred within the house.
3      Q.    There were multiple moisture incidents,
4  correct?
5      A.    That is correct, sir, yes.
6      Q.    They were separate and apart from the
7  leaking toilet?
8      A.    That is correct, sir.
9      Q.    In fact, there were at least two sewer
10  backups in the Garry home prior to August of 2002, one
11  in 1996 and one in July of 2002?
12      A.    That is correct, sir, yes.
13      Q.    There was also water intrusion from a
14  number of windows in the basement bedrooms in the
15  Garry home over time, correct?
16      A.    Yes. I have been made aware that there
17  was leaking in the windows.
18      Q.    There was also a refrigerator leak that
19  occurred about a month or so after the Garrys left,
20  correct?
21      A.    To be specific, I think it was
22  associated with the ice maker.
23      Q.    That is exactly right, and thank you
24  for reminding me about that. As a result of that

Page 31

NEIL G. CARLSON, MS, CIH

1  incident, there was a significant amount of water that
2  went down into the basement area at that time,
3  correct?
4      A.    Yes. I believe it went in the rec
5  room, directly underneath in the rec room area.
6      Q.    There was also, in the GeoTek report I
7  have seen and you have reviewed and is part of your
8  report here today that referenced a water intrusion
9  through a lighting fixture?
10      A.    That would be the upper level, correct.
11  And if I can refer to a house plan, I know exactly
12  where it is.
13      Q.    Why don't we do that.
14      A.    Let's take a look, sir.
15      Q.    I can show you, we are referring to tab
16  1 of Exhibit 2, and it's a GeoTek report and has a
17  floor plan, correct?
18      A.    This is the lower level.
19      Q.    The next page is the upper level.
20      A.    As I recall, it was this office
21  (indicating).
22      Q.    You are referring to the northwest
23  office, right?
24      A.    That is correct, sir.

Page 32

NEIL G. CARLSON, MS, CIH

1      Q.    And that occurred a number of years
2  before the toilet leak was detected, correct?
3      A.    I don't recall when this occurred.
4      Q.    That is referenced in the GeoTek
5  report, right?
6      A.    Yes.
7      Q.    Are you aware of any evidence that the
8  toilet leaked after 1999?
9      A.    I don't know about that.
10      Q.    You don't know whether the toilet leak
11  was repaired in 1999, correct?
12      A.    I was not appraised of that.
13      Q.    You are aware of this sewer backup that
14  occurred in July of 2002, correct?
15      A.    Yes, I am.
16      Q.    And, in fact, the extent of that backup
17  is referenced in this chart that is set forth in tab 1
18  of Exhibit 2, right?
19      A.    That is correct. That is my
20  understanding.
21      Q.    There is an area that is circled and
22  then some shading in that that references the
23  approximate area of the sewage backup, right?
24      A.    That is correct, yes.

Page 33

NEIL G. CARLSON, MS, CIH

1      Q.    And then there is in that same chart a
2  notation in the upper corner of the southwest bedroom
3  showing that this is where visible mold was found from
4  allegedly the leaking toilet above, right?
5      A.    That is correct, yes.
6      Q.    And the GeoTek report referred to a
7  sewer backup several years prior, correct? I can give
8  you that reference.
9      A.    As I recall, there was, right.
10      Q.    In January of '96, is that correct?
11      A.    That is correct, yes, sir.
12      Q.    Were you also aware that in July, or
13  June and July of 2003 there was a major rainfall, and
14  at that time water intrusion was detected through the
15  concrete foundation of the basement in the Garry home,
16  coming through the concrete foundation of the Garry
17  basement?
18      MR. CONLIN: Are you asking him to
19  assume that is how the water got there?
20      MR. STADLER: No. I'm asking him if he
21  is aware of the report that is how the water got
22  there.
23      THE WITNESS: My recollection, I'm not
24  sure if it's included in this particular part of it.

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04



Page 34

NEIL G. CARLSON, MS, CIH

1  Is it included in that piece or not?
2  BY MR. STADLER:
3      Q.     I don't think it's in your reports.  I
4  will mark a document now, Exhibit 7, which is a
5  four-page document, the first page dated July 9th,
6  2003, GeoTek report to Mr. Tom Conlin, referencing
7  site assessment following water intrusion of July of
8  '03.
9      A.     Thank you for appraising me of that.
10         (Whereupon, Carlson Deposition
11         Exhibit No. 7 was marked for
12         identification.)
13 BY MR. STADLER:
14     Q.     Were you aware of this prior to today,
15 this event?
16     A.     I don't recall if I was.  I knew there
17 had been several water intrusion events, and I don't
18 recall if I had particular knowledge of this event.
19         MR. CONLIN:  I think your question
20 initially to him that prompted his review of this
21 report and your marking of it or your supplying of it
22 assumed that there was a report that said it had come
23 through the foundation wall.  I object to your
24 question on that basis.

Page 36

NEIL G. CARLSON, MS, CIH

1         MR. CONLIN:  I don't want you to
2  misquote the documents.
3         MR. STADLER:  I'm not misquoting the
4  documents.
5         MR. CONLIN:  Neil, be very careful with
6  respect to these questions to not presume the document
7  says that.
8  BY MR. STADLER:
9      Q.     This is another event though, sir, is
10 it not?
11     A.     This is another event where water came
12 into the Garry residence.
13     Q.     It has nothing to do with a leaking
14 toilet, correct?
15     A.     That is correct, sir.
16     Q.     Let's look at tab 8 of your report, if
17 I could.
18     A.     Sir, would you like me to put this back
19 on top?
20     Q.     You can hold on to your report.  Look
21 at that report.  It's dated December 17, 2003.  It's
22 apparently a letter to Mr. Tom Conlin I believe from
23 GeoTek, but again, I haven't looked at the last page
24 recently.

Page 35

NEIL G. CARLSON, MS, CIH

1  BY MR. STADLER:
2      Q.     Let me refer you to page 3 of this
3  document, Exhibit 7.  Under the section referring to
4  outside, the second paragraph, it states, "It was also
5  noted there is a crack in the foundation cement right
6  along the south corner of the NW bedroom."  Do you see
7  that?
8      A.     Yes, I do see that.
9      Q.     After that quote it says, "These may be
10 sources of water intrusion into the northwest basement
11 bedroom."  Do you see that?
12     A.     Yes, I do.
13         MR. CONLIN:  My objection stands.  The
14 difference between may and the premises of your
15 question was that in fact that was the case, and may
16 is different.  When you look at the end of the report,
17 it makes it clear there are other possible causes.  I
18 object to it on that grounds.  You are trying to trick
19 him.
20         MR. STADLER:  I don't disagree there
21 are a number of possible sources of water intrusion
22 into the basement, especially in July of 2003 and
23 before.  That is the purpose of my earlier questions
24 to the witness.

Page 37

NEIL G. CARLSON, MS, CIH

1      A.     We'll take a look.  It is from GeoTek.
2      Q.     Mr. Wilkinson?
3      A.     Yes, sir.
4      Q.     Are you familiar with him?
5      A.     Yes, I am.
6      Q.     Have you worked with him in conjunction
7  with this case?
8      A.     Yes, I have.
9      Q.     Have you reviewed any reports that Mr.
10 Wilkinson or GeoTek prepared with respect to the Garry
11 home?
12     A.     Yes, I have, sir.
13     Q.     What does this report in general refer
14 to?
15     A.     This report refers to some visible mold
16 growth that Mr. Thompson, a person from the Twin City
17 area who specializes in mold abatement, he noted some
18 fungal growth on a wall.  In fact, this is a poor --
19 I think I might even have a colored report on this
20 one.  He noticed in I believe it's the utility
21 storeroom, and it was on a shelving unit, and it lists
22 the type of organisms that were present on that
23 particular surface.
24     Q.     Going back now to tab 1 of Exhibit 2

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 38

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2  where we had the schematic of the basement, where is
3  the utility room in conjunction with the northwest
4  bedroom?
5     **A.   The utility room is right in this area**
6  **(indicating).**
7     Q.   North of the northwest bedroom, right?
8     **A.   That is correct, sir, yes.**
9     Q.   And there was mold detected in that
10  area?
11    **A.   There was mold detected on the -- from**
12  **these pictures on the concrete wall, let's see, it**
13  **would be second level. If we don't call this a level,**
14  **it would be the second level of the shelving unit on**
15  **the wall.**
16    Q.   This mold that is referenced in this
17  report that was found in December of 2003, that has
18  nothing to do with the leaking toilet, does it?
19    **A.   It does not, sir.**
20    Q.   I think this was tab 8.   Correct?
21    **A.   Yes, sir.**
22    Q.   Now, when you referred earlier a few
23  minutes back to the general conclusion you reached in
24  terms of your opinion for this case and you referred
25  to basically the last page of your report?

Page 39

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2     **A.   Yes.**
3     Q.   When you talked about the contribution
4  of the leaking toilet, what percentage of the mold in
5  the house is attributable to a leaking toilet compared
6  to or in comparison to any mold that was the result of
7  sewer backups over the years or other water
8  intrusions?
9        MR. CONLIN:   Calculated how?
10       MR. STADLER:   He is the expert.   Let
11  him answer that question first.   He can put whatever
12  contingencies or parameters he wants on it.   If it
13  cannot be done, it cannot be done.
14       MR. CONLIN:   I would like the record to
15  be clear what is being asked.
16       MR. STADLER:   Would you read it back,
17  please.
18       MR. CONLIN:   I would like some
19  clarification whether you are talking in terms of the
20  spore count, the areas affected, the migration of the
21  spores throughout the house, over what period of time.
22  There are too many ways to measure that to get a
23  meaningful answer without it being misleading.
24  BY MR. STADLER:
25    Q.   My question, sir, is very simple.   As

Page 40

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2  of August 1, 2002, let's start there when the Garrys
3  left the home because of their apparent concern for
4  mold in the home, what percentage and proportion of
5  the mold, however you want to define it, by spore
6  count, by raw count, however you want to define it, in
7  the house was attributable to the leaking toilet in
8  comparison to any mold, however you want to define it,
9  that resulted from sewer backup in 1996, sewer backup
10  two or three weeks before they moved out of their
11  house, leaking windows in the home, however you want
12  to define it, what percentage of the mold?
13       MR. CONLIN:   Just another
14  clarification, Counsel.   Are you including in your
15  question about mold all of the different types of
16  species, are you asking for differentiation between
17  them, or whether you are asking for, included within
18  your question is every single species of mold that the
19  home is affected with?
20       MR. STADLER:   That is a fair
21  qualification.
22  BY MR. STADLER:
23    Q.   You are referring primarily in your
24  report to four types of molds, is that correct?
25    **A.   That is correct, sir, yes.**

Page 41

**NEIL G. CARLSON, MS, CIH**

1     **NEIL G. CARLSON, MS, CIH**
2     Q.   Let's break those up a little bit.   As
3  to Stachybotrys and Chaetomium, you say they are the
4  primary sources of the mold in the home is from the
5  southwest bedroom and in the northwest bedroom, right,
6  that is your opinion?
7     **A.   That is correct.**
8     Q.   You then say that type of mold in the
9  northwest bedroom and the southwest bedroom was
10  attributable to a leaking toilet, right?
11    **A.   That is correct, sir, yes.**
12    Q.   So we have those types of mold.   Those
13  two types of mold were found in other rooms in
14  addition to the northwest bedroom and the southwest
15  bedroom, right?
16    **A.   Spores were found.**
17    Q.   Right.   So the answer is correct?
18    **A.   Yes.**
19       MR. CONLIN:   Qualified the way it was,
20  spores were found.
21  BY MR. STADLER:
22    Q.   Spores were found in other areas?
23    **A.   That is correct, yes, sir.**
24    Q.   As to those two types of mold as of
25  August 1st, 2002, what percentage of the mold, the

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04



Page 42

NEIL G. CARLSON, MS, CIH

1 spores as you refer to them, Stachybotrys and
2 Chaetomium, do you attribute to the leaking toilet in
3 comparison to any spores of those mold types that were
4 attributable to a sewer backup in either '96 or in
5 2002 or water intrusion through windows or water
6 intrusion through a ceiling fixture from any other
7 source? Do you understand my question?
8 **A. I believe so, and if I respond in a way**
9 **that doesn't indicate so, please feel free to follow**
10 **up, sir.**
11 Q. I appreciate that.
12 **A. My understanding is you are restricting**
13 **it for purposes of this question to Chaetomium and**
14 **Stachybotrys, is that correct, sir?**
15 Q. Yes.
16 **A. Thank you. With respect to actual**
17 **visible growth in the dispersal of the spores, the two**
18 **bedrooms, bedroom two and three of the southwest and**
19 **northwest, approximately 90 percent with respect to**
20 **those two particular molds.**
21 Q. Now, at the time that you -- let me
22 back up. You talked about visible mold?
23 **A. In other words --**
24 MR. CONLIN: He didn't. He talked

Page 43

NEIL G. CARLSON, MS, CIH

1 about visible mold and disbursement of spores.
2 BY MR. STADLER:
3 Q. When you are talking about disbursement
4 of spores, you are talking about Chaetomium and
5 Stachybotrys spores found in air sampling done in
6 those rooms?
7 MR. CONLIN: I object to the question.
8 It's ambiguous.
9 THE WITNESS: As I understand, I need
10 to respond because objections are ruled on later, is
11 that correct, sir? Okay. It is those two particular
12 sources.
13 BY MR. STADLER:
14 Q. When you say two sources --
15 **A. Of the southwest and the northwest**
16 **bedrooms are the primary sources for those two**
17 **particular molds in this house. The one instance**
18 **where we had an elevation of I believe it was both**
19 **Chaetomium and Stachybotrys in the rec room was a**
20 **sample taken after aggressive sampling was taken in**
21 **the southwest and the northwest bedroom, and previous**
22 **samples to the best of my recollection did not have as**
23 **elevated Stachybotrys and Chaetomium counts in the rec**
24 **room.**

Page 44

NEIL G. CARLSON, MS, CIH

1 Q. Thank you. As to the southwest and
2 northwest bedrooms, isn't it fair to say that the
3 amount of Stachybotrys and Chaetomium found either
4 visible or the amount of dispersion of spores was
5 visibly higher in the northwest bedroom?
6 **A. The air counts on that, that would be**
7 **correct. Typically the airborne counts -- if you can**
8 **indulge me for a moment, I need to refer to the**
9 **aggressive sampling report on that to recall.**
10 Q. I'm talking about again August 1st of
11 2002. I don't think any aggressive sampling had been
12 done prior to that?
13 **A. No.**
14 Q. That is my question.
15 MR. CONLIN: The tests were done before
16 that.
17 MR. STADLER: Are irrelevant from my
18 standpoint. I'm not asking about those.
19 MR. CONLIN: The problem with your
20 question with why it is misleading and ambiguous and
21 why I object to it is as Mr. Carlson has pointed out,
22 the testing done after August 1 of 2002 informs an
23 expert like Mr. Carlson about what was the state of
24 affairs before that date. If you ask him to divest

Page 45

NEIL G. CARLSON, MS, CIH

1 himself of the knowledge gained after August 1 of 2002
2 in answering a question about before, he can't answer
3 the question.
4 MR. STADLER: I don't agree necessarily
5 with your position, but I understand what you are
6 saying. Let me approach it this way, sir.
7 BY MR. STADLER:
8 Q. As of August 1, 2002, there had been
9 some sampling done, right?
10 **A. Correct, yes.**
11 Q. In fact, there was only one day of
12 sampling done, I think it was July 29, 2002, for
13 purposes of air sampling in the home?
14 **A. I think so. And I want to ask a**
15 **question on it. Was that the Nova report that you are**
16 **referring to?**
17 Q. I'm referring to the GeoTek report that
18 is in tab 1. The Nova report for testing was done in
19 September of 2002, sir.
20 **A. If you can refer, is it in this?**
21 Q. Yes.
22 **A. Thank you, sir.**
23 Q. Tab 1. It's right in there. July 29,
24 do you see that, July 30?

12 (Pages 42 to 45)

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 46

NEIL G. CARLSON, MS, CIH

1
2    **A.    Yes. The date of sample was the 29th.**
3    Q.    Let me just ask you this, sir: Are you
4    aware of any air or bulk sampling done in the Garry
5    home prior to July 29th, 2002?
6    **A.    I don't recall if the Nova report was**
7    **done prior to that, sir.**
8    Q.    I will show you the Nova report.
9    **A.    Was that after that?**
10    Q.    September 4th, 2002. It's tab 2 of
11    your own report.
12    MR. CONLIN: The report was issued.
13    But when the air sampling was done for purposes of
14    this report, that is the issue.
15    MR. STADLER: That was September.
16    THE WITNESS: We don't know.
17    BY MR. STADLER:
18    Q.    The air sampling and the testing was
19    done on September 4th, 2002 by Nova. It's in the
20    daily log report in the middle of the document. It is
21    marked as tab 2 to Exhibit 2.
22    **A.    All right.**
23    Q.    All I'm asking you, sir, is a very
24    simple question.
25    **A.    Yes.**

Page 47

1    **NEIL G. CARLSON, MS, CIH**
2    Q.    Based on what you know, was there any
3    air sampling or bulk sampling done in the home of the
4    Garrys prior to July 10th, I will take that date,
5    2002, when the sewer backup occurred?
6    **A.    I was not aware of any.**
7    Q.    So there is no baseline for what
8    existed in the Garry home in term of mold counts prior
9    to the sewer backup, correct?
10    **A.    As far as I know, yes. I haven't been**
11    **appraised of any reports.**
12    Q.    So a sewer backup occurs and you showed
13    me on this map that is set forth in the GeoTek report
14    what the area of that backup was, correct?
15    **A.    Yes, sir.**
16    Q.    That backup affected the northwest
17    bedroom, correct?
18    **A.    It affected the north end of the**
19    **northwest bedroom.**
20    Q.    Among other areas, right?
21    **A.    Among other -- pardon me, sir?**
22    Q.    What other areas did the sewer backup
23    in July of 2002 affect?
24    **A.    It affected the adjacent bathroom to**
25    **the northwest bedroom. It also affected the laundry**

Page 48

NEIL G. CARLSON, MS, CIH

1
2    **room. It affected a storage room closet off of the**
3    **rec room. And it affected the storage room, and I**
4    **think it has also been referred to as the utility**
5    **room.**
6    Q.    You don't have any evidence or any
7    information as to what the extent of the sewer backup
8    was in January of 1996, do you?
9    MR. CONLIN: You mean no information at
10    all or do you mean --
11    MR. STADLER: As to the extent of it,
12    yes, that is what I'm asking.
13    BY MR. STADLER:
14    Q.    Do you have any information as to the
15    extent of the sewer backup that occurred in January of
16    1996?
17    **A.    I have at sometime been appraised of**
18    **the rough, of it occurred, but I don't recall the**
19    **exact extent of it.**
20    Q.    So if you look at this schematic
21    drawing that appears in tab 1 on Exhibit 2, which
22    reflects the sewer backup on July of 2002, you can't
23    really tell me whether the sewer backup in January of
24    1996 was greater in extent or lesser in extent?
25    MR. CONLIN: Based on his memory today?

Page 49

1    NEIL G. CARLSON, MS, CIH
2    MR. STADLER: Yes.
3    THE WITNESS: Based on my memory today,
4    no.
5    BY MR. STADLER:
6    Q.    Can you state today whether the mold
7    levels in the Garry home have been elevated
8    after the toilet leak in the master bedroom had there
9    not been any sewer backups at any time?
10    MR. CONLIN: Which mold?
11    MR. STADLER: Generally. Mold in the
12    house.
13    MR. CONLIN: Any kind of mold?
14    MR. STADLER: Yes.
15    BY MR. STADLER:
16    Q.    Any kind of mold.
17    **A.    Sir, I would like you to rephrase it or**
18    **you could read it back to me. I just want to make**
19    **sure I understand it.**
20    MR. STADLER: Can you read it back?
21    (Requested portion of the record
22    was read by the reporter.)
23    MR. CONLIN: I assume the hypothetical
24    is asking him to assume that all other things were
25    equal except there was no problem with the master



Page 50

NEIL G. CARLSON, MS, CIH

1  toilet, is that the gist of the question?
2  THE WITNESS: Let me ask a question.
3  BY MR. STADLER:
4  Q.  Do you have a basis for testifying in
5  this case that in the absence of all other events, the
6  leaking toilet would have caused elevated mold levels
7  generally in the Garry home?
8  MR. CONLIN: All by itself?
9  MR. STADLER: Yes.
10  MR. PARSONS: Object as vague.
11  THE WITNESS: The water from the
12  leaking toilet that contacted the porous surface,
13  which in this case was sheetrock, and later when it
14  was, when it caved in the carpet, did have -- at
15  sometime had fungal growth.
16  BY MR. STADLER:
17  Q.  Is that elevated?
18  A.  And so it at sometime elevated the
19  **fungal spore levels. The question would be during the**
20  **course of sampling, you often find no levels and then**
21  **times where you will find levels that will be up and**
22  **will be variable, because the spore release into the**
23  **environment will be highly variable. Does that help**
24  **you out?**

Page 51

**NEIL G. CARLSON, MS, CIH**

1  Q.  Are you saying you cannot determine
2  whether the leaking toilet in and of itself would have
3  resulted in elevated mold levels in the Garry home?
4  MR. CONLIN: He answered yes to that
5  question, Counsel. I wish you wouldn't try to trick
6  him.
7  BY MR. STADLER:
8  Q.  So you are saying at some point in time
9  the leaking toilet would have resulted in elevated
10  mold levels in the home?
11  A.  **The leaking toilet and the subsequent**
12  **water on a surface that can grow mold, in other words,**
13  **on a sheetrock or whatever, would have and has at**
14  **least in the air sampling data elevated those**
15  **particular -- elevated airborne counts in particular**
16  **respect to Chaetomium and Stachybotrys.**
17  Q.  And Stachybotrys and Chaetomium was
18  found in other areas of the home in addition to the
19  southwest bedroom, correct?
20  MR. CONLIN: Do you mean spores?
21  THE WITNESS: The spores were found in
22  other areas, I believe. And may I refer to the
23  report? I believe there was a location in, and I am
24  going to need to refer to this, but I believe

Page 52

NEIL G. CARLSON, MS, CIH

1  Chaetomium was found also in base trim of the laundry
2  room and northwest corner of rec room.
3  BY MR. STADLER:
4  Q.  Was that Chaetomium the result of a
5  leaking toilet in the Garry home?
6  A.  **Those particular ones, no.**
7  Q.  What were they the result of?
8  A.  **I am unaware of the exact precise cause**
9  **for those.**
10  Q.  So what percentage of the Chaetomium
11  that was found in the home at any given time was
12  attributable to the leaking toilet?
13  A.  **My best estimate on that would be**
14  **approximately 90 percent, because the areas that were**
15  **identified that I am aware of on the other ones were**
16  **small areas of growth.**
17  Q.  Are you talking about visible growth,
18  right?
19  A.  **That is correct, sir, yes. Visible**
20  **growth on surface.**
21  Q.  I am talking about what about
22  Chaetomium found in air sampling?
23  A.  **In air sampling?**
24  Q.  Yes.

Page 53

NEIL G. CARLSON, MS, CIH

1  A.  **Let me refer to that. And this is**
2  **particular to Chaetomium, correct, sir?**
3  MR. CONLIN: It's particular more
4  importantly to Chaetomium spores only, am I correct,
5  sir?
6  THE WITNESS: In the air.
7  BY MR. STADLER:
8  Q.  When I am talking air, I am talking
9  spores. If I should be talking something else, please
10  let me know.
11  A.  **You are correct, sir. The highest**
12  **counts were found in the southwest and the northwest**
13  **bedrooms. Lower counts were found in the downstairs**
14  **bathroom, basement storage room and master bedroom**
15  **and, yup.**
16  Q.  When you say northwest bedroom,
17  Chaetomium found in the air samples there, how do you
18  know that Chaetomium came from a leaking toilet and
19  not from the sewer backup that occurred in July of
20  2002?
21  A.  **Well, that is one that I will diagram**
22  **out for you and we can talk through it later so we can**
23  **clarify it.**
24  Q.  We have a diagram here, sir. Maybe you

Page 54

NEIL G. CARLSON, MS, CIH

1  can draw on this, because it's part of your report.
2  Before you start putting pen to pad, we are going to
3  use this, it is marked as Exhibit 2, so you are not
4  going to be able to erase it.
5      MR. CONLIN: Do you have a pencil?
6      THE WITNESS: Pencil would be helpful,
7  but it is going to be pretty straight forward.
8      MR. CONLIN: Why don't we use a pencil.
9  Let's just take a bathroom break and I will get a
10  pencil.
11      (Recess taken.)
12  BY MR. STADLER:
13      Q.   The witness has made some markings on a
14  GeoTek Engineering drawing that appears at tab 2 to
15  Exhibit 2. I'm sorry, tab 1 to Exhibit 2. Would you
16  describe what you have done, sir?
17      **A.   When Tim Wilkinson and I did the**
18  **investigation, we pulled back the carpet around the**
19  **perimeter of the southwest bedroom and all the way**
20  **along the northwest bedroom.**
21      Q.   When was that investigation? I don't
22  mean to interrupt.
23      **A.   That would have been -- let's see.**
24  **Let's go back to here, refresh my memory. That would**



Page 55

1      **NEIL G. CARLSON, MS, CIH**
2  **have been the first of the two that we did, so that**
3  **would have been --**
4      Q.   Is this March, 2003? Earlier you
5  referred to two visits, March and May of 2003?
6      **A.   I have to remember if we did it on that**
7  **earlier one or subsequent one. I may need to look at**
8  **the report to determine which one that was.**
9      Q.   I believe --
10      **A.   That is the big report, number 5.**
11  **Thank you, sir. So that would have been -- yeah, it**
12  **would have been -- let's see what date this is. March**
13  **11th, 2003.**
14      Q.   That is when you made some observations
15  concerning some water staining, correct?
16      **A.   That is correct, yes, sir.**
17      Q.   And the water staining was along
18  several walls of the southwest bedroom and the
19  northwest bedroom, correct?
20      **A.   Yeah.**
21      Q.   Go back to your drawing. There we go.
22  The verbal description on page 4 of 19 on that is
23  number 5. Actually it should be tab 4. You told me
24  earlier that report you are referring to should be tab
25  5. I just want to make certain for purpose of the

Page 56

1  record what it is.
2      **A.   It's the March 11th and May, 2003. So**
3  **we can make sure it's clear.**
4      Q.   Let me make sure we are on the same
5  page. March 11th, and May 7th, 2003, that report,
6  June 19, 2003?
7      **A.   No. This report is March 11th and May**
8  **7th.**
9      Q.   If you will look at your report, sir,
10  item 4 says report dated June 19th, 2003.
11      MR. CONLIN: It's the third page.
12      THE WITNESS: June 19, 2003.
13  BY MR. STADLER:
14      Q.   That is tab 4. Let's make sure you are
15  referring to that as tab 4.
16      **A.   Let me double check. Thank you very**
17  **much. That clears that up.**
18      Q.   We are looking now at tab 4 of Exhibit
19  2 which is part of your report?
20      **A.   Yes.**
21      Q.   You are referring to your observations
22  that you made when you and Mr. Wilkinson went through
23  the property and went through the basement of the
24  Garry home, is that correct?

Page 57

1      NEIL G. CARLSON, MS, CIH
2      **A.   That is correct. It's on page 4 of 19.**
3      Q.   You made some notations where you
4  believe there were water stains at the base of the
5  wall?
6      **A.   No. It was one to two feet out from**
7  **the wall on the back side of the carpet. We pealed**
8  **back the carpet. We looked along the exterior of the**
9  **wall.**
10      Q.   That is the west wall, is it not, that
11  you are referring to?
12      **A.   Yeah. That is the west, south and then**
13  **a portion of the east wall. And the carpet tack**
14  **strips at those locations were also rusted, indicating**
15  **that there had been water coming in at sometime.**
16      Q.   Just in terms of scale and looking at
17  it, there is some area long the northwest bedroom west
18  wall that you found some staining, right?
19      **A.   That is correct, sir.**
20      Q.   Wasn't that staining right below one of
21  the windows in the northwest bedroom?
22      **A.   The window, as I recall, and if we have**
23  **any pictures we can do it later, as I recall the**
24  **window is right around there.**
25      Q.   In any event, there is far greater

Page 58

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2  degree, at least based on your observations, of
3  staining in the southwest bedroom than in the
4  northwest bedroom?
5      **A.    That is correct.**
6      Q.    Were there also windows in the
7  southwest bedroom?
8      **A.    As I recall here on the west, about the**
9  **middle of the west wall of the southwest bedroom and**
10 **there is a window approximately in the middle of the**
11 **southwest bedroom and it would be on the south end of**
12 **it. If you would like, I can draw it in, although I**
13 **am not precisely sure of the locations.**
14     Q.    If you could draw in the approximate
15 locations of windows.
16     **A.    Approximate location is right there and**
17 **I will put a W for window (indicating).**
18     Q.    Now, did you become aware at any time
19 that the windows that are at both the northwest
20 bedroom and the southwest bedroom were pressure tested
21 to see if they leaked?
22     MR. CONLIN: That both of them were?
23 BY MR. STADLER:
24     Q.    Windows in both rooms.
25     **A.    I recall there was one of them that was**

Page 59

1      **NEIL G. CARLSON, MS, CIH**
2  **skipped, and I'm not sure which one. McGregor**
3  **Pearce's report would have had that.**
4      Q.    You are referring to tab 6 of Exhibit
5  2, is that correct, McGregor Pearce report?
6      **A.    That is correct.**
7      Q.    We'll get into this in a little more
8  detail in a bit, sir, but with respect to your opinion
9  in this case as to Chaetomium and Stachybotrys in the
10 home being primarily from the northwest and southwest
11 bedrooms?
12     **A.    Yes, sir.**
13     Q.    And then you go and say that mold,
14 Chaetomium and Stachybotrys in those two locations
15 were from the leaking toilet, correct?
16     **A.    Yes, sir.**
17     Q.    And is it your testimony that none of
18 the Stachybotrys or Chaetomium that was found in the
19 air in those two bedrooms was from leaks from the
20 windows?
21     MR. CONLIN: Are you asking him as if
22 he has already answered that or is this a fresh
23 question?
24
25     MR. STADLER: Fresh question.

Page 60

1  NEIL G. CARLSON, MS, CIH
2      THE WITNESS: Fresh question. With
3  respect to any sampling that has been done, I have not
4  been appraised of any mold growth around those windows
5  that has been Stachybotrys or Chaetomium. I
6  understand there is some Penicillium and some other
7  ones, but I haven't been appraised if there is
8  Stachybotrys on that. So they do not appear at least
9  to the best of my knowledge in all of the sampling
10 that we have currently to contribute. If there is
11 further sampling that indicates otherwise, then I am
12 open to changing that opinion.
13 BY MR. STADLER:
14     Q.    Aspergillus and Penicillium were types
15 of mold found in those locations?
16     **A.    I'm not 100 percent sure. I know there**
17 **was a possible location of that. Let's scratch that.**
18 **I don't know for sure.**
19     Q.    We'll look at the McGregor report that
20 I think speaks to that at some point.
21     **A.    Yes, please.**
22     Q.    But what I want to ask you now though
23 is if there had been no Stachybotrys or Chaetomium in
24 this home, would it be your opinion that this home is
25 not contaminated?

Page 61

1      NEIL G. CARLSON, MS, CIH
2      **A.    Throughout the course of this,**
3  **throughout the whole course from let's say the start**
4  **of ownership to present, I would say that would be**
5  **incorrect.**
6      Q.    Because Aspergillus among other things
7  and Penicillium have been found in various locations?
8      **A.    That is correct, sir.**
9      Q.    And those mold types were associated in
10 your mind -- strike that.
11     With respect to those two mold types --
12     MR. CONLIN: Which ones?
13     MR. STADLER: Aspergillus and
14 Penicillium.
15     MR. CONLIN: Which subspecies of
16 Aspergillus?
17     MR. STADLER: I would appreciate it if
18 someone would let me finish my question before you
19 make an objection. I am willing to clarify my
20 question, but if you would let me finish it, I think
21 it would be helpful for the report.
22 BY MR. STADLER:
23     Q.    Sir, your report, when you talk in your
24 report generally about Aspergillus and Penicillium,
25 Aspergillus versicolor, I don't know how you tell that

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 62

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2  in Latin, but that is the Aspergillus I am talking
3  about, that is what you identified in this report,
4  right?
5     A.    That is correct, sir, yes.
6     Q.    You also identified Penicillium?
7     A.    That is correct.
8     Q.    As to those types of mold as referred
9  to in your report, you don't say they are primary
10  sources of contamination, do you?
11     A.    These two bedrooms?
12     Q.    These two bedrooms. You don't conclude
13  these two bedrooms are primary sources of those two
14  mold types, do you?
15     A.    I don't conclude they would be the sole
16  source. I believe that would be the correct reading
17  of my interpretation.
18     Q.    As to those, you don't say those areas
19  are primary and other areas are secondary, you say
20  they are contributing?
21     A.    Yeah, the two bedrooms contribute to
22  those two particular molds.
23     Q.    A lot of other areas in the basement
24  that were affected by the sewer backup in July of 2002
25  were also contributing to the mold in the home,

Page 63

1  NEIL G. CARLSON, MS, CIH
2  correct?
3     A.    I believe -- well, let's see. I don't
4  know if I can attribute exactly to it, but I would say
5  there are other events that contributed to those
6  particular organisms because they were found at
7  locations other than the two bedrooms.
8     Q.    That is what you say in your report?
9     A.    That is exactly right, sir.
10     Q.    If there had been no Stachybotrys and
11  Chaetomium found in the home and you only had this
12  Aspergillus and this Penicillium that you refer to,
13  would you be able to state that the leaking toilet was
14  a primary cause of the Aspergillus and Penicillium in
15  the home?
16     A.    I can't state that that is the primary.
17  It is a contributor. But I couldn't state with as
18  strong a position as I can with respect to Chaetomium.
19  Do you need me to restate that? Because there are
20  other locations where we found the growth in more
21  significant amounts than the other ones are
22  insignificant with respect to Chaetomium and
23  Stachybotrys.
24     Q.    Going back to Stachybotrys and
25  Chaetomium and your conclusion that the northwest and

Page 64

1  NEIL G. CARLSON, MS, CIH
2  the southwest bedrooms were the primary source of
3  those molds in the home, and that the leaking toilet
4  was the cause of those mold types in those areas,
5  correct, that is your opinion?
6     A.    Yes, that is, sir, yes.
7     Q.    And that opinion is based on your
8  observations made about stains approximately a year,
9  nine months after the Garrys left the home, correct,
10  in March of 2003?
11        MR. CONLIN: Solely on that basis?
12        THE WITNESS: It's not solely on that
13  basis.
14  BY MR. STADLER:
15     Q.    Let me approach it another way. Is
16  there anything that you can point to in terms of
17  documentary evidence, information, that existed what
18  the conditions were in the home that existed prior to
19  your being there in March of 2003 that support your
20  position that those carpet stains are due to the
21  leaking toilet?
22     A.    It was interesting in that the way --
23  we spent a lot of time trying to figure out why the
24  stains -- what could have caused the stains. We did a
25  walk around the perimeter and everything else.

Page 65

1  NEIL G. CARLSON, MS, CIH
2     Q.    This was in March of 2003?
3     A.    That is right, yes. We did a walk
4  around the perimeter of the house. We looked at
5  various sources and we looked at the staining, and the
6  interesting part about the staining, for instance, if
7  I thought that the staining in other cases where have
8  had -- where the staining would have been due to a
9  rain event, I would have expected, and let's say the
10  leaking windows, I would have expected to see various
11  different stain lines because the amount of rain
12  coming in would be variable. I saw a very consistent
13  single line which would be around without any angular
14  rings, et cetera. It was very consistent. One stain
15  line all the way around, slightly rusted, and it took
16  on the color from the nails that were on the carpet
17  tack strip and it had that slight rust staining all
18  the way around it and continuous.
19        The best explanation I can come up
20  with, if someone can come up with a better one, I
21  would be willing to listen, would be if you had a leak
22  from a toilet and that was saturated from for a long
23  period of time.
24     Q.    What are you referring to when you say
25  that you are going to have to be more specific?

Page 66

NEIL G. CARLSON, MS, CIH

1        NEIL G. CARLSON, MS, CIH
2      A.    The carpet was saturated for a long
3    period of time. That would have had a nice, well
4    delineated line around the carpet along the perimeter.
5      Q.    Are you saying the carpet was or was
6    not saturated for a long period of time?
7      A.    I would say the carpet would be
8    saturated for some period of time, and the length of
9    time would vary.
10     Q.    Was that your conclusion?
11           MR. CONLIN: Could you let him finish,
12   please.
13   BY MR. STADLER:
14     Q.    I thought he had finished. Go ahead,
15   sir.
16     A.    I don't know the exact length of time,
17   but it would be an event where you have water down
18   here and that is where the liquid would have
19   essentially ran along the perimeter and stopped there.
20   The stain line went out further from the northwest
21   corner than it did at any other location. The stain
22   line on the carpet, just to be clear.
23     Q.    At anywhere in your report does it note
24   how long you believed the carpet had been saturated?
25     A.    No. There is no specific line on the

Page 67

NEIL G. CARLSON, MS, CIH

1    exact time.
2      Q.    I'm not saying for exact time, sir.
3            MR. STADLER: Counsel, if you have an
4    objection, make an objection.
5            MR. CONLIN: I am making an objection
6    because I think the witness misspoke when he said that
7    was the northwest corner.
8            THE WITNESS: Southwest corner. I
9    apologize. The southwest corner.
10   BY MR. STADLER:
11     Q.    So again, sir, you were there in March
12   of 2003?
13     A.    Yes.
14     Q.    Six, seven, eight months after the
15   Garrys left the home?
16     A.    Right.
17     Q.    And you observed carpet that was wet,
18   is that what you are telling me?
19     A.    No.
20     Q.    You observed stains that you believe
21   reflect the fact at some point the carpet in that
22   corner or along the base of these walls was saturated,
23   right?
24     A.    Yes. There was water in that location.

Page 68

NEIL G. CARLSON, MS, CIH

1        NEIL G. CARLSON, MS, CIH
2      Q.    For what period of time approximately
3    based on your observation of these stains was that
4    area wet?
5      A.    I don't know.
6      Q.    Can anyone that you are aware of based
7    on what you know in the field of public health,
8    industrial hygiene, make that determination?
9      A.    No one that I know of could give you a
10   precise time, sir.
11     Q.    Could have been a month before, three
12   months before, a year or two or three years before?
13     A.    No one based on that observation at
14   that time would know.
15     Q.    Let me see if I am clear on this. When
16   you did this inspection in March of 2003, did you know
17   whether the leaking toilet had been repaired in 1999?
18     A.    We are going back to that one, and I
19   don't know the exact date when that toilet was
20   repaired, sir.
21     Q.    Would that fact be significant to you
22   in your evaluation as to what the cause of that water
23   stain was that you drew on this drawing, tab 2 of --
24   tab 1 of Exhibit 2, is that a significant fact?
25           MR. CONLIN: For purposes of what

Page 69

NEIL G. CARLSON, MS, CIH

1      question?
2            MR. STADLER: For his opinion in this
3    case.
4            MR. CONLIN: Which one?
5            MR. STADLER: The only one he has
6    given, that the leaking toilet was the cause of all
7    of the water stains that appear along the walls that
8    he has drawn, on the walls that appear on this
9    drawing.
10           MR. CONLIN: The question is would the
11   precise date of the toilet fix --
12           MR. STADLER: No. That is not the
13   question, sir.
14   BY MR. STADLER:
15     Q.    The question is: Would the fact that
16   the toilet was repaired in 1999 be a significant fact
17   in your assessment of that situation?
18     A.    Let's see. Let me think through that.
19           MR. CONLIN: Essentially the question
20   is assume --
21           MR. STADLER: Object to counsel
22   rephrasing my question. If the witness doesn't
23   understand the question, he can say so and I will try
24   to rephrase it. If you have an objection, make the

Page 70

NEIL G. CARLSON, MS, CIH

1    objection. Tell me what it is that you find
2    objectionable.
3
4         MR. CONLIN: I object to the question.
5    It's unwieldy, it's ambiguous, it's vague. You
6    haven't clarified whether you are asking him to assume
7    that the toilet was fixed in 1999. You can try to
8    answer if you can.
9         THE WITNESS: I don't know if the fix
10   date has any relevance to it. I know at least from --
11   I think everybody agrees at sometime or another the
12   toilet leaked, and I know that the toilet leaked. So
13   whether there was a repair done after the toilet
14   leaked that worked, that doesn't seem to have any
15   bearing on this.
16   BY MR. STADLER:
17        Q.    If the toilet had been repaired in 1999
18   and there was no leak after 1999, it's still your
19   opinion that Stachybotrys and Chaetomium could have
20   been growing, could have been present in those walls
21   of the southwest bedroom and the northwest bedroom as
22   you have drawn it on this diagram, is that your
23   testimony?
24        MR. CONLIN: I object to the form of
25   the question. It asks two questions; one, assume it

Page 71

NEIL G. CARLSON, MS, CIH

1
2    was present, and another, assume it was growing.
3    Those are two different questions with two different
4    answers and I object to it on that ground, whether it
5    was present and sitting there as a dead colony, versus
6    whether it was there actively growing.
7         THE WITNESS: I think you are asking
8    me --
9    BY MR. STADLER:
10        Q.    Let me back up a bit.
11        A.    I have a hard time.
12        Q.    Let me back up to make it simple. We
13   have no evidence whatsoever in this case, do we, that
14   there was any mold either dead or growing in this home
15   before July 29th, 2002, correct? It's pure
16   speculation whether there was mold present in the home
17   prior to that date, correct?
18        A.    I don't know.
19        Q.    Fair enough.
20        A.    I don't know.
21        Q.    The only thing you know is some tests
22   were done in late July of 2002, right?
23        A.    I know that there was a toilet leak, or
24   people have told me there was a toilet leak, and then
25   I have seen the test results at that time, yes, sir.

Page 72

NEIL G. CARLSON, MS, CIH

1
2         Q.    In late July of 2002?
3         A.    That is correct, sir.
4         Q.    You know before then there was a sewer
5    backup in areas of the home including the northwest
6    bedroom, right?
7         A.    Yes. We have established that.
8         Q.    And you also know from other
9    information in your reports or your report that the
10   windows were tested at some point and leaked in one or
11   two of these bedrooms?
12        A.    Yes, that is correct, sir.
13        Q.    You also said earlier that the sampling
14   and testing done of samples taken is highly variable,
15   correct?
16        A.    Yes, sir, that is what I said.
17        Q.    Just so I'm clear on this, as to the
18   Aspergillus species that you referred to and the
19   Penicillium in the home, you cannot give an opinion as
20   to which, if any, of these bedrooms was a primary or
21   secondary source in causing mold in the home?
22        A.    I can give you an opinion about
23   secondary. I can't give you an opinion specifically
24   about the percentage contribution of that.
25        Q.    So you are referring to those

Page 73

NEIL G. CARLSON, MS, CIH

1
2    Aspergillus and Penicillium and you are saying these
3    bedrooms were at least a secondary source?
4         A.    Yes.
5         Q.    And there were other secondary sources,
6    right?
7         A.    That is correct, yes.
8         Q.    Was there a primary source?
9         A.    I don't think that we could state there
10   was a primary source with respect to those two. Those
11   two areas have consistently tested high for these
12   organisms, but they have also been present in elevated
13   areas, other portions of the building, and with
14   respect to Penicillium, one outdoor air sample was as
15   high as the interior sample.
16        Q.    If not higher?
17        A.    Yeah. So with respect to Penicillium,
18   that is why I broaden that out. There is a more
19   cosmopolitism distribution of that particular organism
20   to be to air samples.
21        Q.    I am glad you mentioned the outside
22   air. Among the many sources we talked about today,
23   the sewer backups, the window water intrusion, water
24   from a light fixture, there is also outdoor air
25   source?

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 74

NEIL G. CARLSON, MS, CIH

1
2     A.    That is correct.
3     Q.    And tests have been done and they are
4  reflected in your report at various times that
5  Penicillium and Aspergillus levels in the outside air
6  were pretty high at various times?
7     A.    The Penicillium was higher than the
8  inside. The Aspergillus versicolor, as I recall, was
9  not, outdoor level was not higher than indoor levels.
10    Q.    But in any event, isn't it fair to say
11 and I hope to in the next few minutes go into the
12 reporting that was done by GeoTek in July of 2002, but
13 isn't it fair that the Aspergillus and Penicillium
14 found in the air tested in the northwest bedroom and
15 other areas were substantially higher than the air
16 tested in the southwest bedroom?
17    A.    That is correct.
18    Q.    Let me, if we can, go back to your
19 report and the tabs, the documents in the tabs that
20 are appended to your report. Is that the entirety of
21 your opinion for this case, or opinions in this case,
22 is there anything else that reflects your opinions
23 that you are going to give in this case?
24    A.    At this time I don't think there is
25 anything else.

Page 75

NEIL G. CARLSON, MS, CIH

1
2     Q.    Your report is dated I think April
3  19th, 2004?
4     A.    Let's just double check that. I think
5  that is correct.
6     Q.    So you have your report and we have
7  these eight documents that have been tabbed 1 through
8  8. Does this contain all of the opinions you are
9  going to give in this case, to the best of your
10 knowledge today?
11    A.    To the best of my knowledge today, that
12 would be accurate, yes, sir.
13    Q.    And you haven't revised your opinion or
14 opinions in any way, shape or form since you signed
15 this report on April 19, 2004, correct?
16    A.    No, I haven't, sir.
17    Q.    And you haven't been asked to look at
18 anything in particular with respect to your opinions
19 after you issued this report, correct, to consult with
20 anything else? I know we marked a couple of documents
21 today you said you reviewed?
22    A.    I can't recall specifically if I was
23 asked to review the one report put out by the
24 defendant's air sample person. I can't recall if I
25 was specifically asked.

Page 76

NEIL G. CARLSON, MS, CIH

1
2     Q.    The URS report?
3     A.    The URS report. I believe I may have
4  been asked. I never did comment on it. I glanced
5  briefly at it, but I haven't commented on that in
6  writing or verbally, as I recall.
7     Q.    And there is nothing in that report,
8  that URS report, that caused you to change in any way
9  or revise your opinion or opinions in this case,
10 correct?
11    A.    No, sir.
12    Q.    That is correct?
13    A.    Yeah, that is correct.
14    Q.    I asked you earlier about your resume
15 here, your CV, and you indicated it is an accurate
16 reflection of your employment history?
17    A.    Yes.
18    Q.    Is it an accurate statement of your
19 education and professional accomplishments as far as
20 you know?
21    A.    As of the date of the document, I
22 believe it is. There may have been one or two
23 omissions with respect to some training or some
24 presentation or poster sessions, but to the best of my
25 recollection this is what I could compile.

Page 77

NEIL G. CARLSON, MS, CIH

1
2     Q.    I believe in your disclosure you stated
3  that you have never testified at trial in connection
4  with -- in the last four years anyway, you haven't
5  testified at trial?
6     A.    That is incorrect. My disclosure had
7  two cases.
8     Q.    Let me back up. Your disclosure refers
9  to two cases in the last four years. I understood
10 those to be depositions?
11    A.    The Woodroffe versus University of
12 Minnesota, that was actually a workers comp trial.
13 The other one was a deposition.
14    Q.    The Beattie case was a deposition?
15    A.    The Beattie case was a deposition.
16    Q.    Just while we are on that, the
17 Woodroffe case was a workers compensation case, had
18 nothing to do with insurance coverage as far as you
19 know?
20    A.    Workers comp is usually insurance.
21    Q.    Let me back up. Did it have anything
22 to do with homeowners insurance coverage?
23    A.    No, it did not.
24    Q.    Did it have anything to do with mold?
25    A.    Yes, it did, in small ways.

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 78

NEIL G. CARLSON, MS, CIH

1    NEIL G. CARLSON, MS, CIH
2    Q.    In what small way, microscopically or
3  small way?
4    A.    In the value of the case there was a
5  small amount of mold sampling done. The indoor counts
6  were much lower than -- we couldn't find any interior
7  source on mold samples. There was a small amount of
8  elevated fungal count found in some duct work, but it
9  didn't seem to be germane to the particular case.
10    Q.    In any event, that wasn't a claim for
11  property damage?
12    A.    That is correct, sir.
13    Q.    The Beattie case, what did that
14  involve?
15    A.    That was a response to an e-mail that I
16  got that said if there is water damage in a lower
17  level space and they look at the outside of the
18  sheetrock, is that an accurate determination of
19  whether fungal growth may occur in it. And I replied
20  to her, no, occasionally the fungal growth will occur
21  on the back side of the sheetrock. That was roughly
22  the extent of it, and then I was deposed based on
23  that. As it turned out, it was a case of where they
24  had a modular home and they placed it between three
25  and six inches off center on the slab and there was

Page 79

NEIL G. CARLSON, MS, CIH

1    NEIL G. CARLSON, MS, CIH
2  water that came in, but I didn't know that at the
3  time.
4    Q.    That case had nothing to do as far as
5  you are aware with homeowners insurance coverage,
6  correct?
7    A.    I don't think so. I think they were
8  suing the installer of the home and the person that
9  constructed the home. I don't think it was a
10  homeowners insurance thing, but there may be some
11  other aspects that I don't know about on that one.
12    Q.    In the last four years you have only
13  testified twice either by deposition or trial,
14  correct?
15    A.    Correct. Do you include pretrial ones
16  that never go to trial?
17    Q.    Talking about depositions. Yes, any
18  case in which you have been deposed as a lay or expert
19  witness.
20    A.    Well, I will tell you what I did and
21  we'll see if it covers it. There was a pretrial
22  motion with respect to fungal growth in a house that I
23  did after I was asked to submit this report of that.
24    Q.    Referring to your report in this case,
25  after you submitted this report?

Page 80

NEIL G. CARLSON, MS, CIH

1    NEIL G. CARLSON, MS, CIH
2    A.    After I submitted that, yes. And we
3  discussed whether the case should be thrown out or
4  not, and it ended up being thrown out.
5    Q.    Anything else, and I am going back more
6  than four years, any other case where mold was an
7  issue where you testified at deposition or trial?
8    A.    There was -- this was at an arbitration
9  hearing. Is that included or not, a homeowners
10  arbitration hearing?
11    Q.    Was it involving mold?
12    A.    Yes, it was.
13    Q.    Just generally what was your testimony
14  in that case, what issue did it deal with?
15    A.    In this case the homeowner had a
16  transite duct system, and the water discharge from the
17  sump pump wasn't working appropriately because the
18  exterior drain tile was crushed and there was a
19  significant amount of water in the home, and there was
20  also sewer water in the ventilation system. We
21  testified about some fungal growth that was occurring
22  on some of the material in the spaces where they had
23  their children in the lower level basement.
24    Q.    Did you have to testify about the
25  source of mold in that case, was that an issue in the

Page 81

NEIL G. CARLSON, MS, CIH

1    NEIL G. CARLSON, MS, CIH
2  case?
3    A.    Yeah. Because I identified specific
4  sources of mold in that house. It was lower level, it
5  was on the sheetrock and on a briefcase and underneath
6  the garage on a wall.
7    Q.    Did you, as you have in this case at
8  least with respect to Chaetomium and Stachybotrys,
9  have to differentiate between primary and secondary
10  sources of mold?
11    A.    I was not asked to do that in that
12  case. I was just asked to identify the areas where
13  the mold was.
14    Q.    Other than this case, have you ever in
15  any case testified about whether mold, the source of
16  mold found was either primary or secondary?
17    A.    Not in any other legal cases, sir.
18    Q.    Do you know of any person, person you
19  look at as an expert or colleague in the field who has
20  ever testified in any case that there was a primary or
21  secondary source for mold?
22    A.    Yes, I do.
23    Q.    Who is that?
24    A.    My colleague Andy Streifel from the
25  Department of Environmental Health and Safety.

Page 82

1          NEIL G. CARLSON, MS, CIH
2     Q.    Anybody else?
3     A.    Phil Morrie, and I am not sure, he
4  keeps changing companies, but he is a CIH. Let's see,
5  who else? Chuck Lane from Environmental Process,
6  Inc., Arif Quaraishi from the Institute of
7  Environmental Assessment, and then some of his
8  employees at that organization. They have had to do a
9  lot of legal cases with respect to identifying where
10  fungal growth has occurred.
11     Q.    My question is not where it is
12  occurred, but as to multiple sources of mold where you
13  have a similar situation where there is water
14  intrusion in different locations and different events
15  that they have testified that mold found in the air or
16  even visible mold that was tested in bulk sampling,
17  that they testified there was a primary versus a
18  secondary source of the mold?
19     A.    Yeah, I believe so.
20     Q.    Is there any textbook or any kind of
21  literature that refers to that type of differentiation
22  between primary and secondary sources of mold in an
23  indoor space?
24          MR. CONLIN: Using just those terms?
25          MR. STADLER: I am using the terms the

Page 83

1          NEIL G. CARLSON, MS, CIH
2  witness used in his report.
3          MR. CONLIN: I understand. I am asking
4  whether you are using those terms specifically or
5  whether they are a generic marker for the concept in
6  general.
7  BY MR. STADLER:
8     Q.    The terms you used in your report, are
9  they generic terms or terms of art in the field or
10  just thought something that was a good word to use?
11     A.    It was the best way I could describe to
12  at least help lay out the situation with respect to
13  this particular case. In other words, what is the --
14  which one -- I could have used which location is the
15  most significant contributor, which location, or in
16  which one is a contributor but not the specific major
17  contributor. I could have used those terms. I don't
18  think they are particularly words used as specific
19  terms within the trade.
20     Q.    So there are no specific terms in the
21  trade in order to define this type of situation, are
22  there?
23     A.    I don't know if there are or not, sir.
24     Q.    Okay. Even using your term significant
25  contributor, your testimony as to the type of

Page 84

1          NEIL G. CARLSON, MS, CIH
2  Aspergillus that we saw and Penicillium, you are not
3  stating that the southwest bedroom and the northwest
4  bedroom were significant contributors to that?
5     A.    I would say they are significant, but
6  not the -- I wouldn't say they are insignificant.
7  They are significant, but there are other sources for
8  it.
9     Q.    The other sources are also significant,
10  are they not?
11     A.    That is correct. I am not able to put
12  them in hierarchal description.
13     Q.    They are of unpreferentiated
14  importance?
15     A.    Correct, sir.
16     Q.    With other sources being the sewer
17  backups and the water coming through the windows,
18  right?
19     A.    There are other locations where those
20  organisms are identified, yes, sir.
21     Q.    You can't tell me in terms of a
22  percentage in the home following any particular air
23  sampling that was done what percentage of Aspergillus
24  or Penicillium was due to leaking toilet or other
25  sources?

Page 85

1          NEIL G. CARLSON, MS, CIH
2     A.    Those two, I can't.
3     Q.    As to Stachybotrys and Chaetomium, you
4  believe in any given air sampling that was done,
5  finding those spores in the air in the home, that 95
6  percent of those spores were attributable to a leaking
7  toilet?
8          MR. CONLIN: I think he said 90
9  percent.
10          THE WITNESS: I did not say 95. I said
11  roughly 90.
12  BY MR. STADLER:
13     Q.    I apologize for that 5 percent
14  difference. If you think that is significant.
15          MR. CONLIN: Be fair to the witness.
16  We clarify and then you make some dig on the witness.
17          MR. STADLER: It was not meant to be a
18  dig on you, sir. It was meant to be humorous.
19          MR. CONLIN: It was not, not given the
20  course of the way you have treated this witness.
21  BY MR. STADLER:
22     Q.    Sir, do you feel you have been
23  mistreated in any way during the deposition?
24     A.    I don't really have an opinion on that,
25  sir.

Page 86

**NEIL G. CARLSON, MS, CIH**

1
2    Q.    Okay, fine. I will let you finish your
3    answer.
4    A.    I think the words you parsed with
5    respect to air sample, I would tend to -- the way I
6    believe I have characterized it is those particular
7    areas had significant presence or at least sources of
8    those particular spores, and that occasionally those
9    spores may have traveled outside of that area, and in
10   one case, in the case of Chaetomium there are two
11   localized sources of growth, but with respect to the
12   total volume of growth on surfaces in that building,
13   those, based on all of the information we have to
14   date, are 90 percent.
15   Q.    Have you ever confronted any mold
16   issues in your own home or office environment?
17   A.    Yes, at home and then it's my primary
18   responsibility at the University of Minnesota.
19   Q.    At home have you encountered mold you
20   had to deal with?
21   A.    Yes, I have.
22   Q.    Significant mold?
23   A.    Minor. And then one where I addressed
24   a water leak appropriately and didn't get the mold
25   growth.

Page 87

**NEIL G. CARLSON, MS, CIH**

1
2    Q.    When you say in the first instance in
3    terms of minor mold, did you do air testing?
4    A.    Let's see. Actually I did air testing
5    actually in the second case to make sure I got it.
6    And in the first case, no, it was mildew because we
7    had just gotten the house. We didn't dehumidify or
8    didn't have the air conditioning on, so I did surface
9    wipes to remove surface mildew. It wasn't at that
10   time physically growing on a surface where it was
11   latched on. It was just light growth.
12   Q.    It appears you have never had any
13   confirmed mold in your home?
14   A.    Well, not that I know of for sure. I
15   have a couple of leaks that I have to attend to, but I
16   haven't had any -- I guess I wouldn't say that.
17   Growth on -- confirmed growth on let's say sheetrock,
18   I have some water stains that may have some growth or
19   not, but I have to get it abated.
20   Q.    You did that?
21   A.    I have not.
22   Q.    And you haven't done that?
23   A.    Not yet.
24   Q.    You are still living in the home?
25   A.    Yes.

Page 88

**NEIL G. CARLSON, MS, CIH**

1
2    Q.    There is a possibility mold is growing
3    in the home?
4    A.    This is in the garage.
5    Q.    This is mold in your residence at some
6    point?
7    A.    There may be. I don't know.
8    Q.    Any relatives or friends ever
9    experience any problems with mold in their home as far
10   as you know?
11   A.    Let's see. Relatives and friends, yes.
12   Q.    As reported to you?
13   A.    Yes.
14   Q.    Have you given them advice as to what
15   they should do in that context?
16   A.    Yes.
17   Q.    What advice have you given them
18   generally? I don't want to get into every specific
19   instance. I don't want you to identify your relatives
20   or friends. I just want to know what type of advice
21   you give them.
22              MR. CONLIN: I object to the form of
23   the question. It's over broad. Try to answer if you
24   can.
25              THE WITNESS: It's very specific to the

Page 89

**NEIL G. CARLSON, MS, CIH**

1
2    circumstance. I essentially attempt to have them
3    identify the source of the water, get the leak
4    stopped, have the abatement done in an appropriate
5    fashion so that they don't spread the spores around.
6    BY MR. STADLER:
7    Q.    Any of those instances where you became
8    aware they confirmed mold present in their home,
9    either spores or active growth?
10   A.    Yes.
11   Q.    Was any of those instances significant
12   in your view in terms of elevated levels of mold?
13   A.    I am trying to think. You asked
14   particularly friends and family, and I am trying to
15   think if I have done specific airborne testing with
16   friends and family. I have done a lot of other ones,
17   but not with -- I don't know if I have done any
18   specific ones with friends or family. I can't recall,
19   sir.
20   Q.    Are you aware of any of those instances
21   though where your friends or family may have had mold
22   growth where they abandoned the home because of the
23   mold?
24   A.    Not friends or family. For consulting,
25   yes.



Page 90

NEIL G. CARLSON, MS, CIH

1
2    Q.    None of your friends or relatives?
3    A.    I have to think through it. Let's see.
4    Not completely abandoned. They have vacated spaces.
5    No, none of them have abandoned.
6    Q.    You are currently a public health
7    specialist, correct?
8    A.    That is correct.
9    Q.    You have a masters of science in public
10   health?
11   A.    Master of science in I believe it's
12   environmental health and safety.
13   Q.    You don't have a PhD, is that correct?
14   A.    That is correct, sir.
15   Q.    You are not a medical doctor?
16   A.    No, I am not a medical doctor.
17   Q.    And you are not a toxicologist?
18   A.    I am not a toxicologist.
19   Q.    And you are not a microbiologist?
20   A.    I am a microbiologist but not a
21   bicrobiologist.
22   Q.    When you say microbiologist, what is
23   that?
24   A.    A person who studies fungi.
25   Q.    Do you have a masters in that?

Page 91

NEIL G. CARLSON, MS, CIH

1
2    A.    I do not have a masters. I have
3    extensive coursework in it and I also teach classes in
4    it.
5    Q.    Is there a licensing process to become
6    a microbiologist?
7    A.    No, there isn't.
8    Q.    You don't have a license in that field?
9    A.    No. We participate in the EMPAT
10   program with the American Industrial Hygiene
11   Association, and our lab at the University, and I am
12   part of that, are tested for proficiency with respect
13   to fungal identification, and as far as we have been
14   doing that for several years and we are in the passing
15   category with it. I don't say we have done everything
16   correct, but we have done the passing capacity.
17   Q.    The lab you refer to at the University,
18   is that certified to do testing for mold?
19   A.    That is not, does not have an M lab
20   certification. It is part of the EMPAT program, but
21   it is not a certified lab.
22         MR. CONLIN:  Is EMPAT --
23         THE WITNESS:  E-M-P-A-T.  That is my
24   best recollection on that.
25   BY MR. STADLER:

Page 92

NEIL G. CARLSON, MS, CIH

1
2    Q.    M lab is the formal entity that
3    certifies?
4    A.    No. That is the American Industrial
5    Hygiene Association.
6    Q.    What is M lab, have you heard that term
7    before?
8    A.    I have seen the term, but I don't
9    recall the specific part of that.
10   Q.    So with respect to the air sampling
11   that was done after you became involved in this case,
12   your University lab was not involved in analyzing
13   those, correct?
14   A.    That is correct.
15   Q.    Why not?
16   A.    I was not asked to do it.
17   Q.    You or the Garrys used a different
18   laboratory than the one at the University of
19   Minnesota?
20   A.    It was GeoTek and a couple of other
21   ones. In fact, GeoTek used the same lab at least in
22   one case that your -- the defendant's attorney did.
23   Q.    That wasn't my question, sir. I am
24   trying to get through this as quickly as I can.
25   A.    Go ahead.

Page 93

NEIL G. CARLSON, MS, CIH

1
2    Q.    My question was very simple. The
3    University of Minnesota lab that you have talked about
4    as having gone through a passing stage was not used to
5    analyze any of the samples in this case?
6    A.    Correct, sir.
7    Q.    In the course of your work as a public
8    health specialist and working in this lab at the
9    University of Minnesota, have you analyzed bulk or air
10   samples for the presence of mold?
11   A.    Yes.
12   Q.    Is there any reason why you weren't
13   involved in testing or analyzing any of the samples in
14   this case?
15   A.    I wasn't asked to.
16   Q.    You are relying on the results and
17   analysis of other entities, correct?
18   A.    Yes. I was relying on those labs, yes.
19   Q.    Have you ever worked in the
20   construction industry or trades?
21   A.    Not specifically. I painted houses,
22   but I have not been involved or employed as a
23   construction worker.
24   Q.    For example, have you ever installed
25   rugs or carpets?

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 94

NEIL G. CARLSON, MS, CIH

1
2    A.    Outside of my own home?
3    Q.    Right. Separately.
4    A.    No, I haven't installed rugs or carpets
5 outside of my home.
6    Q.    Have you ever removed and replaced
7 sheetrock?
8         MR. CONLIN: The question is outside of
9 his home?
10        MR. STADLER: Yes.
11        THE WITNESS: Outside of my home, no.
12 BY MR. STADLER:
13   Q.    Do you have any experience in
14 construction building codes?
15   A.    Yes, some. I am -- one of my
16 responsibilities is to review plans with respect to
17 buildings at the University of Minnesota.
18   Q.    Construction or renovation of buildings
19 there?
20   A.    That is correct, yes, sir.
21   Q.    Have you ever at the University of
22 Minnesota been involved in trying to assess whether
23 mold is present in any of the buildings?
24   A.    Yes.
25   Q.    In conjunction with that work, did you

Page 95

NEIL G. CARLSON, MS, CIH

1
2 ever have to determine what the source of the mold
3 was?
4    A.    Yes.
5    Q.    Did you ever have to determine whether
6 there was a primary versus a secondary source?
7    A.    Yes.
8    Q.    Did you ever have an opportunity to
9 make that determination based on the staining of
10 carpet or the staining of baseboard?
11   A.    Yes.
12   Q.    In how many instances did you do that?
13   A.    I'm going to give you approximate
14 numbers because I have done a lot. At least 500.
15   Q.    In the course of that work did you ever
16 have to determine how long, for what period of time an
17 area had been wet where you noted that there were
18 stains on carpet and/or sheetrock?
19   A.    Yes. We had to do that, and the basic
20 determination comes from several sources, but, yeah.
21   Q.    What are those sources?
22   A.    The sources would be moisture media
23 readings, the history of the space, the types of fungi
24 present.
25   Q.    Are you familiar with the Nova entity?

Page 96

NEIL G. CARLSON, MS, CIH

1
2    A.    Tangentially I have visited their
3 office at one time a long time ago. I've got to think
4 back. I don't know if I have done any particular
5 fungal identification for that organization.
6    Q.    They did an investigation of the Garrys
7 home in September of 2002, correct?
8    A.    Yes.
9    Q.    I am going to show you their report
10 that you previously referred to, and I think it's tab
11 2 of the report. At least that is where I just pulled
12 it from. We are going to talk about that. If you
13 could go to that, I think it's the fourth or fifth
14 page in. Get into the investigation summary and maybe
15 five or six pages in if you see that subparagraph 2.0.
16 There it is.
17   A.    Thank you.
18   Q.    They apparently, based on this report
19 -- and I believe you have at some point reviewed this
20 in order to come to your opinions, correct?
21   A.    Yes.
22   Q.    They went in and investigated various
23 areas of the home including the southwest bedroom and
24 the northwest bedroom, correct?
25   A.    Yes.

Page 97

NEIL G. CARLSON, MS, CIH

1
2    Q.    They concluded, at least as I see on
3 the bottom of this page, "Nova did not identify any
4 additional areas of water damage or visible mold
5 growth." The only areas, if you see the paragraph
6 before that, they found mold growth or water damage
7 was in the basement garage stairwell leading into the
8 garage and lower sheetrock wall in the laundry room.
9 Do you see that paragraph 3 on the bottom?
10   A.    Let's go back. Hold on. Are you on a
11 different page? Paragraph 3 doesn't talk about --
12   Q.    I'm sorry, it's the third paragraph
13 from the bottom.
14   A.    It starts with, "Nova continued"?
15   Q.    "Nova continued," yes.
16   A.    Okay. Yes, I see that.
17   Q.    And then the next paragraph notes they
18 did some destructive sampling in those areas including
19 the areas I mentioned, the southwest and northwest
20 bedroom?
21   A.    Main level, master, lower, yeah.
22   Q.    And the two bedrooms we have been
23 talking about that you say are primary sources for
24 Stachybotrys and Chaetomium, correct?
25   A.    That is correct.



Page 98

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2    Q.    In September of 2002 they did a
3  boroscope of the wall surfaces in some of these areas,
4  do you see that, in that same paragraph?
5    A.    Yes.
6    Q.    They used a boroscope.  What is that?
7    A.    That is a device that is in some ways
8  usually a method for going inside and looking at the
9  back side of a wall cavity without ripping out the
10  whole wall.
11    Q.    As part of that process can you
12  determine whether there is either water present or
13  mold growth?
14    A.    It's a helpful tool.  I don't think you
15  can definitively determine it from that.
16    Q.    But they did that process here,
17  correct?
18    A.    That is correct.
19    Q.    Did you ever do that process in any of
20  your work at the Garry home, use a boroscope?
21    A.    I don't recall us using a boroscope.
22    Q.    Why not?
23    A.    We chose to physically remove and
24  examine things.  In other words, underneath the toilet
25  we chose to physically remove the sheetrock and

Page 99

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2  examine it rather than use a boroscope.  You've got a
3  wider field of vision.
4    Q.    I am talking about primarily the
5  northwest bedroom, the southwest bedroom is where they
6  had the toilet?
7    A.    Right.
8    Q.    Why didn't you use a boroscope in the
9  northwest bedroom?
10    A.    At that time we didn't, there was wanes
11  coating on that wall and there was some -- and that is
12  the wanes coating that was on the northwest bedroom
13  wall.  I don't know if we had a boroscope along, and
14  we were reluctant to rip that apart.
15    Q.    But in any event, Nova did some work in
16  those areas and found they did not identify any
17  additional areas of water damage or visible mold
18  growth, do you see that?
19    A.    Yes, I do.
20    Q.    Was that important information to you
21  to take into account in coming to your opinions in
22  this case?
23    A.    It didn't have a strong bearing with
24  respect to my central conclusions.
25    Q.    They were in there a month or two after

Page 100

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2  the events and you were in there six or seven or eight
3  months after, correct?
4    A.    That is correct.
5    Q.    Now, if I could, in the middle of this
6  document -- towards the end of the document there is a
7  daily log and it doesn't have a page number.  Actually
8  it says page 1 of 2.  It's in the back of their
9  report, section of daily log.  If you can find that.
10  I think it might be right before the photographs.
11  It's right before some of the sample chain of custody
12  forms.  It's back further.
13    A.    Is it just before the -- this is a long
14  report.  I'm on page 18 now.  Where do I need to go?
15    Q.    It's a log, it's an attachment, it's an
16  appendix.  It's after you get passed the schematic.
17    A.    Is it prior to photographs or after
18  photographs?
19    Q.    It's right before photographs, right
20  before chain of custody sheets.
21    A.    There is a daily log.  Page 1 of 2, is
22  that the page you want me to be on?
23    Q.    Yes.  There is a reference to 9/4/2002,
24  12:10 P.M., do you see that, Nova investigates the
25  master bedroom toilet leak area?

Page 101

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2    A.    Yes.
3    Q.    That is the area you did some work in,
4  right?
5    A.    Yes.  I am just asking for
6  clarification.  It looks like they are looking at it
7  from the top of the toilet area.
8    Q.    It refers to the plywood subfloor, does
9  it not?
10    A.    Yeah, they are looking --
11    Q.    Ceramic tile, plywood and plywood sub
12  floor?
13    A.    Yes.  They are looking down from the
14  master bedroom, as I understand it, master bedroom,
15  bath.
16    Q.    They drilled some holes and
17  investigated through a boroscope and they concluded
18  there was no mold or water damage in that area, do you
19  see that?
20    A.    Yes, I do.
21    Q.    They did some further drilling and
22  again didn't find any evidence of mold contamination?
23    A.    Yes.
24    Q.    Are you aware of this log, do you
25  recall seeing this log before at some point?

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 102

NEIL G. CARLSON, MS, CIH

1
2       A.    I don't recall seeing this specific log
3   or reviewing this specific log report, although it was
4   in the report that I sent out. I don't recall
5   reviewing that specific paragraph.
6       Q.    Did you have this daily log at the time
7   you went in there in March of 2003 to do your own
8   investigation, did you have this report?
9       A.    Yes. This was in September of --
10      Q.    This was in September of 2002.
11      A.    I don't believe we took it along. I
12  believe I was aware of the full extent of this report.
13  What I focused on primarily on this report was looking
14  at the sample results from that report and then I
15  looked at the subsequent example reports from GeoTek.
16      Q.    You were also interested at that time
17  when you were doing your own investigation to try to
18  determine whether the leaking toilet was the result of
19  any water damage that resulted in mold, right?
20      A.    Correct.
21      Q.    This type of investigation Nova did
22  bears on that, does it not?
23      A.    In some respects. It was a limited
24  inspection.
25      Q.    This inspection was done by Nova, that

Page 103

NEIL G. CARLSON, MS, CIH

1
2   was for the Garrys as far as you understood it?
3       A.    As far as I understood it, the Garrys
4   had Nova come out.
5       Q.    The Garrys retained GeoTek?
6       A.    As far as I know, yes.
7       Q.    Go to the next page. At the top it
8   refers to 12:30 P.M. Nova removed some baseboard in
9   the closet. I'm going to talk about the northwest
10  bedroom because this is the last bedroom. It says
11  Nova proceeds to the northwest bedroom. There is a
12  reference there to work Nova did there to try to see
13  if there was mold contamination. Do you see that?
14      A.    I want to be clear. I'm not sure
15  exactly where they are drilling. Let's take a look at
16  this. Are they drilling on the exterior wall at that
17  point?
18      Q.    This is a good point you are making.
19  When you got this report and you reviewed it, you had
20  questions because you just have a question right here
21  about this. Did you get on the phone and call Nova
22  and ask what they did?
23            MR. CONLIN: I object to the form of
24  the question. It's based on the phrase do you. I
25  assume you are asking what he would have done.

Page 104

NEIL G. CARLSON, MS, CIH

1
2   BY MR. STADLER:
3       Q.    After you reviewed this Nova report --
4   strike that.
5             Did you ever call Nova at any time to
6   ask them questions concerning this report?
7       A.    I didn't call them. We had a meeting
8   with Nova and GeoTek, and we were trying to figure out
9   sampling strategies as we moved forward, and we were
10  trying to figure out who should continue as the
11  primary person sampling. I didn't discuss this
12  particular spot. If I understand the location,
13  correct me on the 12/30, I would not have expected
14  growth at that particular location because the
15  sheetrock was gapped above the wall, in other words,
16  gapped at the base of the wall.
17      Q.    So is it your testimony that there was
18  no mold contamination anywhere in the sheetrock in the
19  northwest bedroom?
20      A.    I don't know about that. When we did
21  examination of the sheetrock along the -- I have to
22  get the directions right, along the west wall in the
23  areas that had not been -- there is a section of it
24  that had been removed and replaced.
25      Q.    You are talking about the southwest

Page 105

NEIL G. CARLSON, MS, CIH

1
2   bedroom?
3       A.    Southwest bedroom.
4       Q.    I'm talking about the northwest
5   bedroom.
6       A.    I'm talking about both of them. The
7   base of the sheetrock with respect to the floor, there
8   was a gap, which if there was a small amount of water
9   that got under the floor, in other words, so a floor
10  that was less than say a half inch deep, the water
11  would not have wicked up the sheetrock. We could
12  still see the staining on the carpet tack strip but
13  the water had not migrated up because that is a good
14  solid construction technique.
15      Q.    So was that water in that location from
16  a leaking toilet or from flooding?
17            MR. CONLIN: Which water, Counsel?
18            MR. STADLER: The one he just referred
19  to.
20            MR. CONLIN: He was posing a
21  hypothetical question about the differences between
22  what you would see on sheetrock, a general answer
23  about what you would see on sheetrock and what you
24  would see on carpet. If you are asking a specific
25  question about what he observed, you need to clarify.

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 106

NEIL G. CARLSON, MS, CIH

1    BY MR. STADLER:
2    Q.    I am asking you based on this note
3    here.
4        MR. CONLIN:  Which note?
5        THE WITNESS:  The 12/30 note?
6    BY MR. STADLER:
7    Q.    12/30 note, page 2 of 2, daily log,
8    September 4, 2002, what you understood when you read
9    this.
10   A.    I read this particular part for the
11   first time today.
12   Q.    So when you came to your opinion you
13   didn't take this into account, this information, is
14   that what you are saying?
15   A.    Those two pieces were not items that I
16   looked at. I looked at the sampling report. I didn't
17   look at the daily log when I was putting together this
18   report.
19   Q.    You didn't look at the Nova daily log?
20   A.    No, I did not.
21   Q.    Is there such thing as a certified
22   microbiologist, certified or licensed microbiologist?
23   A.    I don't know. I don't think so.
24   Q.    You are not a certified microbiologist?

Page 107

NEIL G. CARLSON, MS, CIH

1    A.    I am not a microbiologist.
2    Q.    But you are a certified industrial
3    hygienist?
4    A.    That is correct.
5    Q.    As part of that work are you
6    experienced to identify mold in samples, mold types in
7    samples, air or bulk samples?
8    A.    As part of my expertise, I am. It's
9    not necessarily a requirement for that, but I am.
10   Q.    And in conjunction with your work for
11   the University of Minnesota, do you look at air and
12   bulk samples for the presence of mold?
13   A.    Yes, I do a lot.
14   Q.    You do so for other entities?
15   A.    That is correct, yes.
16   Q.    As part of your consulting work?
17   A.    Yes, sir.
18   Q.    You mentioned the company you have?
19   A.    N.G. Carlson Analytical, Inc.
20   Q.    How long has that been in business?
21   A.    I don't recall the specific date of
22   incorporation. It may be on my resume. It has been
23   for more than five years.
24   Q.    Approximately how many employees do you

Page 108

NEIL G. CARLSON, MS, CIH

1    have?
2    A.    It's a S corp, so two.
3    Q.    What is your approximate annual revenue
4    for the work you do for that entity?
5    A.    It varies greatly. I think it has been
6    upwards of 50,000 and in low years it's been about
7    5,000.
8    Q.    Your CV says you have taken some
9    graduate courses in mycology and medical microbiology?
10   A.    That is correct.
11   Q.    Have you taken more than one course in
12   those areas?
13   A.    I have taken several in mycology, plus
14   additional conference work because the courses weren't
15   available at the University, so I took a course on --
16   it's a course offered through, I don't recall the
17   exact piece. It's in the resume. A course on
18   identification of Penicillium and Aspergillus, a
19   course on Penicillium, a course on identifying mold
20   organisms that was in Ottawa, Canada, taught by the
21   bureau of slemacultures. I think I have it in here
22   because that is a tough one to spell out. For the two
23   years I have taught for the center of public outreach
24   for mold identification for people that are interested

Page 109

NEIL G. CARLSON, MS, CIH

1    in it. And that is a branch of the school of public
2    health.
3    Q.    I note that you also have written
4    several papers, correct, have had several
5    publications?
6    A.    Yes, I have.
7    Q.    It looks like you have four
8    publications from your CV?
9    A.    Yes, that is correct.
10   Q.    Are those all peer reviewed
11   publications?
12   A.    Let me take a look at it. I want to be
13   sure. I think those that are listed are.
14   Q.    There are only four publications you
15   have on your CV?
16   A.    That is correct. I want to be sure
17   they are peer reviewed as well. I want to be sure
18   they are accurate. Which page of the CV?
19   Q.    I think it's page 3 or 4.
20   A.    I'm sorry. There. Publications. The
21   first one is peer reviewed. The second one was not
22   peer reviewed. The third one is peer reviewed. The
23   fourth one is not peer reviewed. So two peer reviewed
24   publications, and there is actually another one that

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 110

NEIL G. CARLSON, MS, CIH

1
2  should be published that is not there. And I don't
3  know if I put it as a poster session or not. There is
4  another article on a peer reviewed one on anatomy of a
5  nonviable fungal problem. That is under the poster
6  session level. That should be listed as a peer
7  reviewed publication as well.
8      Q.    From what you just said, that is your
9  fifth publication?
10     A.    Yes.
11     Q.    It appears to be on its face the only
12  one that relates directly to mold. Can you correct me
13  if I am mistaken in that regard? You have one
14  referring to managing water infiltration in buildings,
15  but I don't know what that means.
16     A.    Mold is a critical component of that
17  one.
18     Q.    Other than that one and other than this
19  anatomy of a nonviable fungal problem paper, of these
20  other publications do they have anything to do with
21  mold?
22     A.    Any of the other peer reviewed
23  publications?
24     Q.    Any of the other three. We have five
25  total. The managing water infiltration in buildings

Page 111

NEIL G. CARLSON, MS, CIH

1
2      A.    That is correct, it was in the public
3  risk.
4      Q.    So the others don't relate to mold?
5      A.    Yeah. The anatomy of the nonviable
6  fungal problem would be the primary one.
7      Q.    Just quickly if I could, do any of
8  these publications or poster sessions or paper
9  presentations, do they discuss how one goes about
10  determining primary versus secondary sources for mold
11  in a building, not whether mold is present, not what
12  the health effects of mold are, but determining
13  primary or secondary sources for mold?
14     A.    Let me see. I think it was dealt with
15  -- are you talking in total or including poster
16  sessions or not?
17     Q.    Let's start in total.
18     A.    All right. In total. Let's go back
19  here. Poster session assessment methods for mold
20  remediation dealt with that.
21     Q.    Where you mentioned specifically
22  primary versus secondary?
23     A.    I can't recall if that specific term
24  was used.
25     Q.    That is what I'm asking, the terms you

Page 112

NEIL G. CARLSON, MS, CIH

1
2  are using in this report here in this case.
3      A.    The terms were particular to this
4  report and -- I don't know if I ever used those
5  specific terms. I have used other terms that are
6  paraphrases of those. So I don't know if you would
7  find anything that uses those specific, but I used
8  paraphrases.
9      Q.    Why in this report did you not use the
10  paraphrases but used the terms primary and secondary?
11     A.    It fit this particular case.
12     Q.    This is a unique case?
13     A.    No. It just fit this particular --
14  with respect to this particular analysis, that was the
15  most appropriate terms.
16         MR. CONLIN: Could we have a short
17  break?
18         (Recess taken.)
19  BY MR. STADLER:
20     Q.    Again, in going over all your poster
21  presentations, paper presentations and other things,
22  you don't have a memory of using those particular
23  terms in any of those matters?
24     A.    I think an analogous term like sources
25  of fungal growth, I would say your primary sources of

Page 113

NEIL G. CARLSON, MS, CIH

1
2  fungal growth, half of the indoor air related ones
3  would be associated with that.
4      Q.    I'm not asking if they are associated.
5  I am asking if you used the terminology primary and
6  secondary sources when there are -- if you used those
7  particular terms in any of these presentations or
8  papers as you have used them here in this case?
9          MR. CONLIN: And he has answered that
10  question.
11
12         MR. STADLER: I just want to be clear
13  if he didn't change it after the break.
14         THE WITNESS: You used the term -- with
15  respect to presentations, I have used those terms or
16  something very similar.
17  BY MR. STADLER:
18     Q.    When you say presentations, these are
19  not in writing, these are presentations, these are
20  things you gave orally?
21     A.    Yeah, I have got copies of Power Point
22  presentations with respect to dealing with mold
23  problems in buildings and how to address them, how to
24  find sources, how to identify the organisms where they
25  are, how to use an air sample to determine where the

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

NEIL G. CARLSON, MS, CIH

1    NEIL G. CARLSON, MS, CIH
2 source might be. In other words, if you have
3 Stachybotrys, then you look for water damaged
4 sheetrock; if you have Chaetomium, you look for a
5 cellular-based material that has fungal growth.
6    Q. I know you talked about finding the
7 source. If you have any Power Points on this, I would
8 like to see copies of them where you have used the
9 term secondary in terms of differentiating between
10 multiple sources of mold that might be found in an
11 indoor environment. If you have done so and can bring
12 me copies, I would appreciate that.
13    A. I will review that.
14    Q. Thank you, sir. You have also given
15 presentations also on flooding strategies for cleaning
16 and drying?
17    A. Yes.
18    Q. In a situation like the Garrys where
19 they have sewer backups and flooding, that is always
20 going to be a problem in terms of mold?
21    A. Almost always depending on the surfaces
22 that are impacted.
23    Q. Based on the testing done here, both
24 bulk and air sampling, there was a mold problem in the
25 basement due to a backup at least in part, correct?

1    NEIL G. CARLSON, MS, CIH
2    MR. CONLIN: At what point in time?
3    MR. STADLER: In any time he was on the
4 premises evaluating whether a mold problem existed.
5    THE WITNESS: There may have been, yes.
6 BY MR. STADLER:
7    Q. You also gave a presentation titled
8 Mold Science Versus Speculation. Do you see that?
9    A. Yes, I do.
10    Q. What is the speculation you are
11 referring to there?
12    A. That one was a panel discussion. That
13 was 2002. I am trying to recall what the speculation
14 part was.
15    MR. CONLIN: Is your question assuming
16 that he titled the program --
17    MR. STADLER: My question was what it
18 is. If he doesn't understand the question --
19    THE WITNESS: No, I understand the
20 question. I am trying to recall what particular part
21 was related to the speculation in that speech. If you
22 want to come back to it, please do, but right now I
23 can't recall. If you don't mind me interrupting you
24 in the course of a response.
25 BY MR. STADLER:

1    NEIL G. CARLSON, MS, CIH
2    Q. Go right ahead if it comes to the front
3 of your mind. Also, if you have a paper or something
4 in writing that relates to that seminar or
5 presentation, I would request a copy of it.
6    A. Sure.
7    Q. On that same page you have another
8 presentation, part of the Minnesota Bar Association,
9 two-day seminar on mold?
10    A. Yes.
11    Q. The title was Evaluating the Case, A
12 Reality Check. Do you see that?
13    A. Yes.
14    Q. You were the author with Mr. Sieff or
15 Sieff?
16    A. Yes. We presented separate
17 presentations in that seminar.
18    Q. What was the reality check you were
19 referring to in presenting that seminar?
20    A. This is a seminar in October of 2002.
21 Right.
22    Q. Before you were retained in this case?
23    A. Yes. I am attempting to remember the
24 specific part of the reality check. I remember the
25 rough substance of the talk. I don't remember

1    NEIL G. CARLSON, MS, CIH
2 specifically relating to the reality check.
3 Essentially it was a talk about mold sources, how you
4 identify them, what are some of the structural
5 problems associated with mold growth, how you sample
6 for it, and some of -- I have a copy of it if you
7 would like.
8    Q. Yes. I would like a copy of that.
9 This was a presentation to lawyers primarily?
10    A. Yes. That was the Minnesota CLE, I
11 believe.
12    Q. Minnesota Bar Association, right?
13    A. I believe so, yes.
14    Q. Then you had another presentation as
15 well it appears six months later before the same
16 association, Investigating and Interpreting Result.
17 Do you see that?
18    A. Yes. And I have a copy of that
19 presentation if you would like.
20    Q. Yes, I would. And again, that was to a
21 group of lawyers?
22    A. That is correct.
23    Q. The third one looks like maybe the same
24 time period, another day long seminar, Minnesota Bar
25 Association, When Mold Takes Hold. I guess that is

Page 118

NEIL G. CARLSON, MS, CIH

1
2 part of the same seminar, right, you gave a second
3 presentation?
4     **A.   Yes.**
5     Q.   The title of your paper was
6 Remediation, It Can Be a Nightmare?
7     **A.   Yes.**
8     Q.   What do you mean by that?
9     **A.   If you don't do it correctly, you can**
10 **have a big problem with respect to remediation. In**
11 **other words, if you have fungal growth on a material**
12 **and you don't remove the material in a careful and**
13 **thoughtful manner controlling the spore release, you**
14 **can spread the spores to other areas.**
15     Q.   Based on your review of this case, is
16 it fair to say a company called InTek conducted a mold
17 removal in July of 2002 in the Garry home where they
18 did not undertake the proper remediation procedures or
19 measures?
20     **A.   I would say based on what I have looked**
21 **at, that their remediation was not -- if their**
22 **remediation was appropriate, we wouldn't have had the**
23 **elevated levels in the carpet.**
24     Q.   We are talking about the remediation
25 where you took out mold that was found in some

Page 119

NEIL G. CARLSON, MS, CIH

1
2 sheetrock right below the toilet that had been
3 leaking?
4     **A.   Correct.**
5     Q.   They did that in mid July of 2002 or
6 about the time of the sewer backup?
7     MR. CONLIN:  Your question is
8 ambiguous. You said right below the toilet. I don't
9 know whether you are referring to the ceiling or
10 walls.
11     MR. STADLER:  I appreciate that.
12 BY MR. STADLER:
13     Q.   You are familiar with the fact in mid
14 July of 2002 there was a sewer backup. Mr. Garry in
15 the course of that asked InTek to look for mold in the
16 southwest bedroom, correct?
17     **A.   I don't know the specific dates. I**
18 **know there was a removal done, and I don't know the**
19 **time where they removed, and it was obvious from the**
20 **investigation, they removed like a square-shaped piece**
21 **out of the ceiling and then several feet out from**
22 **either side of the southwest corner.**
23     Q.   That was done by InTek, a company
24 called InTek?
25     **A.   I believe so.**

Page 120

**NEIL G. CARLSON, MS, CIH**

1
2     Q.   I will show you something very briefly
3 on that. Do you know whether that work was done
4 before or after the Garrys gave notice to Hawkeye
5 about the situation?
6     **A.   I don't know anything about the**
7 **sequence.**
8     Q.   Do you know who hired InTek to do that
9 remediation?
10     **A.   I don't know.**
11     Q.   But it's your belief based on what you
12 reviewed here as a result of that remediation there
13 was some elevated mold levels found in some carpet at
14 least when bulk sampling was done, correct?
15     **A.   Yes. I think there would have been.**
16     MR. CONLIN:  You have answered his
17 question. With respect to these publications you have
18 asked him for copies of, Counsel, I would appreciate
19 it very much, because this one he has marked on is
20 actually the original exhibit, so if you could please
21 follow with a letter to Mr. Parsons identifying those,
22 that would be great. That way we can have a letter,
23 give it to Neil, and he can make copies.
24     MR. STADLER:  Certainly.
25 BY MR. STADLER:

Page 121

NEIL G. CARLSON, MS, CIH

1
2     Q.   I wasn't going to have you go back and
3 try to reconstruct what it is you told me. We
4 typically do that.
5     **A.   I appreciate that, sir.**
6     Q.   The last thing I want to talk to you
7 about on your CV, the next page you have opened there,
8 right below the bar association presentation you gave,
9 two or three down below that there is a reference to
10 Mold and Insurance Issues, Insurance Extravaganza,
11 Prior Lake, Minnesota. Do you see that?
12     **A.   Yes.**
13     Q.   What was your topic in that
14 presentation?
15     **A.   It was about a three-and-a-half hour**
16 **talk, so we covered the gamut. There is about five or**
17 **six Power Point presentations given on that.**
18     Q.   This is something you made a
19 presentation on with respect to mold, not insurance
20 issues, correct?
21     **A.   It was primarily mold. This was given**
22 **to insurance agencies, so it was given to them and**
23 **giving them the perspective of here's all of the**
24 **issues on it, and then kind of wrapping up how does**
25 **insurance people come into part of it.**

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 122

NEIL G. CARLSON, MS, CIH

1
2    Q.    Did you speak or discuss anything to do
3  with insurance coverage, you personally in this
4  presentation?
5    A.    Let's see. I gave the different
6  scenarios that companies are choosing to limit their
7  liability with respect to mold claims.
8    Q.    What was the basis for your knowledge
9  in making that presentation?
10    A.    It was based off of information from
11  discussions with or information that I got from our
12  attorneys in the Twin Cities because we were putting
13  together a presentation to colleges, and it was to the
14  legal people for the colleges and universities around
15  the state. So they gave me several cases and listed
16  how the different insurance companies across the
17  country were addressing, limiting mold liability.
18    Q.    Some of the lawyers at the University
19  of Minnesota, their lawyers office, gave you some case
20  materials that discussed insurance issues relating to
21  mold?
22    A.    Yes, as I recall.
23    Q.    You took those materials yourself, read
24  them, digested them in some sort and spoke about them
25  at this seminar?

Page 123

NEIL G. CARLSON, MS, CIH

1
2    A.    That is correct.
3    Q.    Other than that you don't have any
4  insurance coverage background, do you, to speak on
5  those issues?
6    A.    I haven't been trained as an insurance
7  adjuster.
8    Q.    And you are not an attorney, correct?
9    A.    And I am not an attorney.
10    Q.    Did you speak about this case in that
11  seminar?
12    A.    I have to think about it. I don't
13  recall if I spoke specifically about it. There may
14  have been one -- I will have to look back on it.
15  There may have been a photo from this particular case
16  with respect to both the positive and the negative
17  part, the positive being that the sheetrock was gapped
18  and that is a good construction practice; the fact
19  that the carpet tack strip was rusting, which is an
20  indication of water infiltration, and that the back of
21  the carpet tack strip had rust stains on it which was
22  with respect to water infiltration. I don't know.
23  Although I have used it in other presentations where
24  we rolled back the portion of the carpet and there is
25  the water stain line on that. There is a picture of

Page 124

NEIL G. CARLSON, MS, CIH

1
2  that in the presentation. I just talked about that
3  when you are doing an investigation, this is some of
4  the things that you can use to determine if there has
5  been water infiltration.
6    Q.    But you don't know specifically if any
7  of the photographs from this case were used in that
8  presentation?
9    A.    No, I'm not sure.
10    Q.    I will put that on my list of things
11  for you to look for.
12    A.    Sure.
13    Q.    Do you recall having mentioned in that
14  presentation the terms primary and secondary sources
15  for mold?
16    A.    I don't know if I did or not.
17       MR. CONLIN: You have answered his
18  question.
19  BY MR. STADLER:
20    Q.    If you don't know, you don't know.
21  It's that simple.
22       So that presentation was a combination
23  of both your CIH, industrial hygiene experience, as
24  well as what you understood to be some legal issues
25  that you could discuss regarding insurance coverage,

Page 125

NEIL G. CARLSON, MS, CIH

1
2  correct?
3    A.    Correct. It was to give them on the
4  background of the scope of the program from all
5  different angles, public health, insurance, et cetera.
6    Q.    Is the Garrys' home below grade, the
7  one we are talking about now?
8       MR. CONLIN: Which portions?
9       THE WITNESS: A portion of it is below
10  grade.
11  BY MR. STADLER:
12    Q.    Which portion?
13    A.    The portion of the Garry home that is
14  below grade is -- can we take a look at the diagram?
15    Q.    Sure. Let's go back to the diagram.
16    A.    My recollection on a portion is fairly
17  good. On the other part, it's not as good as I would
18  like, so let's just go through it.
19       Southwest bedroom, northwest bedroom,
20  and I believe a portion of, it's been variously
21  referred to as the storage room or the utility room,
22  and I believe the hallway in between the bathroom and
23  the outer wall on the lower level. Then, as I recall,
24  a portion of the rec room, I think that part is at
25  grade. Do we have pictures of the back side of the

Page 126

NEIL G. CARLSON, MS, CIH

1            NEIL G. CARLSON, MS, CIH
2  house that could assist?
3    Q.    Again, the only thing I have with
4  respect to your report is what you put in front of us
5  as tabs 1 through 8.
6            MR. CONLIN: Do you have other pictures
7  of the home?
8            MR. STADLER: Nothing here.
9            THE WITNESS: Let's get those. If you
10  would like to question me on something else, go ahead
11  and we can come back to that.
12            (Discussion had off the record.)
13            THE WITNESS: My recollection ends
14  about here, but the hallway would be across from the
15  bathroom. The southwest bedroom, the northwest
16  bedroom and the storage room/utility room are ones
17  that I know for sure are below grade. I'm not sure,
18  there may be portions of the rec room that is below
19  grade but I don't recall exactly which portions. I
20  think maybe along this side, on the south side.
21  BY MR. STADLER:
22    Q.    You spoke at one of your presentations
23  or conferences about floor coverings for basements?
24    **A.    Yes.**
25    Q.    Are there certain types of floor

Page 127

NEIL G. CARLSON, MS, CIH

2  coverings that promote mold growth as opposed to other
3  types of floor coverings?
4    **A.    It depends if you have a subslab**
5  **moisture problem and how the slab is set up.**
6    Q.    In the Garry case, for example, let's
7  look at that.
8    **A.    Carpet can be problematic, floor tile**
9  **can be problematic.**
10    Q.    Both of which were in their basement in
11  some areas?
12    **A.    Yes. And even cement with dirt on it**
13  **can be problematic, or with dust on it, can be**
14  **problematic.**
15    Q.    We were talking a few minutes ago about
16  the remediation InTek did about where the toilet
17  allegedly was leaking. There is some reference to it.
18  I will mark as Exhibit 8 a document entitled Microbial
19  Assessment for Fountain Drive, Sioux Falls, South
20  Dakota, dated 2002, prepared by Legend Technical
21  Services, Inc. Let's mark that as Exhibit 8.
22            (Whereupon, Carlson Deposition
23            Exhibit No. 8 was marked for
24            identification.)
25  BY MR. STADLER:

Page 128

NEIL G. CARLSON, MS, CIH

2    Q.    I am showing you what has been marked
3  as Exhibit 8, and ask you if you have seen this
4  before. This is a report, if you look at the second
5  page, dated September 2, 2002, final report for
6  microbial assessment for the residence, and it's the
7  Garrys' home?
8    **A.    Um-hum.**
9    Q.    It's from a Cheryl Sykora at Legend
10  Technical Services, Inc. Have you ever heard of Ms.
11  Sykora?
12    **A.    Yes, I have done work for her.**
13    Q.    For her?
14    **A.    Yes.**
15    Q.    It's to a Mr. Bill Bloemendal from GME
16  Consultants, Inc. in Minneapolis. Do you see that?
17    **A.    Yes, I do, sir.**
18    Q.    Do you know Mr. Bloemendal?
19    **A.    No, I don't.**
20    Q.    But you know Ms. Sykora?
21    **A.    Yes, sir.**
22    Q.    How do you know her?
23    **A.    I did fungal analysis for her.**
24    Q.    When you say for her, for her company
25  Legend Technical?

Page 129

NEIL G. CARLSON, MS, CIH

2    **A.    Yes. For her company, Legend Technical**
3  **Services.**
4    Q.    For what period of time did you do work
5  for Ms. Sykora?
6    **A.    I don't recall exactly. It was several**
7  **years.**
8    Q.    Was it periodic or were you an employ
9  of her company?
10    **A.    Periodic I was a consultant for her. I**
11  **did her microbial analysis.**
12    Q.    Did you report to her when you worked
13  for that entity?
14    **A.    I would not report to her. She would**
15  **send me bulk samples or airborne samples and I would**
16  **analyze them and give her the results.**
17    Q.    Did you know prior to today that she or
18  her company had done a microbial assessment of the
19  Garrys' home?
20    **A.    I believe someone had mentioned she may**
21  **have done that, but that was in passing, and I can't**
22  **recall for sure who told me that, but I was not**
23  **appraised of the report. They just said -- I think**
24  **someone mentioned I think Cheryl is doing a test on**
25  **the Garry residence.**

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 130

NEIL G. CARLSON, MS, CIH

1  NEIL G. CARLSON, MS, CIH
2      Q.    Do you know GME Consultants, have you
3  heard of them?  That is Mr. Bloemendal's company.
4      A.    No.  I have not heard of GME.
5      Q.    Now, the third page of this document,
6  Exhibit 8, makes reference to, if you look at
7  executive summary?
8      A.    That is correct.
9      Q.    It makes a statement about the middle
10 of the paragraph towards the end, "Poly enclosure and
11 HEPA filtered negative pressure was not used for
12 removal of gypsum wallboard from the lower level
13 bedroom below the toilet leak."  Do you see that?
14     A.    Yes, I do.
15     Q.    Is that consistent with your
16 understanding of what was done in July of 2002?
17     A.    Yes.  My understanding they didn't use,
18 this would be termed a controlled abatement.  They did
19 not use controlled abatement.
20     Q.    Again, we are talking about removal of
21 mold from the southwest bedroom?
22     A.    Yes.
23     Q.    That was from InTek as far as we know?
24     A.    You have told me that.
25     Q.    The next sentence states, "The

Page 131

1  NEIL G. CARLSON, MS, CIH
2  appearance of gypsum wallboard dust tracked through
3  the garage visible in photo 17," I believe there are
4  photographs attached to this report, "indicates that
5  the removal of the GWB ceiling," GWB is gypsum
6  wallboard, "compacted by the freezer leak was also not
7  done which controls," do you see that?
8      A.    Yes, I do.
9      Q.    You mentioned earlier in your
10 deposition today about the refrigerator leaking and
11 ice maker leaking?
12     A.    Yes.
13     Q.    That was in September of 2002?
14     A.    I don't recall the exact date, but I
15 know that occurred, yes.
16     Q.    Do you know whether engineering
17 controls were used when that material was removed,
18 that gypsum wallboard was removed?
19     A.    I don't know that.  I would rely on
20 this report.  I don't know if I did or not.
21     Q.    In the course of your work with Ms.
22 Sykora, did you come to rely upon work that she did or
23 her analysis in connection with any mold assessments?
24     A.    I did not rely on her analysis at all.
25 She would submit results to me, but the work that I

Page 132

1  NEIL G. CARLSON, MS, CIH
2  did did not rely on her analysis.
3      Q.    Do you consider her to be a reputable
4  and certified industrial hygienist?
5      A.    I would like to go off the record for
6  just a second because I don't want to be in trouble on
7  something.  Can I be off the record for a second?
8      Q.    You can consult with your attorney.
9      A.    I need to do that.
10     (Discussion had off the record.)
11 BY MR. STADLER:
12     Q.    Let me go back and strike the question.
13 I wanted to go to in this report the third, fourth
14 page in, narrative report.  If you go -- do you see
15 that?  There is a statement they are in the third
16 paragraph under background information about again the
17 removal work that was done.  All I'm asking you, if
18 that description is consistent with your understanding
19 about what happened?
20     A.    Paragraph 3 under 2.0?
21     Q.    Yes.  And particularly this sentence,
22 "Gypsum wallboard was removed from below the master
23 bedroom leak at that time," referring to 2002.  "It is
24 our understanding the work was performed without the
25 work of an enclosure and without the use of a HEPA

Page 133

1  NEIL G. CARLSON, MS, CIH
2  filtered negative air machine."  Is that your
3  understanding?
4      A.    That paragraph is my understanding of
5  it, yes.
6      Q.    Now, on page 8 of 11, if you go to that
7  page for me at the very bottom, it talks about
8  Stachybotrys spores.  Do you see that?
9      A.    Um-hum.
10     Q.    And they did some air sampling in that
11 lower bedroom, and I believe they are referring to the
12 southwest bedroom?
13     A.    Um-hum.
14     Q.    It states in the middle there, "The
15 number of Stachybotrys spores detected were low and no
16 active Stachybotrys growth was observed, nor were wet
17 materials observed."  Do you see that?
18     A.    Yes.
19     Q.    Do you have any information that
20 relates to that?  I know you haven't seen this report.
21 Were you ever told testing was done in September of
22 2002, beside the Nova testing?
23     A.    This one I was aware testing may have
24 been done.  I haven't seen this report.  Is that clear
25 enough?

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 134

NEIL G. CARLSON, MS, CIH

1
2      Q.     Because you mentioned earlier somehow
3   you were aware Cheryl Sykora was involved in some
4   testing?
5      A.     Yes, but I wasn't aware of this report.
6      Q.     So you never had occasion to talk to
7   her directly about her evaluation of the home?
8      A.     No, I have not.
9      Q.     They go on to say at the end of this,
10  "It is likely the removal of the fungal contaminated
11  GWB from the lower level bedroom is the cause of these
12  airborne spores rather than active Stachybotrys
13  growth." Do you see that?
14     A.     Yes, I do.
15     Q.     Is that something based on what you
16  know now about the removal done by InTek that you
17  would agree with?
18     A.     I don't know if I would particularly
19  parse it the way that she did because I don't know if
20  during the course of the water coming into the space,
21  if some of the Stachybotrys spores came out onto the
22  carpet at that time and how to parse out the poor
23  removal as opposed to possibility that some of the
24  spores were deposited prior to the removal.  I can't
25  parse out that particular one, if that is what you are

Page 135

NEIL G. CARLSON, MS, CIH

1
2   asking me to.
3      Q.     You don't have any information that
4   would lead you at this point to dispute or disagree
5   with her assessment?
6          MR. CONLIN:  I think he answered that,
7   yes, I would put it differently.  I think that is
8   exactly what he said.
9          THE WITNESS:  I would put it
10  differently.  I do not know if -- let me see how to
11  put it.  I think I will stand on my original answer.
12  BY MR. STADLER:
13     Q.     Let me approach it this way.  It may be
14  helpful, and it may not be, and I will hear from your
15  counsel if that is so.
16     A.     Sure.
17     Q.     What impact did the removal -- strike
18  that.
19          What impact did the failure to use
20  proper engineering controls by InTek in removing that
21  mold in the southwest bedroom have on the mold that
22  was found in the home?
23     A.     The poor abatement of the mold in that
24  situation as described as I understand it would have
25  contributed to, in some part to the dispersal of both

Page 136

NEIL G. CARLSON, MS, CIH

1
2   Stachybotrys and Chaetomium spores.
3      Q.     Would the same be true as well with
4   respect to the removal done and cleanup done after the
5   refrigerator leak when there was no engineering
6   controls used as well?
7      A.     I don't know about Stachybotrys or
8   Chaetomium.  I could go under the rough assumption
9   based on the fact that we did see on some of the
10  sheetrock that wasn't removed some growth, that there
11  probably was some spores released during that
12  uncontrolled abatement.
13     Q.     As to the uncontrolled abatement versus
14  mold spores that may have resulted from the leaking
15  toilet before that, would you say that one of those
16  was a primary source of the mold found in the home?
17          MR. CONLIN:  For that species?
18  BY MR. STADLER:
19     Q.     Yes, of the Stachybotrys.
20     A.     You are talking about primary source of
21  airborne distribution of it?
22     Q.     Right.  You talked about the improper
23  removal playing a contributing role in the
24  Stachybotrys found throughout the house, and I am
25  asking you comparing that event to just the alleged

Page 137

NEIL G. CARLSON, MS, CIH

1
2   leaking of the toilet over some period of time going
3   down, did you surmise through walls and being
4   deposited, the water in some areas of that southwest
5   bedroom and you say also the northwest bedroom, those
6   two scenarios, can you say which of those two were
7   primary and secondary sources of mold in the house?
8   And I am talking about Stachybotrys and the mold --
9      A.     Right.  Right.  I don't know if I could
10  go primary, secondary on that one, but I would say it
11  is not an insignificant source.  It would have been a
12  sufficient spore distribution mechanism.  But the part
13  that I am trying to parse out is that the ceiling
14  collapsed prior to the abatement, so that would have
15  also been an effective spore distribution mechanism.
16     Q.     The ceiling collapsed in 1999, it
17  didn't collapse in 2002, sir?
18          MR. CONLIN:  That is right.
19          THE WITNESS:  Correct.
20  BY MR. STADLER:
21     Q.     You are saying there could have been
22  some Stachybotrys mold resulting in the house from the
23  falling out of the ceiling in 1999?
24     A.     That is correct, yes, sir.
25     Q.     And you are also saying that was not an

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 138

NEIL G. CARLSON, MS, CIH

1
2  insignificant event, right?
3      A.    No.
4      Q.    That is correct?
5      A.    That is correct.
6      Q.    And also was not an insignificant event
7  when the InTek firm hired by the Garrys used improper
8  engineering controls in removing mold from the same
9  bedroom in the southwest bedroom?
10     A.    Both events are significant.
11     Q.    You don't know which event occurred
12  when Hawkeye Insurance Company was notified of this
13  case?
14     A.    No, I'm not aware of the timetable when
15  the insurance company was notified.
16     Q.    This report, if you go to the very end
17  of it --
18     A.    Is that the picture?
19     Q.    Yeah, the picture. Yet another diagram
20  where someone has attempted, and I believe it is these
21  folks Legend, to tell us where in the basement of the
22  Garry home various events impacted. There is a
23  reference here to the toilet leak in the corner of the
24  southwest bedroom, and then there is a storage room,
25  laundry, bathroom being affected and northwest bedroom

Page 139

NEIL G. CARLSON, MS, CIH

1
2  being affected by sewer backup. Do you see that?
3      A.    Yes, I do.
4      Q.    Then there is another area near the rec
5  room, the corner of the rec room where there was the
6  freezer leak from above?
7      A.    That is correct, sir.
8      Q.    And you are familiar with all of those
9  events, right, based on at least the GeoTek report and
10  some of the other reports you have seen?
11     A.    Yes, I am, sir.
12     Q.    And that diagraming, do you know
13  whether that is consistent with what actually happened
14  in those events to the best of your knowledge?
15     A.    To the best of my knowledge, yeah.
16     Q.    Now, if I could, I think we have marked
17  the document I want to refer to.
18     A.    Sir, do you want this back?
19     Q.    That goes with your report, I believe.
20     A.    No, that wasn't with the report.
21     Q.    You are correct. Let me show you what
22  has been marked as Exhibit 7. This report refers in
23  the first page, this is a report to Mr. Conlin
24  indicating that Mr. Wilkinson had been in the Garry
25  home doing an inspection in June of 2003. Do you see

Page 140

NEIL G. CARLSON, MS, CIH

1
2  that?
3      A.    Yes.
4      Q.    There had been apparently a major
5  rainstorm or recent rainstorm, I should say, that
6  resulted in water intrusion in the basement?
7      A.    Um-hum.
8      Q.    The northwest basement bedroom was
9  involved, I believe, at least the second time they
10  were present on June 26, 2003. Do you see that?
11     A.    Yes.
12     Q.    And this says that that rainstorm
13  resulted in a pad along the west wall below the west
14  window in the northwest basement bedroom being wet.
15  Do you see that?
16     A.    Yes.
17     Q.    From the photograph, if you still have
18  that schematic you drew on earlier today, that would
19  be in an area along the west wall that you indicated
20  there was carpet staining when you looked at it in
21  March, right?
22     A.    Yes, sir. I don't know the precise
23  location of that leak.
24     Q.    When we talk about the leak, we are
25  talking about a window leak?

Page 141

NEIL G. CARLSON, MS, CIH

1
2      A.    Yes.
3      Q.    Not a toilet leak?
4      A.    Window leak.
5      Q.    There was a leak in June of 2003 that
6  resulted in wetting of areas, part of which may be
7  areas you highlighted earlier today regarding the
8  toilet leak?
9      A.    Part of the crescent, yeah.
10     Q.    If you can go to the last, the third
11  page of this report.
12     A.    That is the conclusions part, sir?
13     Q.    Yes. There is a reference to the
14  southwest basement bedroom?
15     A.    Um-hum.
16     Q.    GeoTek felt along the floor of all
17  floor walls. It says, "The carpet padding and cement
18  were all dry. Water infiltration was not observed on
19  any of the walls, ceiling or windowsills." Do you see
20  that?
21     A.    Yes, I do.
22     Q.    Then it talks about the northwest
23  basement bedroom. Again states, "The wet flooring
24  noted by the realtors on June 26 was still present
25  along the west wall near the west window. GeoTek felt

Steve and Allison Garry vs Homeland Central Insurance Company, et al. 10/22/04

Page 142

NEIL G. CARLSON, MS, CIH

1 along all four walls for wetness. The wall was
2 isolated to the west wall below the west window." Do
3 you see that?
4     **A.    Yes, I do.**
5     Q.    Then the next paragraph goes on to say
6 in the middle, "The carpet was still rolled back from
7 the west wall. The staining on the carpet extends
8 from the south corner to the center of the window."
9 Is that the same area of staining that you say you
10 noted in March of 2003?
11     **A.    The staining on the carpet --**
12     Q.    On the west wall of the northwest
13 bedroom?
14     **A.    -- extends from the south corner to the**
15 **center. Yeah, that is the old stain that we are**
16 **referring to.**
17     Q.    Yeah, but there is apparently staining
18 that they are noting here, right, in July or June of
19 2003, and it says, "The carpet staining matches the
20 pattern of water intrusion in this area. It does not
21 run the length of the wall. It was also noted that
22 the tack strip was the darkest in that area." Do you
23 see that?
24     **A.    Yes.**

Page 143

1     **NEIL G. CARLSON, MS, CIH**
2     Q.    What I'm confused about is in July or
3 June of 2003 there is this staining along the west
4 wall and there is also noted that the tack strip is
5 discolored, and associating it with the rainstorm that
6 just happened, correct?
7     **A.    Yeah.**
8     Q.    Now, is this observation the thing that
9 you are referring to in your report and your opinion
10 as to how you associate the northwest bedroom
11 condition with the leaking toilet, because isn't this
12 basically almost the same language you used in your
13 report?
14     MR. CONLIN: I object to the form of
15 the question. Answer if you can.
16 BY MR. STADLER:
17     Q.    We can look at your report again and
18 your conclusion. If you can look at your conclusion
19 in your report on the contribution, you make reference
20 to, you say, "Based on observed stain markings on the
21 carpet and discolored carpet tack strips, the leak
22 from the toilet area extended along the east, south
23 and west sides of the southwest bedroom and along the
24 west side of the northwest bedroom." That is where
25 you made your markings on Exhibit 1 earlier today?

Page 144

1     NEIL G. CARLSON, MS, CIH
2     **A.    It's certainly possible that that water**
3 **stain may have been due to a window leak based upon**
4 **looking directly at this.**
5     Q.    What I'm getting at is when you did
6 your report, were you referring to this event, this
7 water event in June of 2003 and not any prior water
8 event?
9     **A.    I was not referring to that event in**
10 **June. I was referring to a possible prior event,**
11 **yeah, possible prior event.**
12     Q.    Which could have been a leak through
13 the window, not from a leaking toilet, right?
14     **A.    It is certainly possible given this**
15 **particular statement, yes, sir.**
16     Q.    And this document also refers in the
17 next paragraph, I think we talked about it earlier
18 this afternoon, but I just want to make sure we are on
19 the same page. "Outside there is a large gap between
20 the foundation and landscaping near the northwest
21 bedroom window." Do you see that?
22     **A.    Outside visual, west side, yes.**
23     Q.    That is on the west side of the house
24 right outside the west wall of the northwest bedroom,
25 right?

Page 145

1     NEIL G. CARLSON, MS, CIH
2     **A.    Yes.**
3     Q.    It says, "Any water pooling in this
4 area is definitely sloping toward the house and
5 eventually down the foundation walls," right?
6     **A.    Um-hum.**
7     Q.    Is that a possible source of water
8 intrusion in that area that you highlighted earlier
9 today in the northwest bedroom?
10     **A.    It is a possible source, yes, sir.**
11     Q.    Can you say today based upon what you
12 know and what you looked at that the leaking toilet
13 was more likely a source of moisture in the northwest
14 bedroom area than a leak from a window or a
15 window or through a crack in the foundation?
16     **A.    Based on this particular specific**
17 **information, I can't say for certain what the source**
18 **of the water is, whether it is the window or the**
19 **toilet.**
20     Q.    In the northwest bedroom?
21     **A.    In the northwest bedroom, yes, sir.**
22     Q.    Therefore, with respect to any air
23 sampling that was done or bulk sampling taken from the
24 northwest bedroom, you can't say any mold spores found
25 in those samples related to or were contributed to the