UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

STEVE AND ALLISON GARRY, )
)
Plaintiffs, )
)
vs. ) No. CIV. 03-4019
)
HOMELAND CENTRAL INSURANCE )
COMPANY, formerly known as )
HAWKEYE SECURITY INSURANCE )
COMPANY, )
)
Defendants. )
____________________________)

DEPOSITION OF ANDREW SAXON, M.D., taken on behalf of the Plaintiffs, at 10833 Le Conte Avenue, Room 57-175, Los Angeles, California 90095, commencing at 1:01 p.m., Tuesday, November 9, 2004, before AUDREY Y. SHIOZAKI, Certified Shorthand Reporter No. 8984.



APPEARANCES:

For Plaintiffs:
Richard W. Langerman, ESQ.
LAW OFFICE OF RICHARD W. LANGERMAN
3216 Third Street
Suite 200
Phoenix, Arizona 85012
(602) 240-5525

For Defendants:

John S. Stadler, ESQ.
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts 02110-2131
(617) 345-1000

EXHIBIT
tabbles
4



INDEX


| DEPONENT | EXAMINED BY | PAGE |
|---|---|---|
| ANDREW SAXON | Mr. Langerman | 5 |

| EXHIBITS FOR IDENTIFICATION | PAGE |
|---|---|
| Plaintiffs': | |
| 1 - Adverse Human Health Effects Associated with Molds in the Indoor Environment | 10 |
| 2 - Document Entitled "Andrew Saxon, M.D. Previous 4 Years Testimony" | 20 |
| 3 - Letter Dated 6/23/04 | 56 |




LOS ANGELES, CALIFORNIA; TUESDAY, NOVEMBER 9, 2004
1:01 P.M.

ANDREW SAXON, M.D.,
deponent, was sworn and examined
and testified as follows:

THE REPORTER: Do you solemnly swear that the testimony you are about to give in this proceeding shall be the truth, the whole truth, and nothing but the truth, so help you God?
DR. SAXON: I do.

EXAMINATION

Q BY MR. LANGERMAN: Can you please state your full name for the record?
A Andrew Saxon. I have no middle name.
Q You are a medical doctor?
A Yes.
Q You've been deposed on a number of occasions before?
A Yes.
Q You are currently employed by the University of California?
A Yes.

wouldn't say — so, my answer is saying there are specific areas I have expertise. I wouldn't hold myself out to be an expert in the general field because there is large parts that outside of my expertise.
Q Are you a certified industrial hygienist?
A No.
Q How about mold remediation? Are you an expert in that field?
A No.
MR. STADLER: Off the record for a second.
(A discussion was held off the record.)
(Plaintiffs' Exhibit 1 was marked for identification by the court reporter.)
Q BY MR. LANGERMAN: Sir, I've handed you a copy of a document that's on the Web site for the American College of Occupational Environmental Medicine entitled "Adverse Human Health Effects Associated with Molds in the Indoor Environment." You were one of the coauthors of this paper?
A I'm one of the people who prepared this for the American College of Occupational and Environmental Medicine.
Q Other than this paper have you written any other papers that deal directly or indirectly with the health effects of molds?



A Yes.
Q What other papers have you written?
A There are a number of papers in my CV that deal with issues related to mold infection and immunocompromised individuals, and there are several book chapters. They really relate to just putting mold in perspective. As I recall, it's been some years, in the perspective of looking at molds as part of the world of allergens.
Q So, you've written some on infectious properties of molds; is that correct?
A The relation — infections in immunocompromised hosts. So someone else wouldn't misunderstand, yes, that's one.
Q And you've written some on the allergic effects of molds and their metabolites?
A Yes.
Q Have you written any papers on the toxic effects of molds and their associated metabolites?
A No.
Q As part of the review that you did for the American College of Occupational and Environmental Medicine you reviewed some of the literature dealing with the health effects of mold?
A Yes.



Q Which of the subjects covered in the paper did you review papers of?
A All of them.
Q Did you review any papers dealing with animal studies for showing neurotoxic effects of molds in associated metabolites?
A At this point I don't recall. I may have given you a better answer when you asked me that in the Kilian matter, K-i-l-i-a-n. So, I don't remember if there were animal neurotoxicity studies reviewed or just human studies. It's been two-and-a-half years, I'd say.
Q As you sit here today you don't recall whether you reviewed any animal studies showing neurotoxic effects of molds and associated mycotoxins?
A For this manuscript for this, writing this. I know I reviewed them since because I reviewed them for you.
Q You didn't review them for me, sir. I never hired you to do anything.
A I reviewed them in relationship to your asking me questions. But in relationship to this paper, this position statement, I don't recall.
Q Did you as part of your work in preparing this paper -- let me rephrase that.
Did you as part of your preparation of the



American College of Occupational and Environmental Medicine paper review animal studies showing pulmonary effects of molds and mycotoxins?
A I'm sure I did, yes.
Q Do you recall which ones you reviewed?
A No.
Q Do you recall how many you reviewed?
A No.
Q In the -- I'm going to use the acronym ACOEM which is A-C-O-E-M. In the ACOEM paper there are citations to 83 references. Do you see that, sir?
A Yes.
Q Did you review all of the articles, chapters and papers that are cited in the ACOEM paper?
A I can't be sure. I don't know.
Q There is a text by the American Conference of Governmental Industrial Hygienists entitled "Bioaerosols." Are you familiar with that text?
A Is it one of the references?
Q I don't know whether it's referenced or not.
A I just was trying to make sure because there was a better name. So, I'm sorry to interrupt you, Mr. Langerman. The name was what?
Q "Bioaerosols: Assessment and Control"

A Early part of October. Well, it won't help to look at my book. The date got moved around so much I think it's inaccurate in my red book.
Q In the three depositions that you've given in the last few months, do you recall the names of any of those cases?
A There have been since June, so yes, I do. One is Frances, second is Loring, L-o-r-i-n-g, and the third I can get you. I remember the plaintiffs. I just don't remember the name. I remember lots -- some of the details around it, but I can't remember the plaintiff's names in that case. There was a third one.
Q And the last time you were deposed, when was that?
A Last Friday night.
Q Do you recall who the plaintiff's attorney was who deposed you?
A Yes.
Q And that was?
A Ms. Gamboa, G-a-m-b-o-a.
Q And the one before that, do you recall who the plaintiff's attorney was?
A Yes.
Q And that was?
A Mr. McGaragol (phonetic). Give me a



second. McGarity or McGaragol. He's right here in West L.A. I kept calling him Mr. McGaragol and it was wrong. It's with an "A." Mr. McGaragol was from Harry Potter. It was getting in the way. It's McGaragol or McGarity.
Q And in the Frances case do you recall who the plaintiff's attorney was?
A I'm sorry. I thought -- I made a mistake -- that's who you just asked me. He was the Frances case.
Q How about Loring?
A Ms. Gamboa.
Q And the one that you couldn't remember the plaintiff's name?
A I don't remember the attorney for the plaintiffs. I don't even remember the attorney for the defense in that case.
Q You were deposed about a week and a half ago by Mike Duffy.
A And that shows you my memory. And there's another case. It was out of state and out of mind.
Q So there are four depos and one trial attorney?
A That I can recall, and there might be another one. You're right.
Q And --



A I don't mean any insult to Mr. Duffy.
Q And when are you next scheduled to be deposed?
A In around the first of December.
Q You're not scheduled to be in up state California tomorrow getting deposed?
A No.
Q That got continued?
A They've all been moved around, yes.
Q In all of the --
A That's the one that's actually now the first of December.
Q In all of the testimony that you've given since June, those were all mold cases?
A Yes.
Q And in each case you were retained as an expert for the defense?
A That's correct.
Q How many cases are you currently working on in litigation matters?
A In general? In everything?
Q All of your litigation consulting work.
A Where I've been retained, not just a contact; right?
Q Right.



A Sure.
Q They paid you a retainer.
A Most of the time they don't pay a retainer, let me just say. But where I assume, so I would -- I'm not going to limit it, but just so you understand the framework of the answer, where they've contacted me and either paid some retainer or they have sent me some work to do. I'd estimate 20 cases.
Q And of those 20 current litigation matters how many of them involved mold?
A Yeah, I'd say all but three or four.
Q And of those 20 cases are there any where you've been retained by the plaintiff's attorney?
A I'll just say no.
Q In calendar year 2003 how much income did you derive from your litigation consulting work?
A I can't answer that because the way it goes through the university. I can't -- I can give you a percent of time, but I actually don't -- the way the university pays me I don't know.
Q How are you paid?
A By the University of California.
Q Well, for example, I just handed you a check for $1,080. It was made out to the Regents. Are you going to get any of that money?

A Yes. I just wasn't sure what you meant how I was paid.
Q So what, every month, every quarter, every what you get a check from the university?
A Okay. You're asking a slightly different question. I was going to answer the first one but --
Q How often do you get paid for --
A I get paid once a month from the university.
Q And part of that is your compensation for your litigation consulting work?
A No, it is not.
Q How often do you get paid for your litigation consulting work?
A Somewhere between every quarter and every six months to every year. It depends on the divisional schedules. I generally quarterly I would expect, but it's not paid in a fashion as litigation consulting, so I was -- wherein the litigation work is paid as part of my medical work for the university is folded in with patient care money, it's folded in with all my activities.
Q What percentage of your income is derived from litigation work?
A I don't know. I say I can't answer that. I can give you a time effort.

Page 26

Q Do you have an accountant?
A Yes, but -- I have an accountant. He wouldn't know. I mean, he just gets the money from the university.
Q Recently you started doing your billing through Legal Cost Consultants, Inc.
A Correct.
Q So, they would have an idea at least for the recent time frame what your litigation consulting billings are?
A They would have billings; correct..
Q And what percentage of the billings -- you know, if there's a $10,000 bill, what percentage ends up in your pocket?
A That's what I was trying to answer earlier. Of the $1,080 you were kind enough to give me, approximately at the end of the day with my current salary structure about 42 percent of it, okay.
Q In addition to the 42 percent of the actual fee that goes to you, is there any other perk that goes to, for example, better raise, better promotion, better something?
A I understand the question. The answer is no.
Q You currently charge $500 an hour for consulting work?

Page 27

A Correct.
Q And $720 an hour for testimony such as you're giving today?
A Correct.
Q Do you know how many hours you billed in the Garry case?
A No, but I can easily find out.
Q Can you estimate how much time you spent in the Garry case?
A I can estimate, but again, a lot better answer would be if we take a break I can get you a number. I'll estimate if you'd like.
Q We'll give an estimate, and if we take a break and we have time you can get an exact number because, just for the record, you bill by the minute; correct?
A That's right. I felt it so high that I try to actually put my watch on and remember it and bill because I think rounding it off is a lot. That's correct. I try to keep it to the minute.
Q And roughly how many hours?
A I would say, and I'm going to -- it's almost a guess when the number is up there. Twenty.
Q In the consulting work that you do in mold related cases, what is the average amount that you end

Page 28

up billing per case?
A I have no clue and I wouldn't even hazard a guess at that.
Q Well, in the Kilian versus Glen Eagles case you billed something in excess of $70,000; correct?
A I don't know. They were billed at separate times. The billing goes through, the money goes through the Regents, so I actually never added it up in the Kilian matter. You may be right; you may be wrong. If I gave you that number, hopefully I looked at some data to give you that information.
Q Well, actually I have your billing statements from Snell and Wilmer.
A That's fine. I think that's how I would get it. That's exactly what I would do.
Q Does that sound about right, sir?
A It could be. I don't have a sound to it. Whatever the hours were, the hours are.
Q The paper that you helped prepare for ACOEM, your coauthors were Bryan Hardin and Bruce Kelman?
A Correct.
Q Neither of those gentlemen are physicians; correct?
A That's correct.

Page 29

Q So, you were the only physician involved in the drafting of that document?
A I'm the only M.D. physician; correct.
Q The toxicity section of the paper was authored primarily by Drs. Hardin and Kelman; correct?
A They wrote the drafts. I reviewed everything, but they were the primary authors of the toxicology section.
Q Are you holding yourself out, sir, as an expert in the toxicity of mycotoxins?
A Not outside the discussions we've had about knowing about dose and effects required for doses. Specific mycotoxins and specific effects, I need to look them up. Some I know. I mean, aflatoxins, there's so many. I don't hold myself out to be an expert in all of them.
Q I want to focus on satratoxin. Do you claim expertise in the toxic effects of satratoxin?
A I have a reasonable knowledge or did last time we talked because we looked at -- on the -- so I have a reasonable knowledge. I wouldn't call myself an expert.
Q Do you know what toxic effects have been observed for satratoxin?
A It would depend on the model and the dose.



It's easier to look at a paper and see what they reported. I just don't --
Q Sir, I'm not asking you if -- I can go out and read papers. What I want to find out today is what's inside your head, and I can't read any paper to answer that question. Only you and your mouth can answer that question, so that's why I asked you.
Can you as you sit here today tell us what the toxic effects are that have been observed from satratoxin?
A I would defer to looking at a primary source to refresh my memory.
Q What are the target tissues or organs of the poison satratoxin?
A That's the same answer. I would defer to look. I have memory, but I don't need to have a memory contest. I can certainly look at information and look it up because I don't keep these things in my head. I don't feel it's necessary as an expert even to know which toxin causes which effect when there are lists of them.
Q What is the toxic dose of satratoxin?
A Again, something one should look up. Depends on the animal species, depends on the weight, depends on the root and is something one could look up



and would look up if one were interested.
Q In terms of inhalation exposure what is the toxic dose of satratoxin measured in micrograms per kilogram body weight?
A It's an unanswerable question because you don't know what toxic end point you're talking about. Again, that's why asking those kinds of questions in my view is best looked at -- we look at the information. I wouldn't attempt to carry it in my head.
Q How long is satratoxin and its metabolites stored in the human tissue?
A Same answer. There was a nice paper recently on half-lives of mycotoxins.
Q What paper was that?
A I don't recall, but there was a paper in the last month that has half-lives of mycotoxins. Most of them are not human obviously and -- but I came across it in the last couple of months, and most of them are days. For any individual toxin, I just don't recall.
Q Do you recall what journal this paper was published in?
A I don't.
Q Do you recall one or more of the authors of this paper?
A I'm going to give you names. Probably



wrong. I think Bruce Kelman might have been an author. You might look under Kelman's name. I know I can find it, but I don't have it down here or obviously in my head. And it's within the last three months, I'll say now.
Q What tissues -- in what tissues are satratoxins and their related metabolites stored in the human body?
A I don't recall. Again, I'll look it up for the same reason. There's different places different toxins are stored.
Q In the ACOEM paper that you worked on there's a discussion about no observable adverse effect levels. In terms of the mycotoxins that were discussed in that paper, what adverse effect was being analyzed or discussed?
A Again, we've been through this before in another setting, and I would just say we need to look at those papers again. It's the Nikulin paper. But I don't have the papers in front of me to remember what end point Rao or Nikulin were using as -- were used as the end points in those papers. That's R-a-o is one, and the other I believe is N-i-k-u-l-i-n, Nikulin.
Q In the ACOEM paper the no observable adverse effect level derived from Dr. Rao's paper is